UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EUGENE BURZOTTA, Individually, and on Behalf of All Others Similarly Situated,<br><br>                Plaintiff,<br><br>vs.<br><br>MANULIFE FINANCIAL CORPORATION,<br><br>                Defendant. | 09 CIV 6185(JFK) |

**MEMORANDUM OF LAW IN SUPPORT OF MOVANT EUGENE BURZOTTA'S MOTION FOR APPOINTMENT AS LEAD PLAINTIFF TO REPRESENT A CLASS PURSUANT TO SECTION 11 OF THE SECURITIES ACT OF 1933 AND FOR APPROVAL OF THE DESIGNATION OF LEAD COUNSEL**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................. 1

STATEMENT OF FACTS ..................................................... 4

ARGUMENT ............................................................... 9

    A.    Movant Should Be Appointed Lead Plaintiff for the DRIP Class .............. 9

        1.    Movant Has Satisfied the Procedural
           Requirements Pursuant to the PLSRA ............................ 9

        2.    Movant is "The Most Adequate Plaintiff" ........................ 9

        3.    Movant is an Adequate Representative of the DRIP Class ........... 10

        4.    A Single Lead Plaintiff Cannot Fairly Represent the DRIP Class ...... 12

    B.    The Court Should Approve Movant's Choice of Lead Counsel ............. 16

CONCLUSION ............................................................ 16

## PRELIMINARY STATEMENT

Plaintiff Eugene Burzotta respectfully submit this Memorandum of Law in support of his motion for appointment as Lead Plaintiff of a class of purchasers of Manulife Financial Corporation common shares which were acquired during the period from March 28, 2008 through June 22, 2009, ("the Class Period") pursuant to a Registration Statement in connection with the Manulife sponsored Dividend Reinvestment Program ("DRIP") (the "DRIP Class"). This Motion is made pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. §77 z-1 and the Securities Act of 1933 (the "Securities Act") to designate Movant Lead Plaintiff for the DRIP Class, and to approve his designation of the law firm of Paskowitz & Associates as Lead Counsel for the DRIP Class.

Movant now asserts only claims pursuant to the Securities Act.[1] Section 11 imposes strict liability against those responsible thereunder, in stark contrast to Section 10(b) of the Exchange Act which imposes on plaintiff the burden to plead and prove fraud pursuant to heightened pleading standards of the Private Securities Litigation Reform Act of 1934 15 U.S.C. § 15 U.S.C. §78u-4. The PSLRA imposes no such burden on claimants pursuant to the Securities Act, 15 U.S.C. § 77z-1, unless of course the DRIP Class is forced into a single complaint with the open market Section 10(b) claims, which may well result in the application of a fraud pleading standard to all claims in such complaint.

---

[1] The initial Complaint in this action asserted claims for the violation of both Section 10(b) of the Exchange Act and Section 11 of the Securities Act. By an Amended Complaint filed herewith, plaintiff now asserts his claims only on behalf of the DRIP Class for violation of the Securities Act. (A copy of the Amended Complaint in this Action is annexed as Exhibit A to the Declaration of Roy L. Jacobs sworn to September 8, 2009, and filed herewith.)

1

Plaintiff recognizes that certain entities with large open-market losses intend to file for Lead Plaintiff designation primarily based on claims pursuant to Section 10(b) of the Exchange Act, and will likely seek to represent *all* Manulife securities purchasers, including the DRIP Class. The better course would be to appoint a separate Lead Plaintiff to represent the DRIP Class and designate a separate Lead Counsel. This course is strongly supported by the current law in this Circuit:

1. The Second Circuit held in *Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2003) that where a plaintiff predicates his case on fraud, the fraud pleading standard will apply to all claims alleged by that plaintiff in the complaint, including Securities Act claims which would otherwise be entitled to be pled as strict liability claims. Thus, the result of combining Section 10(b) and Section 11 claims in one complaint under a *single Lead Plaintiff and Lead Counsel* is a grave error, since it greatly increases the likelihood that the Securities Act claims will be dismissed, when they would otherwise survive. What *Rombach* teaches is that courts must be wary of a single lead plaintiff taking contrary positions that there was fraud and that there was only negligence. This is why courts in this district and the Second Circuit have recently come to the conclusion that separate representation of conflicting claims is crucial, although once this is accomplished, for purposes of efficiency the parties can proceed under a single pleading and pursue the case though a uniform schedule and on an efficient and coordinated basis. *See Zemprelli v. The Royal Bank of Scotland*, 09-CV-300 (DAB) (S.D.N.Y. May 5, 2009)(Ordering appointment of a separate Lead Plaintiff and separate Lead Counsel in case closely paralleling the instant matter to represent purchasers asserting Securities Act claims, and to file a single

complaint and ordering all parties to proceed in a harmonious and efficient manner to prevent a lack of duplication of effort.)(A copy of the Order in *Zemprelli* is annexed hereto as Exhibit A);[2]

2. A single designated Lead Plaintiff with most or all of its losses as a result of open-market purchasers of Manulife shares will seek to protect such claims by pleading a fraud-based complaint to the material detriment of the DRIP Class. Such a single Lead Plaintiff would therefore be conflicted and could not provide adequate representation to the DRIP Class. *See Central States Southeast and South West Areas Health and Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 246 (2d Cir. 2007).(reversing class settlement where class representatives were conflicted in their ability to represent a significant portion of the class; remanded for certification of subclass and the designation of a subclass representative to protect the interests of the unrepresented segment of the class).

For the foregoing reasons, Movant respectfully requests that the Court appoint Movant as the Lead Plaintiff for the DRIP Class so to avoid having the Section 11 claims subjected to the sound-in-fraud- rule through representation by a Lead Plaintiff whose pleading will inevitability be fraud centered on behalf of its clients.[3]

---

[2] This ruling does comport with the Second Circuit holding in *See Central States Southeast and South West Areas Health and Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 246 (2d Cir. 2007) which puts an end to the prior practice of bundling disparate and conflicting claims together under a single Lead Plaintiff.

[3] Separate representation avoids the "disclaimer issue" as to which courts have often deemed a fraud plaintiff's disclaimers ineffective to negate allegations which sound in fraud. *See infra* at pp. 12-13. Buzatta, serving as a separate court designated Lead Plaintiff, will not be faced

## STATEMENT OF FACTS

The Class Period begins on March 28, 2008 with the dissemination by the Company of its Annual Report and Management's Discussion and Analysis annexed to its F-40 filing with the SEC.[4] With respect to its risk management strategies concerning its Segregated Fund Contracts the disclosure stated in relevant part:

> **Risk Management Strategy** We manage assets supporting products that generally pass through investment returns to policyholders, to achieve a target return designed to maximize dividends or credited rates, subject to established risk tolerances. To support wealth management products with fixed credited rates, we invest in fixed income assets that have a term profile generally matching the term profile of the liabilities to the extent assets are available in the market at those terms. Several insurance and wealth management products have guaranteed benefits extending well beyond the term for which fixed income assets are generally available in the market. We manage assets supporting these long-dated benefits to achieve a target return sufficient to support these obligations over their lifetime, subject to established risk tolerances by investing a portion in a diversified basket of non-fixed income assets, with the balance invested in fixed income portfolios.
>
> We evaluate market price and interest rate risk exposures using a variety of techniques and measures that are primarily based on projecting asset and liability cash flows under a variety of future interest rate and market return scenarios. These measures include durations, key-rate durations, convexity, cash flow gaps, shareholders' economic value sensitivity to specific stress scenarios, earnings at risk and economic capital.
>
> Interest rate and credit spread risk arising in our general account, is managed against enterprise-wide economic capital and earnings at risk based limits and economic value sensitivity limits for specific segments. We delegate trading authorities to individuals as well as accountabilities for managing and monitoring interest rate risk. Asset duration, key-rate duration and cash flow targets are reviewed, modified and communicated to portfolio managers with a frequency ranging from daily to annually, depending on the type of liabilities and the frequency and size of potential changes in the liability profiles. We monitor actual

---

with the disclaimer issue, as he will have no fraud allegations to disclaim.

[4] These facts are alleged in Movant's Amended Complaint.

asset positions against targets and rebalance positions to within established interest rate risk exposure limits with a frequency ranging from daily to quarterly, depending on the potential exposure to changes in the profile of assets and liabilities.

We mitigate market price risk arising from our general account non-fixed income investments by investing in a diversified basket of assets consisting of public and private equities, commercial real estate, timberland, agricultural land and oil and gas properties. We manage total non-fixed income asset investments against an established aggregate limit and against aggregate limits for each asset category. To diversify risk, we manage our public and private equity investments against established targets and limits by industry type and corporate connection, commercial real estate investments to established limits by property type and geography, and timber and agricultural land investments to limits by geography and crop. We proactively manage allocations to non-fixed income assets, reflecting management's risk preferences.

We mitigate both market price and interest rate risk arising from off-balance sheet products through benefit guarantee design, limitations on fund offerings, use of reinsurance and capital markets hedging. We design new product benefit guarantees and fund offerings to meet established extreme event risk exposure limits, based on economic capital. We have reinsurance in place on existing business that transfers investment return related benefit guarantee risk, where appropriate. We also employ dynamic capital markets hedging for a portion of our business.

The afore-referenced Risk Management Strategy with respect to Segregated Fund Contracts was materially false and misleading since the non-fixed "diversified" basket of assets was *not diversified* with respect to the risk of material decline its value, and the Company had applied no material hedging strategy with respect to that risk. Indeed, at the very time the Strategy was disseminated to the investing public, the United States economic system was suffering huge negative shocks in the failure of Bear Stearns and Company, Inc. and the equity markets were highly volatile and risky. Yet the Manulife Risk Strategy failed to convey the true nature of the risk. Rather it misled purchasers of Manulife shares to believe that the Risk was controlled when it was not.

5

On February 12, 2009, Manulife issued a press release filed as a 6-K with the SEC announcing its financial results for the fourth quarter and fiscal year 2008. The Company revealed that its reserves for Segregated Fund Contracts had to be increased from $526 million as of December 31, 2007 to an astonishing $5.7 billion for the period ending December 31, 2008. This revelation constituted a partial but not a full disclosure of the wrongdoing. The press release stated, among other things:

> Manulife Financial Corporation ("Manulife") today reported shareholders' net income of $517 million for the year ended December 31, 2008, compared to net income of $4,302 million in 2007. Fully diluted earnings per share were $0.32 compared to $2.78 in 2007. The Manufacturers Life Insurance Company ("MLI") reported an MCCSR ratio of 233 per cent as at December 31, 2008, up from 221 per cent last year.
>
> "As previously disclosed, our results have been negatively impacted by the downturn in global equity markets, particularly in the fourth quarter", said Dominic D'Alessandro, President and Chief Executive Officer, "We have reacted quickly by strengthening our capital base and ensuring that our product strategies remain appropriate for the long term. Despite these very challenging conditions, our core businesses continue to maintain or increase market share and generated record levels of life insurance sales and new business embedded value in 2008."
>
> As a result of the sharp declines in equity markets, balance sheet reserves for segregated fund guarantees were increased to $5,783 million as at December 31, 2008 compared with $526 million at the prior year end. The Company's obligations under its segregated fund guarantees are substantially payable over a thirty year period beginning in seven years. Over the long term, should equity markets recover, portions of these reserves may reverse into net income.
>
> The loss in the fourth quarter of 2008 amounted to $1,870 million or $1.24 per share on a fully diluted basis and differed by $370 million from the estimate of $1,500 million announced on December 2, 2008. A sharp drop in swap interest rates which are used to value segregated fund guarantee liabilities was the major reason for the higher reported loss. The fourth quarter results include a number of non cash items totaling $2,727 million after tax, including $2,407 million for segregated fund guarantees, other equity related losses of $513 million, accruals for credit impairments and downgrades of $128 million, partially offset by

6

changes in actuarial methods and assumptions.

"Unfavourable movements in interest rates late in the quarter exacerbated the impact of unprecedented declines in equity markets," noted Peter Rubenovitch, Senior Executive Vice President and Chief Financial Officer. "Even after this quarter's very sharp drops in equity markets and interest rates, our balance sheet remains strong and our capital levels are amongst the highest we have ever enjoyed."

During the quarter, the Company successfully raised $4,275 million of new capital, consisting of $2,275 million of common shares and $2,000 million of term loans. The common share issue included $1,125 million sold by way of private placement to eight existing institutional investors and $1,150 million, including a fully subscribed over-allotment of $150 million, sold to a syndicate of underwriters in a "bought deal" public offering. The five year term loan was provided by leading Canadian banks, is repayable at the Company's option at any time, without penalty, and is priced on a floating rate basis at one month BAs plus 380 bps.

As a result of the disclosure of this adverse news, the Company's stock declined from $15.25 per share on February 11, 2009, to $9.87 on February 23, 2009. On March 23, 2009, the Company disseminated its Management's Disclosure and Analysis with its 40-F filing, essentially repeating its Risk Management Disclosure disseminated in March 2008.

At the end of March, 2009, Manulife had liabilities to its Segregated Fund Contract customers totaling $103.7 billion to pay death benefits, interest or reimbursement at the terminal of the contract, but had only $74 billion in its portfolio backing the business. While the Company added more than $13 billion to close the gap, Manulife will be likely compelled take future additional accruals to close the gap, reducing earnings per share. Sellers of such annuities receive investments from annuity buyers, invest in stocks, and rely on the assumption that the future value of the stock portfolio will exceed the future annuity liabilities. Annuity sellers similarly situated to Manulife regularly engaged in hedging transactions to manage and

7

mitigate the risk that the future value of the stock portfolio would not be adequate to meet annuity obligations. Manulife did not engage in such hedging relationships.

On June 19, 2009, Canada's primary stock market regulator, the Ontario Securities Commission (the "OSC"), announced it had reached a preliminary conclusion that Manulife had failed to properly disclose the risks associated with its variable annuity guarantee and segregated funds business before March 2009.

When trading markets reopened on June 22, 2009, the Company's shares declined 12%, to close at $17.67, down almost $3 a share, from $20.57, on an unusually high trading volume of almost eight million shares.

It was thereafter reported that the Company failed to hedge the risks of an equity downturn. The Separate Fund Contracts which is at the heart of the Company's problems, sells products similar to personal pension or retirement plans, where Manulife invests a customer's money and promises future payments. Notwithstanding its Risk Management Strategy Manulife built up a massive stock portfolio, which it chose to leave unhedged. This resulted in a huge decline in the funds available to guaranty the Separate Fund Contract obligations, forcing the Company to raise billions in capital to make up for a widening shortfall in the amount it had promised to pay customers decades from now.

## ARGUMENT

**A.  Movant Should Be Appointed Lead Plaintiff for the DRIP Class**

**1.  Movant Has Satisfied the Procedural Requirements Pursuant To the PSLRA**

The PSLRA sets forth the procedure for the selection of lead plaintiffs to oversee securities class actions brought pursuant to the Federal Rules of Civil Procedure. *See* 15 U.S.C. §77z-1(a)(3). First, the plaintiff who files the initial action must, within 20 days of filing the action, publish a notice to the class informing class members of the pendency of the action and their right to file a motion for appointment as lead plaintiff. 15 U.S.C. §77z-1(a)(3)(A)(i). Movant complied with this requirement. See Jacobs Declaration, Ex. B.[5] This notice advised class members of the pendency of the action, the claims asserted therein and the purported class period.

Pursuant to the PSLRA, motions for the appointment of lead plaintiff must be filed "not later than 60 days after the date on which the notice is published" which, in this case, is September 8, 2009. 15 U.S.C. §77z-1(a)(3)(A)(i)(II).

**2.  Movant is "The Most Adequate Plaintiff"**

Movant satisfies the prerequisites of 15 U.S.C. §77z-1(a)(3)(B)(iii)(i), which provides that:

> [T]he court shall adopt a presumption that the most adequate plaintiff in any private action arising under this title is the person **or group of persons** that-

---

[5]  *PR Newswire* service is a suitable vehicle for meeting the statutory requirement that notice be published "in a widely circulated national business-oriented publication or wire service." *Ambruster v. Cellcyte Genetics Corp.*, 2008 U.S. Dist. LEXIS 96288 at *6 (W.D. Wash. April 28, 2008).

9

> (aa) has either filed the complaint or made a motion in response to a notice . . .
>
> (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and
>
> (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure [pertaining to class actions]. (emphasis added)

*Western Pennsylvania Electrical Employees Pension Trust,* 2007 U.S. Dist. LEXIS 95707 at *3. *See generally Greebel,* 939 F. Supp. at 64; *Lax,* 1997 U.S. Dist. LEXIS 11866 at *7.

Movant has served his Amended Complaint and has made a motion to be appointed Lead Plaintiff for the DRIP Class. Movant believe that he has the largest financial interest in the relief sought by the DRIP Class, and is not conflicted by seeking to represent the open market 10(b) purchasers.[6]

### 3. **Movant is an Adequate Representative of the DRIP Class**

According to 15 U.S.C. §77z-1(a)(3)(B), in addition to possessing the largest financial interest in the outcome of the litigation, the lead plaintiff must also "otherwise satisf[y] the requirements of Rule 23 of the Federal Rules of Civil Procedure." Rule 23(a) provides that a party may serve as a class representative if the following four requirements are satisfied:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R. Civ. P. 23(a).

---

[6] Movant is an individual investor who was a member of the Manulife DRIP during the entire Class Period, and acquired Manulife shares through the plans.

Of the four prerequisites to class certification, only two – typicality and adequacy – directly address the personal characteristics of the class representative. Consequently, in deciding a motion to serve as lead plaintiff, the Court should limit its inquiry to the typicality and adequacy prongs of Rule 23(a), and defer examination of the remaining requirements until the lead plaintiff moves for class certification. *See Western Pennsylvania Electrical Employees Pension Trust,* 2007 U.S. Dist. LEXIS 95707 at *4; *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. LaBranche & Co.*, 229 F.R.D. 395, 412 (S.D.N.Y. 2004). Movant satisfies both the typicality and adequacy requirements of Rule 23, have selected competent and experienced class counsel,[7] thereby justifying their appointment as Lead Plaintiffs.

Under Rule 23(a)(3), the claims or defenses of the representative parties must be typical of those of the class. "The typicality requirement is satisfied if the claims and legal theories of the class representatives are the same as those of the absent class members, even though factual distinctions may exist." *Levett v. Chicago Bd. of Educ.*, 2001 U.S. Dist LEXIS 315, at *7 (N.D. Ill. 2001).

Movant seeks to represent a class of purchasers of Manulife common stock that have identical, non-competing and non-conflicting interests. Movant satisfies the typicality requirement because, just like all other DRIP Class members, he purchased Manulife common stock during the Class Period pursuant to an alleged false Registration Statement, and suffered damages.

---

[7] Pursuant to 15 U.S.C. §77z-1(a)(3)(B)(v), lead plaintiff shall, subject to Court approval, select counsel to represent the Class. Movant has selected the Paskowitz & Associates as Lead Counsel for the DRIP Class. This firm has extensive experience in prosecuting complex securities actions and is well qualified to represent the Class. See Jacobs Declaration, Exhibit D.

Under Rule 23(a)(4), the representative parties must fairly and adequately protect the interests of the class. The PSLRA directs this Court to limit its inquiry regarding the adequacy of Movant to represent the DRIP Class to the existence of any conflicts between the interest of Movant and the members of the DRIP Class. The adequacy of representation requirement of Rule 23(a)(4) is satisfied where it is established that a representative party "will fairly and adequately protect the interests of the class." *In re Bank One Secs. Litigation/First Chi. S'holder Claims*, 2002 U.S. Dist. LEXIS 8709, at *8-9 (N.D. Ill. 2002). Representation is adequate when counsel for the class is qualified and competent, and the interests of the representatives are not antagonistic to the interests of absent class members. *Gammon v. GC Serv. Ltd. Partnership*, 162 F.R.D. 313, 317 (N.D. Ill. 1996). Movant has the same claims as the other members of the DRIP Class, has no issues at odds with that Class and has retained competent class counsel.

4.  **A Single Lead Plaintiff Cannot Fairly Represent the DRIP Class**

A single Lead Plaintiff with primarily open-market claims cannot properly represent the Section 11 claims in an amended consolidated complaint. Since the Second Circuit's decision in *Rombach*, this would result in the Securities Act claims being adjudged under a fraud standard. *See In Coronel v. Quanta Capital Holdings Ltd.*, 2009 U.S. Dist. LEXIS 6633, at *44-50 (S.D.N.Y. Jan. 23, 2009)(Citing *Rombach* and dismissing Securities Act claims for failure to plead fraud with particularity: "The Complaint cannot escape this [heightened] pleading standard by disclaiming any reliance on fraud while simultaneously alleging fraud to support their allegations."); *Ladmen Partners, Inc. v. Globalstar, Inc.*, 2008 U.S. Dist. LEXIS 76670, at *30-39, 57-58 (S.D.N.Y. Sept. 30, 2008)(dismissing Section 11 claims that were combined in one complaint with fraud claims for failing to meet high fraud standard, and deeming disclaimers by

plaintiff that the Section 11 claims were not intended to be read as asserting fraud insufficient to overcome arguments based on the *Rombach* ruling ); *In Re Marsh & McLennan Cos. Sec. Litig.* 501 F. Supp. 2d 501 (S.D.N.Y. 2006)(Since the 10(b) fraud claims dominated the complaint, plaintiffs were required to plead the Securities Act claims as fraud claims); *Alstom SA Sec. Litig.* 402 F. Supp. 2d 402, 417 (S.D.N.Y. 2005)(Securities claims pleaded with Exchange Act claims sounded in fraud and were dismissed. Plaintiffs' assertion disavowing any reliance on fraud in pleading the Securities Act claim was viewed by the Court as ineffective.); *In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 598 (S.D.N.Y. 2006)(Disavowal of reliance on fraud in pleading the Securities Act claims held to be ineffective by the court; complaint alleging both Securities Act claims and Exchange Act claims sounded in fraud and were dismissed.). Thus, here there is a real risk that if a single Lead Plaintiff is appointed, the interests of the DRIP Class will be severely prejudiced.

Because a single Lead Plaintiff with primarily open market claims would attempt to maximize recovery for open market purchasers, such Lead Plaintiff would have no incentive in protecting the interests of the DRIP Class. Simply put, one fiduciary cannot represent two masters with diverging interests. [8]

In *Central States Southeast And Southwest Areas Health And Welfare Fund,* v. Merck-Medco Managed Care, L.L.C., 504 F. 3d 229, 246 (2d Cir. 2007), the Second Circuit reversed a

---

[8]  This lesson is as old as the Scriptures:

> No one can serve two masters. Either he will hate the one and love the other, or he will be devoted to the one and despise the other.

Matthew 6.24.

13

class action settlement on the grounds that part of the class whose claims were advanced on a different theory from the claims of the remainder of the class were not adequately represented since the class representatives (which were all from one of the two class segments) would naturally favor their class segment in structuring the settlement to maximize its damage recovery to the expense of the remainder of the class:

> In our view, this conflict among the Plans does not represent a simple disagreement over potential differences in the computation of damages, since the relationship of the Plans to Medco and its effect on each Plan goes to the very heart of the litigation. While we do not here decide whether the self-funded Plans in fact suffered greater injury, we think it proper to allow them to raise their claims as part of a separate subclass. The Self-Funded Plans dispute any recovery to the insured or capitated Plans, yet none of the class representatives is part of an exclusively self-funded plan that could adequately advance this position. Because the antagonistic interests apparent in the class should be adequately and independently represented, we remand to the District Court for certification of a subclass encompassing the self-funded plans in order to better protect their claims in this litigation.

Since the portions of the class could be viewed as antagonistic to each other as each attempted to maximize its share of the settlement, it was necessary that *both* segments to have their own representative to speak only for them. *See Teachers Ret. Sys. v. ACLN Ltd.,* 01 Civ. 11814 (LAP), 2004 U. S. Dist. LEXIS 25927, *13 (S.D.N.Y. Dec. 20, 2004)(adequacy requires that "the plaintiff's interests must not be antagonistic to those of the remainder of the class"). *See also Jacobs v. Citibank, N.A.,* 01 Civ. 8436 (JSR)(KNF), 2003 U.S. Dist. LEXIS 2880, *5 (S.D.N.Y. Feb. 25, 2003) ("A court must examine closely the adequacy of representation by the named class

representative . . . [A]ny potential conflict of interest that might compromise a class representative's ability to represent fairly and adequately the interests of absent class members."[9]

Here, the differences in litigating the claims under the Exchange Act and the Securities Act Class are substantial. Securities Act and Exchange Act claims have different legal elements and are subject to different standards of proof and pleading requirements. *See, e.g., In re Global Crossing, Ltd. Sec. Litig.,* 322 F. Supp. 2d 319, 330, 347 (S.D.N.Y. 2004). Plaintiffs under the Exchange Act must show individualized scienter on the part of executive management. The Securities Act claim has no such requirement. Exchange Act plaintiffs must plead fraud under a heightened pleading standard imposed by the PSLRA, and must prove fraud at trial. Under the Securities Act, Manulife is strictly liability for the falsity of its Registration Statements.

In similar circumstances, courts have appointed an addition Lead Plaintiff as a means of avoiding conflicts and protecting the interests of absent class members. *See Zemprelli v. The Royal Bank of Scotland Group PLC,* 09 Civ-300 (DAB) ( S.D.N.Y. May 5, 2009); *In re Peregrine Sys., Inc. Sec. Litig.,* 02-cv-870-J (RBB), 2002 U.S. Dist. LEXIS 27690, *50 (N.D. Cal. Oct. 2, 2002); *In re Nanophase Techs. Corp. Litig.,* 98 C 3450, 1999 U.S. Dist. LEXIS 16171, *18019 (N.D. Ill. Sep. 30, 1999); *Miller v. Ventro Crop.,* No. C 01-01287 SBA, 2001 U.S. Dist. LEXIS 26027, *38 (N.D. Cal. Nov. 28, 2001). For the same reasons, appointment

---

[9] It also follows that a single Lead Counsel may not represent all purchasers. See S.D.N.Y. L. Civ. R. 1.5(b)(5) (incorporating New York State Rules of Professional Conduct); 22 N.Y.C.R.R. § 1200.7(a) ("a lawyer shall not represent a client if a reasonably lawyer would conclude that . . . the representation will involve the lawyer in representing differing interests"); see also *People v. Carillo,* 218 A.D.2d 505, 505 (N.Y. App. Div. 1995) ("An attorney who simultaneously represents two clients whose interests actually conflict cannot provide effective assistance to either client . . . ."); *Cardinale v. Golinello,* 43 N.Y.2d 288, 296 (1977) ("The standards of the profession exist for the protection and assurance of the clients and are demanding; an attorney must avoid not only the fact, but even the appearance, of representing conflicting interests. . . . [With] rare and conditional exceptions, the lawyer may not place himself in a position where a conflicting interest may, even inadvertently, affect, or give the appearance of affecting, the obligations of the professional relationship").

of a separate Lead Plaintiff is necessary and appropriate to protect the members of the DRIP Class here.

### B. The Court Should Approve Movant's Choice of Lead Counsel

Pursuant to 15 U.S.C. §77z-1(a)(3)(B)(v), the lead plaintiff shall, subject to Court approval, select and retain counsel to represent the Class. *Western Pennsylvania Electrical Employees Pension Trust,* 2007 U.S. Dist. LEXIS 95707 at *5 (E.D. Wisc. Nov. 7, 2007). The Court should not disturb the lead plaintiff's choice of counsel unless it is necessary to "protect the interests of the class." Movant has selected and retained Paskowitz & Associates to serve as Lead Counsel for the DRIP Class. Paskowitz & Associates has extensive experience litigating securities class actions and has successfully prosecuted numerous securities class actions on behalf of injured investors. *See* Jacobs Declaration, Exhibit D.

### CONCLUSION

For the foregoing reasons, Movant respectfully requests that the Court appoint Movant as the Lead Plaintiff for the DRIP Class and approve Paskowitz & Associates as Lead Counsel for the DRIP Class.

Dated: September 8, 2009

Respectfully submitted,

PASKOWITZ & ASSOCIATES

By: _____
Laurence D. Paskowitz (A Member of the
Bar if this Court)
60 East 42nd Street, 46th Floor

16

New York, NY 10165
Telephone: 212-685-0969
Fax: 212-685-2306
Email: lpaskowitz@pasklaw.com

*Proposed DRIP Class Lead Counsel*

Of Counsel:
**ROY JACOBS & ASSOCIATES**
Roy L. Jacobs
60 East 42nd Street, 46th Floor
New York, NY 10165
Telephone: 212-867-1156
Fax: 212-504-8343
Email: rjacobs@jacobsclasslaw.com

## DECLARATION OF SERVICE

I, Roy L. Jacobs, hereby certify that a true and correct copy of Memorandum of Law in Support of Movant Eugene Burzotta's Motion for Appointment as Lead Plaintiff to Represent a Class Pursuant to Section 11 of the Securities Act of 1933 and for Approval of the Designation of Lead Counsel was served on September 8, 2009, via United States First Class Mail, postage prepaid and addressed as follows:

> Manulife Financial Corporation
> 200 Bloor Street East
> North Tower 10
> Toronto, ON M4W 1E5

Roy L. Jacobs