

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EUGENE BURZOTTA, Individually, and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>MANULIFE FINANCIAL CORPORATION,<br><br>Defendant. | 09 CIV 6185 (JFK)<br><br>AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Manulife Financial Corporation ("Manulife" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of securities analysts' reports concerning Manulife; (c) review and analysis of press releases and media reports issued by and disseminated by Manulife; and (d) review of other publicly available information concerning Manulife.

1.  This is a class action against Manulife and certain of its officers and directors for violation of the federal securities laws. Plaintiff brings this action on behalf of himself and all other persons or entities, except for Defendants and certain of their related parties as described below, who purchased Manulife securities (the "Class") during the period March 28, 2008 through June 22, 2009, inclusive (the "Class Period") pursuant to the Manulife Dividend Reinvestment Plan (the "DRIP"), pursuant to Section 11 of the Securities Act of 1933, 28 U.S.C.

77k (the "Securities Act").

## JURISDICTION AND VENUE

2.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, and Section 22 of the Securities Act (15 U.S.C. §77v).

3.  This action arises under Section 11 of the Securities Act (15 U.S.C. 17k.) Venue is proper in this District pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v) and 28 U.S.C. § 1391(b) and (c). Substantial acts in furtherance of the alleged violation and/or its effects have occurred within this District.

4.  In connection with the acts and omissions alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

5.  Plaintiff purchased Manulife securities during the Class Period, pursuant to the Manulife DRIP, as set forth in the certification attached hereto.

6.  Defendant Manulife is a leading Canadian-based financial services group serving millions of customers in 19 countries and territories worldwide whose principal offices are located at 200 Bloor Street East, North Tower 10, Toronto, ON M4W 1E5. Operating as Manulife Financial in Canada and Asia, and primarily as John Hancock in the United States, the Company operates as a life insurance company. It provides various financial protection and wealth management products and services, including individual life insurance, group life and health insurance, long-term care insurance, pension products, annuities, and mutual funds to individual and group customers in Canada, the United States, and Asia.

## CLASS ACTION ALLEGATIONS

7.  Plaintiff brings this as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons who purchased Manulife securities during the Class Period pursuant to the Manulife DRIP. Excluded from the Class are the Defendant, officers and directors of the Company, members of the immediate families of the officers and directors of the Company and each of their legal representatives, heirs, successors or assigns and any entity in which any Defendant has or has had a controlling interest.

8.  This action is properly maintainable as a class action because:

    a.  the members of the proposed Class in this action are dispersed throughout the United States and are so numerous that joinder of all Class members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that Class members number in the thousands.

    b.  Plaintiff's claims are typical of those of all members of the Class because all have been similarly affected by Defendant's actionable conduct in violation of federal securities laws as alleged herein;

    c.  Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class action litigation. Plaintiff has no interests antagonistic to, or in conflict with, the Class that Plaintiff seeks to represent;

    d.  A class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein because joinder of all members is impracticable. Furthermore, because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it virtually

impossible for Class members to redress the wrongs done to them. The likelihood of individual Class members prosecuting separate claims is remote;

  e. Plaintiff anticipates no unusual difficulties in the management of this action as a class action; and

  f. the questions of law and fact common to the members of the Class with respect to the Securities Act claims predominate over any questions affecting individual

  g. Common questions predominate with respect to the Securities Act claims, including whether the DRIP Registration Statements were materially false, and whether the Class members suffered damages.

## SUBSTANTIVE ALLEGATIONS

9. Segregated Fund Contracts are insurance contracts also known as individual variable annuities that offer death benefits and maturity guarantees. Segregated Fund Contracts offer the growth potential of mutual funds, plus valuable wealth protection features.

Segregated Fund Contracts are insurance contracts also known as individual variable annuities that offer death benefits and maturity guarantees. Segregated Fund Contracts offer the growth potential of mutual funds, plus valuable wealth protection features.

10. The Class Period begins on March 28, 2008 with the dissemination by the Company of its Annual Report and Management's Discussion and Analysis annexed to its F-40 filing with the SEC. With respect to its risk management strategies concerning its Segregated Fund Contracts the disclosure stated in relevant part:

> **Risk Management Strategy** We manage assets supporting products that generally pass through investment returns to policyholders, to achieve a target return designed to maximize dividends or credited rates, subject to established risk tolerances. To support wealth management products with fixed credited rates, we invest in fixed income assets that have a term profile generally

matching the term profile of the liabilities to the extent assets are available in the market at those terms. Several insurance and wealth management products have guaranteed benefits extending well beyond the term for which fixed income assets are generally available in the market. We manage assets supporting these long-dated benefits to achieve a target return sufficient to support these obligations over their lifetime, subject to established risk tolerances by investing a portion in a diversified basket of non-fixed income assets, with the balance invested in fixed income portfolios.

We evaluate market price and interest rate risk exposures using a variety of techniques and measures that are primarily based on projecting asset and liability cash flows under a variety of future interest rate and market return scenarios. These measures include durations, key-rate durations, convexity, cash flow gaps, shareholders' economic value sensitivity to specific stress scenarios, earnings at risk and economic capital.

Interest rate and credit spread risk arising in our general account, is managed against enterprise-wide economic capital and earnings at risk based limits and economic value sensitivity limits for specific segments. We delegate trading authorities to individuals as well as accountabilities for managing and monitoring interest rate risk. Asset duration, key-rate duration and cash flow targets are reviewed, modified and communicated to portfolio managers with a frequency ranging from daily to annually, depending on the type of liabilities and the frequency and size of potential changes in the liability profiles. We monitor actual asset positions against targets and rebalance positions to within established interest rate risk exposure limits with a frequency ranging from daily to quarterly, depending on the potential exposure to changes in the profile of assets and liabilities.

We mitigate market price risk arising from our general account non-fixed income investments by investing in a diversified basket of assets consisting of public and private equities, commercial real estate, timberland, agricultural land and oil and gas properties. We manage total non-fixed income asset investments against an established aggregate limit and against aggregate limits for each asset category. To diversify risk, we manage our public and private equity investments against established targets and limits by industry type and corporate connection, commercial real estate investments to established limits by property type and geography, and timber and agricultural land investments to limits by geography and crop. We proactively manage allocations to non-fixed income assets, reflecting management's risk preferences.

We mitigate both market price and interest rate risk arising from off-balance sheet products through benefit guarantee design, limitations on fund offerings, use of reinsurance and capital markets hedging. We design new product benefit guarantees and fund offerings to meet established extreme event risk exposure

limits, based on economic capital. We have reinsurance in place on existing business that transfers investment return related benefit guarantee risk, where appropriate. We also employ dynamic capital markets hedging for a portion of our business.

11. The afore-referenced Risk Management Strategy with respect to Segregated Fund Contracts was materially false and misleading since the non-fixed "diversified" basket of assets was *not diversified* with respect to the risk of material decline its value, and the Company had applied no material hedging strategy with respect to that risk. Indeed, at the very time the Strategy was disseminated to the investing public, the United States economic system was suffering huge negative shocks in the failure of Bear Stearns and Company, Inc. and the equity markets were highly volatile and risky. Yet the Manulife Risk Strategy failed to convey the true nature of the risk. Rather it misled purchasers of Manulife shares to believe that the Risk was controlled when it was not.

12. On February 12, 2009, Manulife issued a press release filed as a 6-K with the SEC announcing its financial results for the fourth quarter and fiscal year 2008. The Company revealed that its reserves for Segregated Fund Contracts had to be increased from $526 million as of December 31, 2007 to an astonishing $5.7 billion for the period ending December 31, 2008. This revelation constituted a partial but not a full disclosure of the wrongdoing. The press release stated, among other things:

> Manulife Financial Corporation ("Manulife") today reported shareholders' net income of $517 million for the year ended December 31, 2008, compared to net income of $4,302 million in 2007. Fully diluted earnings per share were $0.32 compared to $2.78 in 2007. The Manufacturers Life Insurance Company ("MLI") reported an MCCSR ratio of 233 per cent as at December 31, 2008, up from 221 per cent last year.
>
> "As previously disclosed, our results have been negatively impacted by the downturn in global equity markets, particularly in the fourth quarter", said Dominic D'Alessandro, President and Chief Executive Officer, "We have reacted quickly by strengthening our capital base and ensuring that our product

strategies remain appropriate for the long term. Despite these very challenging conditions, our core businesses continue to maintain or increase market share and generated record levels of life insurance sales and new business embedded value in 2008."

As a result of the sharp declines in equity markets, balance sheet reserves for segregated fund guarantees were increased to $5,783 million as at December 31, 2008 compared with $526 million at the prior year end. The Company's obligations under its segregated fund guarantees are substantially payable over a thirty year period beginning in seven years. Over the long term, should equity markets recover, portions of these reserves may reverse into net income.

The loss in the fourth quarter of 2008 amounted to $1,870 million or $1.24 per share on a fully diluted basis and differed by $370 million from the estimate of $1,500 million announced on December 2, 2008. A sharp drop in swap interest rates which are used to value segregated fund guarantee liabilities was the major reason for the higher reported loss. The fourth quarter results include a number of non cash items totaling $2,727 million after tax, including $2,407 million for segregated fund guarantees, other equity related losses of $513 million, accruals for credit impairments and downgrades of $128 million, partially offset by changes in actuarial methods and assumptions.

"Unfavourable movements in interest rates late in the quarter exacerbated the impact of unprecedented declines in equity markets," noted Peter Rubenovitch, Senior Executive Vice President and Chief Financial Officer. "Even after this quarter's very sharp drops in equity markets and interest rates, our balance sheet remains strong and our capital levels are amongst the highest we have ever enjoyed."

During the quarter, the Company successfully raised $4,275 million of new capital, consisting of $2,275 million of common shares and $2,000 million of term loans. The common share issue included $1,125 million sold by way of private placement to eight existing institutional investors and $1,150 million, including a fully subscribed over-allotment of $150 million, sold to a syndicate of underwriters in a "bought deal" public offering. The five year term loan was provided by leading Canadian banks, is repayable at the Company's option at any time, without penalty, and is priced on a floating rate basis at one month BAs plus 380 bps.

13.    As a result of the disclosure of this adverse news, the Company's stock declined from $15.25 per share on February 11, 2009, to $9.87 on February 23, 2009.

14.    On March 23, 2009, the Company disseminated its Management's Disclosure and

7

Analysis with its 40-F filing, essentially repeating its Risk Management Disclosure disseminated in March 2008.

15. At the end of March, 2009, Manulife had liabilities to its Segregated Fund Contract customers totaling $103.7 billion to pay death benefits, interest or reimbursement at the terminal of the contract, but had only $74 billion in its portfolio backing the business. While the Company added more than $13 billion to close the gap, Manulife will be likely compelled take future additional accruals to close the gap, reducing earnings per share. Sellers of such annuities receive investments from annuity buyers, invest in stocks, and rely on the assumption that the future value of the stock portfolio will exceed the future annuity liabilities. Annuity sellers similarly situated to Manulife regularly engaged in hedging transactions to manage and mitigate the risk that the future value of the stock portfolio would not be adequate to meet annuity obligations. Manulife did not engage in such hedging relationships.

16. On June 19, 2009, Canada's primary stock market regulator, the Ontario Securities Commission (the "OSC"), announced it had reached a preliminary conclusion that Manulife had failed to properly disclose the risks associated with its variable annuity guarantee and segregated funds business before March 2009.

17. Investors responded to this news when trading markets reopened on June 22, 2009, plummeting the Company's shares down 12%, to close at $17.67, down almost $3 a share, from $20.57, on an unusually high trading volume of almost eight million shares.

18. It was thereafter reported that the Company failed to hedge the risks of an equity downturn. The Separate Fund Contracts, which are at the heart of the Company's problems, are similar to personal pension or retirement plans, where Manulife invests a customer's money and promises future payments. Notwithstanding its Risk Management Strategy Manulife built up a

massive stock portfolio, which it chose to leave unhedged. This resulted in a huge decline in the funds available to guaranty the Separate Fund Contract obligations, forcing the Company to raise billions in capital to make up for a widening shortfall in the amount it had promised to pay customers decades from now.

## COUNT I

(For Violations of Section 11 of the Securities Act Against Manulife)

19. Plaintiff repeats and realleges each of the preceding paragraphs 1 through 18 as if fully set forth herein.

20. This Count is brought pursuant to § 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all persons or entities who acquired Manulife stock pursuant to the DRIP Registration Statements.

21. The DRIP Registration Statements as amended, were materially false and misleading; contained untrue statements of material facts; omitted to state material facts necessary to make the statements contained therein not misleading; and failed to disclose material facts, in that they incorporated and updated information provided by Manulife, but failed to accurately disclose the Company's hedging strategy as discussed above. The Defendants failed to supplement the Registration Statements to reveal the omitted information concerning the true risk of purchasing Manulife shares.

22. The Company is strictly liable for the false DRIP Registration Statements.

23. By reason of the conduct alleged herein, Defendant violated § 11 of the Securities Act. As a direct and proximate result of Defendant's conduct, Plaintiff and the other members of the class have sustained substantial damage in connection with the purchase of the common stock issued pursuant to and/or traceable to the Prospectus.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, on behalf of himself and all other Class members, prays for judgment as follows:

    A.    A determination that this action is a proper class action and a certification of the Class under Rule 23 of the Federal Rules of Civil Procedure;

    B.    An award of compensatory damages in favor of Plaintiff and the other Class members against the Defendant for damages sustained as a result of Defendant's wrongdoing, including interest thereon;

    C.    An award to Plaintiff and the Class of their reasonable costs and expenses incurred in this action, including counsel fees, expert fees and other disbursements; and

    D.    A grant of such other relief as the Court may deem just and proper.

Dated: September 8, 2009

ROY JACOBS & ASSOCIATES

By: _____

Roy L. Jacobs, Esq. (A Member of the Bar of this Court)

One Grand Central Place
60 E. 42nd Street, 46th Floor
New York, New York 10165
Tel: (212) 867-1156
Fax: (212) 504-8273

rjacobs@jacobsclasslaw.com

and

Laurence D. Paskowitz (a Member of the Bar of this Court)
PASKOWITZ & ASSOCIATES
60 East 42nd Street, 46th Floor New York, New York 10165
Tel: (212) 685-0969
Fax: (212) 685-2306

lpaskowitz@pasklaw.com

*Attorneys for Plaintiff*

## PLAINTIFF'S CERTIFICATE

The undersigned ("Plaintiff") declares, as to the claims asserted under the federal securities laws, that:

1. Plaintiff has reviewed the complaint of Manulife Financial Corporation and certain other defendants.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as approved by the court.

5. During the Class Period (March 28, 2008 through June 22, 2009) Plaintiff purchased common shares of Manulife through the Manulife Dividend Reinvestment Plan, on a quarterly basis. Plaintiff has approximately 600 shares of Manulife common stock.

6. During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws.

7. I declare under penalty of perjury, this 7th day of July 2009 that the information above is accurate.

_Eugene Burzotta_ (signature)
Eugene Burzotta

## DECLARATION OF SERVICE

I, Roy L. Jacobs, hereby certify that a true and correct copy of Plaintiff's Amended Class Action Complaint for Violation of Federal Securities Laws was served on September 8, 2009, via United States First Class Mail, postage prepaid and addressed as follows:

>Manulife Financial Corporation
>200 Bloor Street East
>North Tower 10
>Toronto, ON M4W 1E5

Roy L. Jacobs