UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re MANULIFE FINANCIAL CORP. SECURITIES LITIGATION | : | Master File No. 1:09-cv-06185-JFK |
| | : | |
| | : | CLASS ACTION |
| | : | |
| This Document Relates To: | : | PLAINTIFFS' MEMORANDUM OF LAW |
| | : | IN OPPOSITION TO DEFENDANTS' |
| ALL ACTIONS. | : | MOTION TO DISMISS THE AMENDED |
| | x | CLASS ACTION COMPLAINT |

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ...................................................................................1

II.   STATEMENT OF FACTS ......................................................................................3

    A.    The Company and Its Guaranteed Products ..........................................................3

    B.    Defendants Mislead Investors about Manulife's Exposure to Stock Market Declines ...............................................................................................................4

    C.    The Truth Gradually Emerges ..............................................................................7

    D.    Post-Class Period Events ......................................................................................9

    E.    The *Financial Post* Article ...............................................................................10

III.  ARGUMENT ...........................................................................................................11

    A.    Applicable Legal Standards.................................................................................11

    B.    The AC Pleads Actionable Misstatements and Omissions .................................13

        1.    Defendants' Statements Are Alleged to Have Been False and Misleading When Made..................................................................................13

        2.    Defendants' Misrepresentations Were Material.......................................17

        3.    Defendants Cannot Establish a Truth on the Market Defense.................21

    C.    Plaintiffs Have Sufficiently Alleged Facts Giving Rise to a Strong Inference of Scienter .........................................................................................25

    D.    The AC Adequately Alleges Loss Causation ......................................................31

    E.    The AC Adequately Alleges a Control Person Claim..........................................35

IV.   CONCLUSION ........................................................................................................35

# TABLE OF AUTHORITIES

**Page**

CASES

*Acito v. IMCERA Group, Inc.,*
    47 F.3d 47 (2d Cir. 1995) ................................................................................. 16

*Ashcroft v. Iqbal,*
    129 S. Ct. 1937 (2009) .................................................................................... 12

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
    493 F.3d 87 (2d Cir. 2007) ............................................................................... 31

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ........................................................................................ 12

*Billhofer v. Flamel Techs. SA.,*
    663 F. Supp. 2d 288 (S.D.N.Y. 2009) ........................................................ 19, 20

*Citiline Holdings, Inc. v. iStar Financial, Inc.,*
    No. 08-cv-03612-RJS, slip op. (S.D.N.Y. Mar. 26, 2010) ............................ 16, 27

*City of Sterling Heights Police & Fire Retirement System v. Abbey National, PLC,*
    423 F. Supp. 2d 348 (S.D.N.Y. 2006) ............................................ 16, 17, 19, 34

*Cornwell v. Credit Suisse Group,*
    No. 08 Civ. 3758 (VM), 2010 U.S. Dist. LEXIS 13927
    (S.D.N.Y. Feb. 11, 2010) ................................................................................. 12

*Cortec Inds., Inc. v. Sum Holding L.P.,*
    949 F.2d 42 (2d Cir. 1991) .............................................................................. 35

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,*
    553 F.3d 187 (2d Cir. 2009) ........................................................................ 19, 25

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,*
    343 F.3d 189 (2d Cir. 2003) ........................................................................ 31, 34

*Fort Worth Employers' Ret. Fund v. Biovail Corp.,*
    615 F. Supp. 2d 218 (S.D.N.Y. 2009) ............................................................... 34

*Ganino v. Citizens Utils. Co.,*
    228 F.3d 154 (2d Cir. 2000) ........................................................................ 17, 21

*Glidepath Holding B.V. v. Spherion Corp.,*
    590 F. Supp. 2d 435 (S.D.N.Y. 2007) ............................................................... 34

**Page**

*Hall v. Children's Place Retail Stores, Inc.*,
  580 F. Supp. 2d 212 (S.D.N.Y. 2008) ...........................................................*passim*

*Heller v. Goldin Restructuring Fund, L.P.*,
  590 F. Supp. 2d 603 (S.D.N.Y. 2008) ................................................................29

*In re Alstom SA Sec. Litig.*,
  406 F. Supp. 2d 433 (S.D.N.Y. 2005) ................................................................28

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
  324 F. Supp. 2d 474 (S.D.N.Y. 2004) ................................................................30

*In re Bausch & Lomb, Inc. Sec. Litig.*,
  No. 01-CV-6190 (CJS), 2003 U.S. Dist. LEXIS 24062
  (W.D.N.Y. Mar. 28, 2003)................................................................................23

*In re Bayer AG Sec. Litig.*,
  No. 03 Civ. 1546 (WHP), 2004 U.S. Dist. LEXIS 19593
  (S.D.N.Y. Sept. 30, 2004)................................................................................17

*In re Cardinal Health Inc. Sec. Litig.*,
  426 F. Supp. 2d 688 (S.D. Ohio 2006)..............................................................17

*In re Citigroup Inc. Sec. Litig.*,
  330 F. Supp. 2d 367 (S.D.N.Y. 2004) ................................................................19

*In re Countrywide Fin. Corp. Sec. Litig.*,
  588 F. Supp. 2d 1132 (C.D. Cal. 2008) .............................................................15

*In re Downey Sec. Litig.*,
  No. 08-CV-3261-JFW (RZx), 2009 WL 2767670
  (C.D. Cal. Aug. 21, 2009)................................................................................17

*In re DRDGold Ltd. Sec. Litig.*,
  472 F. Supp. 2d 562 (S.D.N.Y. 2007) ................................................................20

*In re Dura Pharm., Inc. Sec. Litig.*,
  548 F. Supp. 2d 1126 (S.D. Cal. 2008) .............................................................19

*In re eSpeed, Inc. Sec. Litig.*,
  457 F. Supp. 2d 266 (S.D.N.Y. 2006) ................................................................30

*In re EVCI Colls. Holding Corp. Sec. Litig.*,
  469 F. Supp. 2d 88 (S.D.N.Y. 2006)........................................................14, 22, 25

**Page**

*In re Global Crossing, Ltd. Sec. Litig.,*
  322 F. Supp. 2d 319 (S.D.N.Y. 2004) ..............................................................27

*In re IMAX Sec. Litig.,*
  587 F. Supp. 2d 471 (S.D.N.Y. 2008) ..............................................................31

*In re Initial Pub. Offering Sec. Litig.,*
  544 F. Supp. 2d 277 (S.D.N.Y. 2008) ..............................................................31

*In re Huntington Bancshares Inc. Sec. Litig.,*
  No. 2:07-cv-1276, 2009 WL 4666455
  (S.D. Ohio Dec. 4, 2009) .................................................................................16

*In re JPMorgan Chase & Co. Sec. Litig.,*
  MDL No. 1783, 2007 U.S. Dist. LEXIS 93877
  (N.D. Ill. Dec. 18, 2007) .................................................................................11

*In re Loewen Group Inc. Sec. Litig.,*
  No. 98-6740, 2004 U.S. Dist. LEXIS 16601
  (E.D. Pa. Aug. 18, 2004) .................................................................................11

*In re McKesson HBOC, Inc. Sec. Litig.,*
  126 F. Supp. 2d 1248 (N.D. Cal. 2000) ............................................................11

*In re Moody's Corp. Sec. Litig.,*
  599 F. Supp. 2d 493 (S.D.N.Y. 2009) ............................................ 19, 20, 29, 34

*In re Nash Finch Co. Sec. Litig.,*
  502 F. Supp. 2d 861 (D. Minn. 2007) ..........................................................17, 29

*In re Nortel Networks Corp. Sec. Litig.,*
  238 F. Supp. 2d 613 (S.D.N.Y. 2003) ..............................................................12

*In re NovaGold Res. Inc. Sec. Litig.,*
  629 F. Supp. 2d 272 (S.D.N.Y. 2009) ..........................................................17, 18

*In re Omnicom Group, Inc. Sec. Litig.,*
  541 F. Supp. 2d 546 (S.D.N.Y. 2008) ..............................................................32

*In re Parmalat Sec. Litig.,*
  376 F. Supp. 2d 472 (S.D.N.Y. 2005) ..............................................................32

*In re Pfizer Inc. Sec. Litig.,*
  584 F. Supp. 2d 621 (S.D.N.Y. 2008) ..............................................................35

**Page**

*In re Sadia, S.A. Sec. Litig.*,
   No. 08 Civ. 9528 (SAS), 2009 U.S. Dist. LEXIS 66998
   (S.D.N.Y. July 29, 2009) ...................................................................31

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001) ...................................................... 12, 26, 27

*In re Scholastic Sec. Litig.*,
   No. 97 Civ. 2447 (JFK), 1998 U.S. Dist. LEXIS 13910
   (S.D.N.Y. Aug. 31, 1998) ...................................................................23

*In re Scottish Re Group Sec. Litig.*,
   524 F. Supp. 2d 370 (S.D.N.Y. 2007) .................................................29

*In re Viropharma, Inc. Sec. Litig.*,
   No. 02-1627, 2003 U.S. Dist. LEXIS 5623
   (E.D. Pa. Apr. 7, 2003) .......................................................................17

*In re Vivendi Universal, S.A. Sec. Litig.*,
   381 F. Supp. 2d 158 (S.D.N.Y. 2003) .................................................21

*In re Vivendi Universal, S.A., Sec. Litig.*,
   634 F. Supp. 2d 352 (S.D.N.Y. 2009) .................................................34

*In re Xethanol Corp. Sec. Litig.*,
   No. 06 Civ. 10234 (HB), 2007 U.S. Dist. LEXIS 65935
   (S.D.N.Y. Sept. 7, 2007) .....................................................................30

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001) ...............................................................12

*Lapin v. Goldman Sachs Group, Inc.*,
   506 F. Supp. 2d 221 (S.D.N.Y. 2006) .................................................20

*Lasker v. N.Y. State Elec. & Gas Corp.*,
   85 F.3d 55 (2d Cir. 1996) ...................................................................19

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005) ...............................................................31

*Middlesex Ret. Sys. v. Quest Software, Inc.*,
   No. CV 06-6863 DOC (RNBx), 2008 U.S. Dist. LEXIS 68419
   (C.D. Cal. July 10, 2008).....................................................................29

Page

*Miss. Pub. Emples. Ret. Sys. v. Boston Scientific Corp.*,
    523 F.3d 75 (1st Cir. 2008)........................................................................15, 28

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) .................................................................12, 18, 26

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*,
    595 F.3d 86 (2d Cir. 2010) ...........................................................................12, 25

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*,
    538 F. Supp. 2d 662 (S.D.N.Y. 2008).................................................................16

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
    347 Fed. Appx. 617 (2d Cir. 2009) .....................................................................35

*Phelps v. Kapnolas*,
    308 F.3d 180 (2d Cir. 2002) ...............................................................................12

*Podany v. Robertson Stephens, Inc.*,
    318 F. Supp. 2d 146 (S.D.N.Y. 2004).................................................................20

*Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*,
    645 F. Supp. 2d 210 (S.D.N.Y. 2009).................................................................34

*Pollio v. MF Global, Ltd.*,
    608 F. Supp. 2d 564 (S.D.N.Y. 2009).................................................................20

*Roth v. Jennings*,
    489 F.3d 499 (2d Cir. 2007) ...............................................................................23

*Rubin v. MF Global, Ltd.*,
    634 F. Supp. 2d 459 (S.D.N.Y. 2009).................................................................19

*Shields v. Citytrust Bancorp., Inc.*,
    25 F.3d 1124 (2d Cir. 1994) ...............................................................................30

*South Cherry St., LLC v. Hennessee Group LLC*,
    573 F.3d 98 (2d Cir. 2009) .................................................................................26

*Steinberg v. Ericsson LM Tel. Co.*,
    No. 07-CV-9615-RPP, 2008 WL 5170640
    (S.D.N.Y. Dec. 10, 2008) ...................................................................................20

**Page**

*Steiner v. Medquist, Inc.*,
No. 04-5487 (JBS), 2006 U.S. Dist. LEXIS 71952
(D.N.J. Sept. 29, 2006) ...................................................................................33

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 .................................................................................... 25, 26

**STATUTES, RULES AND REGULATIONS**

Federal Rules and Civil Procedure
9(b) ............................................................................................... 12, 13
10b-5 ............................................................................................... 1, 17
12(b)(6) ........................................................................................... 11, 12

Private Securities Litigation Reform Act of 1995 ........................................ 11, 12, 13

Securities Exchange Act of 1934
Section 10(b) ........................................................................................1
Section 20(a) ........................................................................................1

**SECONDARY AUTHORITIES**

*Financial Post* article entitled, "Inside the fortress: Drama behind Manulife's doors," by
Theresa Tedesco, January 30, 2010 ...........................................................*passim*

Lead Plaintiffs Locals 302 and 612 of the International Union of Operating Engineers-Employers Construction Industry Retirement Trust, Western Washington Laborers-Employers Pension Trust and the California Ironworkers Field Pension Trust ("Plaintiffs") respectfully submit this Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Amended Class Action Complaint, dated December 29, 2009 (the "AC"), cited herein as "¶__") filed by Defendants Manulife Financial Corporation ("Manulife" or the "Company"), Dominic D'Alessandro ("D'Alessandro") and Peter Rubenovitch ("Rubenovitch") (collectively, "Defendants").

## I.    PRELIMINARY STATEMENT

This is a federal securities fraud class action brought on behalf of United States purchasers of the common stock of Manulife between March 28, 2008 and March 3, 2009, inclusive (the "Class Period"), alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5.

Defendant Manulife sells investment products in which it guarantees future payments to customers ("Guaranteed Products"), irrespective of the value of the customers' investment accounts. Under applicable regulations, Manulife is required to maintain sufficient capital reserves to ensure that it can make good on the guarantees. Generally, the level of these reserves is based upon the ratio of the present day value of customers' investment portfolios to the future payments the Company is obligated to make, such that rises in the value of the portfolios reduce the reserve requirements and *vice versa*. Accordingly, investors in Manulife are keenly focused on the Company's capital reserves and whether those reserves are sufficient.

Throughout the Class Period, Defendants misleadingly downplayed the Company's exposure to stock market declines and instead represented that the Company was positioned to succeed even in turbulent market conditions. In truth and in fact, Manulife was amassing over $101 billion in exposure to the stock markets, without hedging that exposure against the risk that the markets might

- 1 -

decline. This exposure threatened the Company's financial position and meant that the Company would have to raise significant amounts of capital, thereby diluting the interests of existing shareholders. Defendants, however, concealed these risks from investors.

As the markets fell over the course of the Class Period, so too did the value of the investment portfolios that Manulife had guaranteed, causing the shortfall that Manulife was responsible for paying to grow from just $2 billion to over $27 billion. Yet, in response to analysts' and investors' questions, Defendants continued to represent that the declining markets were not negatively impacting the Company's financial position.

Then, in October 2008 – when market conditions were rapidly deteriorating – Defendants represented to investors that Manulife's balance sheet and capital levels remained strong, and that the Company was "well-positioned" to withstand the declines. Nothing could be further from the truth. Defendants also dismissed investor concern about the risk that Manulife would have to shore up the required capital reserves backing its Guaranteed Products as "grossly exaggerated," and stated that the Company would not need to issue equity. At the very same time that Defendants were making these assurances, the Canadian insurance regulatory authority, the Office of the Superintendent of Financial Institutions (the "OSFI"), was raising concerns about Manulife's market exposure, had instituted a series of intensive reviews of the Company's financial condition, and was insisting that Manulife increase its capital reserves immediately by engaging in a series of transactions to raise capital.[1]

---

[1] This information is contained in a January 30, 2010 *Financial Post* article entitled, "Inside the fortress: Drama behind Manulife's doors," by Theresa Tedesco, annexed as Exhibit A to the Declaration of Samuel H. Rudman, dated March 29, 2010. References to "Rudman Ex. __" are to the exhibits to that declaration.

- 2 -

Now, Defendants assert the time worn "fraud by hindsight" argument. A fair reading of the AC, however, reveals that it sufficiently alleges that Defendants knowingly or recklessly made materially false and misleading statements. Moreover, as discussed herein, Defendants' dismissal arguments – which boil down to a claim that they supposedly disclosed the risks posed by Manulife's market exposure, and that any misrepresentations that they made were immaterial – are not meritorious.

Accordingly, for these reasons, and as set forth below in further detail, it is respectfully submitted that Defendants' motion to dismiss should be denied in its entirety.

## II.    STATEMENT OF FACTS

### A.    The Company and Its Guaranteed Products

Manulife is a Canadian life insurance and financial services company headquartered in Toronto, with operations in Canada, the United States and Asia. ¶¶2, 34.[2]

At issue in this case are Manulife's segregated fund and variable annuity investment products, *i.e.*, the Guaranteed Products. ¶38. While the features of these products vary, they each allow customers to invest in selected funds, while limiting investment risk by guaranteeing a minimum level of future benefits, such as periodic payments upon retirement. ¶38. In exchange for these guaranteed benefits, customers pay hefty fees and agree to hold the product for a specified period of time. ¶39. Manulife, in turn, relies on the assumption that the future value of the invested funds will exceed the guaranteed payment obligations; if not, Manulife is responsible for the shortfall. ¶39. The OSFI, which regulates insurance companies in Canada, requires Manulife to maintain adequate capital reserves to support these guaranteed payment obligations, which it assesses by, among other things, comparing available capital to various risk metrics. ¶40.

---

[2]    Manulife operates primarily through John Hancock in the United States. ¶¶34-35.

Because Manulife is responsible for any shortfall between the value of the investment portfolios held by its Guaranteed Product customers and the amount of guaranteed payments, stock market declines increase the likelihood that the value of those investment portfolios will fall below the minimum level of guaranteed payments, and that Manulife would have to make up the difference. *See* ¶¶5, 42. As a result, the sale of these Guaranteed Products caused Manulife to build up a massive amount of equity market exposure. By the end of the Class Period, this exposure grew to approximately $101 billion. *See* ¶¶5, 45, 49, 52, 59, 61, 110.

One way that other companies who sell similar products mitigate for the risk of being exposed to the equity market is to hedge their exposure through the use of financial derivative products. Manulife, however, did not hedge, as doing so would have cut into the Company's profits. This decision left the Company exposed to the risk that stock market declines would leave it with inadequate reserves to cover its guaranteed payments under the applicable regulatory capital requirements. ¶¶4, 59. By not hedging the Company's Guaranteed Products, Defendants were betting that the markets would continue to rise. ¶¶4, 45, 49, 52, 56, 59.

## B.    Defendants Mislead Investors about Manulife's Exposure to Stock Market Declines

During the Class Period, Defendants touted the Company's supposedly "prudent" and "proactive[]" risk management, and represented that Manulife was "well-diversified across risk categories" and that the Company had a "clear focus on . . . managing the risk profile of . . . [its variable annuity] business." ¶¶44, 48, 55. In truth and fact, Manulife's risk management was not "prudent" or "proactive," but instead was entirely dependent on the tenuous assumption that the stock markets would continue to rise in the future, and that Manulife would not face an equity market decline. *See* ¶¶45, 49, 52, 59. Nor was the Company's risk exposure "diversified," because Manulife had built up a massive amount of unmitigated exposure to the equity markets through its

Guaranteed Products, and therefore, the Company's fortunes were highly correlated to those of the stock markets. *See id.* Accordingly, Manulife's risk exposure was much greater, and its risk profile was much worse, than the Company represented publicly. *Id.*

Defendants also fostered the misleading impression that Manulife's risk management framework was designed to protect investors against the very type of earnings losses and capital strain that ultimately occurred as a result of the Company's equity market exposure. For example, Manulife's 2007 annual report stated that: (i) "[r]isks will only be assumed that are ***prudent in relation to the Company's capital strength and earnings capacity*** . . . [and that] allow us to ***remain diversified across risk categories***" (¶44); (ii) "[t]he Company's aggregate exposure to equities is managed against enterprise-wide economic capital and earnings at risk based limits" (¶51); and (iii) [t]he Company's risk management programs were "designed to keep potential losses . . . within acceptable limits." ¶50.[3]

In May 2008, when the markets began to decline, Defendant D'Alessandro assured investors that "[t]he diversified nature of our company, combined with a prudent risk management framework" and a "long-standing philosophy of . . . rigorous risk management[,]" enabled Manulife to "successfully weather . . . . volatile equity markets," and meant that the Company could "expect to do well ***no matter*** what and ***how turbulent the financial markets get***." ¶58. The following quarter, in August 2008, D'Alessandro lauded Manulife's ***"strong balance sheet"*** and reiterated that the Company was "***position[ed] . . . well*** to compete in all market conditions." ¶68. In truth, Manulife's

---

[3] The Company's 2007 Annual Report also misled investors into believing that hedging was part of Manulife's risk management strategy for its Guaranteed Products, by stating that: (i) "Risk mitigation activities, such as . . . hedging . . . are used to ensure our aggregate risk remains within our risk appetite and limits" (¶48); (ii) "We mitigate both market price and interest rate risk arising from off-balance sheet products through . . . capital markets hedging" (¶51); and (iii) "We also employ dynamic capital markets hedging for a portion of our business" (*id.*).

balance sheet was highly vulnerable to equity market declines, and the Company was not well-positioned to withstand the turmoil in the stock markets.  ¶69.

During Manulife's May 8, 2008 conference call, in response to analysts' questions, Defendants also stated that, in contrast to their prior practice, Manulife was implementing and ramping up hedging programs to stem the equity market exposure from its Guaranteed Products, that hedging was "very much on the front burner[,]" and that going forward, Manulife would "probably be doing more hedging."  ¶65.

In October 2008, when the stock markets plummeted in value, analysts and investors raised concerns about the Company's capital reserve requirements for its Guaranteed Products and the impact that deteriorating market conditions could have on the Company.  ¶¶8, 74.  In response, Defendants characterized those concerns as "*grossly exaggerated*" (¶¶8, 77-78), and made a number of misleading reassurances about Manulife's vulnerability to a stock market downturn:

- "Manulife remains *conservatively reserved* [and] has a *high quality balance sheet[,]*" its capital reserves provide a "*high level of assurance*," and the Company [is] *well positioned* to weather these difficult times[.]"  ¶74.

- Manulife would "continue to manage its regulatory capital" and Defendants had "*no plans to issue common equity*."  ¶74.

- "We remain very well capitalized and we have no intention to issue equity capital, contrary to speculation . . . ."  ¶77.

- "[T]he capital resources of the company, *under almost any reasonable expectation of what's going to happen, are more than adequate* today[,]" but "if markets do deteriorate . . . we'll go and do something *else* to re-establish our capital levels . . . ."  ¶78.

- "We think that Manulife was side-swiped by the meltdown in the markets in a way that *grossly exaggerated any impact* that they're going to have on us."  ¶78.

- 6 -

- "External equity capital raising is not anticipated to be necessary to maintain our fourth quarter capital ratios[,]" and "*we're well-positioned to cover existing exposures*, even with market conditions at current levels and as they persist in the future . . . ." ¶81.[4]

These statements downplayed the significant risk that, as a consequence of Manulife's massive, unmitigated equity market exposure, a downturn in the stock market would require Manulife to shore up the capital reserves backing its Guaranteed Products, which in turn would have a devastating impact on the Company's balance sheet. ¶¶5, 45, 49, 52, 61, 66, 71, 75, 79, 82. As a result of that exposure, Defendants had no reasonable basis for their repeated, adamant reassurances that Manulife's capital levels were more than adequate and that the Company was well-positioned to withstand the huge declines that were occurring in the markets without issuing equity.

Despite these reassurances, just three weeks later, on November 6, 2008, Defendants announced that the Company had obtained a $3 billion loan "to provide additional regulatory capital[.]" ¶¶86, 88. Defendant D'Alessandro, however, denied that the loan was a sign of trouble, stating that "[e]ven with the decline in global equity markets since September 30th, our capital position is a *very comfortable* one." ¶86. When an analyst asked about Manulife's hedging of its Guaranteed Products during the November 6, 2008 conference call, Defendant Rubenovitch responded that, "[w]e do have a program in place. It hedges a *substantial portion* . . . of the product." ¶91.

## C. The Truth Gradually Emerges

Defendants could only downplay Manulife's exposure to the stock market and keep up their denials about the potential impact of that exposure for so long. On December 2, 2008, in direct contravention to Defendants' vehement reassurances just seven weeks earlier that Manulife would

---

[4] As detailed further herein, at the very time Defendants were making these statements, Canadian insurance regulators were in Manulife's offices telling the Company that it needed to raise capital. *See infra*. pp. 10-11.

not need to issue equity, Defendants announced that the Company was issuing over *$2 billion* in common shares in order to strengthen the capital reserves backing its Guaranteed Products – one of the largest share issuances in Canadian history. ¶94. Defendants also revealed that the Company anticipated substantially increasing those reserves to $5 billion by the end of 2008 (compared to $526 million at the start of the year), including a $2.7 billion increase in the fourth quarter alone. ¶95. As a result, Manulife anticipated a fourth quarter 2008 loss of *$1.5 billion*. *Id.*

With the announcement of Manulife's fourth quarter and full year 2008 financial results on February 12, 2009, Defendants confirmed these capital reserve increases and earnings losses (which turned out to be even greater than anticipated), announcing reserve increases of $5.78 billion and a massive fourth quarter 2008 loss of more than *$1.8 billion*. ¶97. Defendant Rubenovitch further revealed that the "amount at risk" from Manulife's Guaranteed Products had grown to an astounding *$27 billion*, meaning that Manulife had guaranteed future payments to policyholders that totaled $27 billion *more* than the amount contained in the investment portfolios associated with those guarantees – a shortfall that Manulife was responsible for covering. ¶99.

Defendant Rubenovitch also quantified, for the first time, the estimated impact that additional stock market declines would have on Manulife's earnings, equating a 10% drop with a $1.6 billion earnings reduction. ¶102. Finally, Defendant D'Alessandro admitted that the Company had been "late in activating" hedging programs for its Guaranteed Products. ¶104.

Manulife's stock tumbled as the market absorbed these announcements, falling from $17.50 per share on December 1, 2008 to $14.15 per share on February 13, 2009. After Fitch Ratings downgraded Manulife on February 27, 2009, citing the Company's "outsized, unhedged equity market exposure[,]" Manulife's stock closed at $10.15 per share. ¶¶105-06.

On March 2, 2009,[5] Defendant Rubenovitch made a presentation to analysts at a conference in Scottsdale, Arizona, during which he disclosed additional details about the damage that Manulife's equity market exposure had inflicted on its balance sheet, including:

- Manulife's Guaranteed Products had reduced 2008 earnings by over $2.8 billion. ¶108.

- Had it not been for the significant earnings reduction due to the Company's equity market exposure, Manulife's disappointing 2008 earnings of just $517 million would have been $3.7 billion greater, or $4.26 billion, in line with the Company's 2007 earnings. *Id.*

- The value of the funds associated with Manulife's Guaranteed Products totaled $74 billion, and the Company's guaranteed future payments exceeded that amount by nearly $27 billion, meaning that Manulife had made payment guarantees totaling $101 billion. *Id.*

- Despite this incredible amount of exposure, the Company's expected profit from its Guaranteed Products was only $135 million. *Id.*

- The Company's significant increase in its capital reserves, to $5.78 billion, still only covered 40% of the current amount at risk. *Id.*

The presentation also discussed Manulife's belated efforts to reduce this exposure going forward by implementing more significant hedging programs for its Guaranteed Products and refining product features. ¶109. Following the presentation, Manulife's share price declined further, closing at $7.90 per share on March 3, 2009, the last day of the Class Period. ¶110.

**D.    Post-Class Period Events**

In Manulife's 2008 Annual Report, filed after the end of the Class Period on March 26, 2009, Defendants discussed the efforts that were underway to strengthen the inadequate risk management practices that had allowed the Company to build up such a massive amount of exposure to stock market declines. ¶111. On May 7, 2009, Manulife announced that it had taken another massive earnings charge of nearly $1.1 billion in the first quarter of 2009 to further strengthen the capital

---

[5]    Paragraphs 11, 108 and 147 of the AC incorrectly refer to the date of Rubenovitch's presentation as March 2, 2008.  The correct date is March 2, 2009.

reserves backing its Guaranteed Products.  ¶112.  Defendants also stated that going forward, the Company was diversifying its risk positions.  *Id.*

Then, on June 19, 2009, Manulife announced that it had received an enforcement notice from Canada's primary stock market regulator, the Ontario Securities Commission (the "OSC"), stating that the agency was investigating Manulife, and had reached a preliminary conclusion that, prior to March 2009, the Company had failed to adequately disclose its exposure to market price risk arising from its Guaranteed Products.[6]  ¶¶13, 116.  The same day, Defendant Rubenovitch resigned as CFO.  ¶119.

### E.    The *Financial Post* Article

An article appearing in Canada's *Financial Post* on January 30, 2010, subsequent to the filing of the AC, revealed, among other things, that as far back as April 2006, Manulife's chief risk officer had made a presentation warning Defendant D'Alessandro that the Company's balance sheet "could not absorb the growing equity risk" stemming from its Guaranteed Products.  Rudman Ex. A at 2.  By early 2008, Manulife's board members were urging Defendant D'Alessandro to hedge Manulife's exposure and curtail the sale of its Guaranteed Products.  Rudman Ex. A at 3.

The *Financial Post* article also revealed that in **October 2008** – at the same time that Defendants were denying that Manulife would need to issue equity – the OSFI, concerned about Manulife's risk exposure from its Guaranteed Products, was raising questions about the Company's risk controls, had begun a series of "activity reviews" of Manulife's financial condition, was ***adamant that Manulife shore up its capital position immediately, and "insisted [that Manulife] do a series of transactions."***  Rudman Ex. A at 3-4.

---

[6]   Upon information and belief, the OSC investigation remains ongoing.

According to the *Financial Post* article, on November 12, 2008, the OSFI issued a "supervisory letter" informing Manulife that it had raised its "intervention stage rating" on the Company, indicating that it had identified deficiencies that could lead to serious "material safety and soundness concerns." Rudman Ex. A at 5. Following a meeting in early December 2008, the OSFI informed Manulife that it continued to harbor concerns about the Company's "growing exposure to equity markets" and about "board approved risk-tolerance policies[.]" Rudman Ex. A at 5-6.

The *Financial Post* reported that, at the OSFI's request, Manulife retained accounting firm Deloitte & Touche to conduct an independent examination of the Company's risk-management processes for its Guaranteed Products. Rudman Ex. A at 6. On February 3, 2009, the OSFI raised Manulife's composite risk rating to "above average," the second-highest rating, meaning that the Company's risk exposure was not sufficiently mitigated by its capital and earnings. Rudman Ex. A at 7. The OSFI cited Manulife's "continued exposure to negative movements in the equity markets and senior management's failure to effectively control the risk." *Id*.[7]

## III.    ARGUMENT[8]

### A.    Applicable Legal Standards

In ruling on motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must construe the complaint liberally, accept all factual allegations as true, and draw all reasonable inferences in the

---

[7]    If the Court deems it necessary, the facts from the *Financial Post* article can be included in an amended complaint. *See In re Loewen Group Inc. Sec. Litig*., No. 98-6740, 2004 U.S. Dist. LEXIS 16601, at *20 (E.D. Pa. Aug. 18, 2004) ("[m]edia [s]ources can satisfy the heightened pleading requirements of the [PSLRA]"); *see also In re JPMorgan Chase & Co. Sec. Litig*., MDL No. 1783, 2007 U.S. Dist. LEXIS 93877, at *14 (N.D. Ill. Dec. 18, 2007) (holding that "newspaper articles satisfy the heightened PSLRA pleading requirements if (1) they are based on an independent investigative effort, (2) they are sufficiently particular and detailed to indicate their reliability, and (3) Plaintiffs' counsel conducted its own independent investigation which corroborates the information in the article"); *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000) (newspaper article that corroborates plaintiff's investigation and "provides detailed factual allegations" together with other alleged facts is a reasonable source under the PSLRA).

[8]    Citations and internal quotations are omitted, and emphasis is added, unless otherwise noted.

plaintiff's favor. *See Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir. 2010). At issue on such a motion "'is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims.'" *Phelps v. Kapnolas*, 308 F.3d 180, 184-85 (2d Cir. 2002). In essence, "'[a] pleading is not a trial and plaintiffs are not required to marshal their evidence and sustain a verdict at this stage.'" *In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 621 (S.D.N.Y. 2003). Accordingly, a complaint "attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," but rather must simply provide the grounds of entitlement to relief and raise a right to relief above the speculative level. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) ("[a]sking for plausible grounds . . . does not impose a probability requirement at the pleading stage").

Although securities fraud actions are subject to the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. §78u-4, *et seq.*, and Fed. R. Civ. P. 9(b), a plaintiff is not required to plead "detailed evidentiary matter[,]" *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001), but simply sufficient facts "to support a reasonable belief" that defendants' statements were materially false or misleading. *Novak v. Kasaks*, 216 F.3d 300, 314 n.1 (2d Cir. 2000). Accordingly, a complaint must merely particularize the allegedly false or misleading statements (or omissions), allege circumstances giving rise to a strong inference that they were made with scienter, and allege a causal link between the actionable statements and the plaintiff's loss. *Cornwell v. Credit Suisse Group*, No. 08 Civ. 3758 (VM), 2010 U.S. Dist. LEXIS 13927, at *13-*14 (S.D.N.Y. Feb. 11, 2010) (citing *Novak*, 216 F.3d at 306 and *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001)).

Accepting Plaintiffs' allegations as true and drawing all reasonable inferences in their favor, the motion to dismiss should be denied.

**B.      The AC Pleads Actionable Misstatements and Omissions**

      **1.      Defendants' Statements Are Alleged to Have Been False and Misleading When Made**

As detailed herein, Manulife built up a huge amount of exposure to the stock markets through the sale of its Guaranteed Products – an amount that had reached $101 billion by the end of the Class Period.  *See* ¶¶5, 45, 49, 52, 59, 61, 110.  By choosing to leave that exposure largely unhedged against the risk that the markets might decline, Defendants left the Company's fortunes highly dependent upon the stock markets, and essentially made a risky wager that markets would continue to rise in the future.  *See* ¶¶4, 49, 52, 56, 59.  Despite this, Defendants' Class Period statements consistently concealed, downplayed and misrepresented Manulife's true vulnerability to the adverse market conditions that were occurring throughout the Class Period and the damage that a stock market downturn could inflict on the Company's balance sheet.  *See, e.g.*, ¶¶58, 68, 74, 77-78, 81.

In what has become a usual refrain in securities litigation, Defendants contend that that these allegations amount to "fraud by hindsight" because, after each set of challenged statements, the AC recites these explanations, among others, as the reasons that Defendants' Class Period statements were false and misleading when made, or were made in reckless disregard for their truth.  *See* Def. Mem. at 18-22.[9]  Aside from the fact that Defendants improperly ask this Court to disregard the well-pled allegations of the AC and give ***them*** the benefit of every favorable inference, a fair reading

---

[9]  Despite their charge that the AC is "long on rhetoric but wholly lacking in specificity" (Def. Mem. at 4), Defendants actually concede that the AC adequately sets forth the allegedly false and misleading statements, identifies the speakers, sets forth where and when the statements were made, and alleges the circumstances of the fraud, as required by Fed. R. Civ. P. 9(b) and the PSLRA.  *See* Def. Mem. at 2, 19 (citing the AC's explanations).  They claim only that the AC does not allege that the statements were false and misleading when made.  This contention is without merit.

of the AC amply supports an inference that the statements at issue here were materially false and misleading *when made*. *See In re EVCI Colls. Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 96 (S.D.N.Y. 2006) ("Each statement is followed by a paragraph identifying precisely what facts defendants knew but failed to disclose when the statement was made.").

Defendants did not simply "fail to predict" that the stock markets could suffer large declines. Rather, *as that situation was unfolding*, Defendants contemporaneously issued repeated denials about the adverse impact that market turmoil could have on the Company's balance sheet. As stock market conditions worsened over the course of the Class Period, those denials became increasingly strong. *See* ¶58 (stating, in May 2008, that Manulife could "expect to do well no matter . . . how turbulent the financial markets get."); ¶68 (stating, in August 2008, that Manulife had a "strong balance sheet" and was "position[ed] . . . well to compete in all market conditions[.]"); ¶¶74, 81 (in October 2008, when the markets plummeted, continuing to tell investors that Manulife was "well-positioned to weather these difficult times" and "well-positioned to cover existing [equity market] exposures, *even with* market conditions at current levels and as they persist in the future[.]"). In October 2008, when the stock markets were tanking, Defendants even went so far as to dismiss investor concern about the impact this could have on Manulife because of the capital reserve requirements for its Guaranteed Products as "grossly exaggerated." ¶¶77-78. At the same time however, the OSFI was raising identical concerns and insisting that Manulife shore up its capital position immediately by engaging in "a series of transactions." Rudman Ex. A at 4.

Even though Manulife's capital reserves, and in turn, its balance sheet, were highly vulnerable to the market turmoil that was occurring, Defendants continued to extol the Company's "high quality balance sheet" and to characterize its capital reserves as "conservative[,]" providing a

"high level of assurance" (¶74), and "more than adequate" "under almost any reasonable expectation of what's going to happen" (¶78), and stated that Manulife "remain[ed] very well capitalized" (¶77).

All the while, the shortfall between the value of the investment portfolios held by purchasers of Manulife's Guaranteed Products, and the amount of future payments that Manulife had guaranteed to those customers, was mushrooming from approximately $2 billion at the end of 2007, to over $27 billion by the end of the Class Period, placing enormous strain on Manulife's capital reserves. *See* ¶53 (Table 3); ¶99.[10]  Instead of accurately informing investors about the substantial risks posed by this growing exposure, Defendants' statements placated and misled investors into believing that even in the face of a continued downturn, Manulife's Guaranteed Products did not pose a material risk to the Company's balance sheet or capital levels.  Unbeknownst to investors however, the OSFI was insisting that Manulife increase its capital reserves (Rudman Ex. A. at 4), which the Company eventually did by issuing common shares (a measure that Defendants had assured investors would not be necessary), and by taking successive quarterly earnings charges of $1.8 billion the fourth quarter of 2008, and $1.1 billion the following quarter, after the end of the Class Period.  ¶¶81, 94, 97, 112.  "[A]t the pleadings stage, a bad outcome truly is relevant to the likelihood of fraud." *Miss. Pub. Emples. Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75, 90 (1st Cir. 2008) (observing that although "[t]he law proscribes the pleading of fraud by hindsight," a plaintiff cannot "be expected to plead fraud with complete insight").[11]

---

[10]  The Company's 2007 Annual Report even dismissed the amount at risk from its Guaranteed Products as "a theoretical value only."  ¶53 (Table 3 n.2).

[11]  For these reasons, the court should reject Defendants' repeated attempts to blame Plaintiffs' losses on the financial crisis and to portray themselves as innocent victims of that crisis. *See, e.g.*, *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1174 (C.D. Cal. 2008) (rejecting company's attempt to blame plaintiffs' loss on the sub-prime mortgage crisis).

In this respect, this case is analogous to *City of Sterling Heights Police & Fire Retirement System v. Abbey National, PLC*, 423 F. Supp. 2d 348 (S.D.N.Y. 2006) ("*Abbey*"), in which a bank allegedly misrepresented the health of its "investment portfolio, in light of its substantial holdings" in companies like Enron. *Id*. at 352. As the collapse of these companies adversely affected the bank, defendants continued to represent that business remained "sound" and that they had instituted "very conservative" provisions and measures to "reduce its risk profile[.]" *Id*. at 359. The court observed that "[i]f it is true that defendants knew the direness of the situation and failed to acknowledge that truth, then the[ir] statements and omissions. . . were false and misleading." *Id*. at 361; *see also Citiline Holdings, Inc. v. iStar Financial, Inc.*, No. 08-cv-03612-RJS, slip op. at 2, 8 (S.D.N.Y. Mar. 26, 2010) (Rudman Ex. B) (statements, *inter alia*, that "there was 'a lot of room for things to go wrong and for us to still be okay[,]'" that the company was focused on risk management, and that the company's "portfolio was 'performing pretty much as expected,' despite the deterioration in the real estate market" were materially false and misleading when made where defendants allegedly knew the portfolio was suffering losses). Here as well, Defendants concealed, downplayed, and failed to acknowledge the extent of Manulife's exposure to equity market declines because of its Guaranteed Products. These allegations support a reasonable inference that Defendants' statements were materially false and misleading when made.[12]

---

[12]   Accordingly, this is not a case where Plaintiffs are seeking to hold Defendants liable for failing to predict reasonably unforeseeable problems that later materialized, as in *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 53 (2d Cir. 1995) (where two previous FDA inspections indicated that a plant was improving, defendants' failure to predict that the plant would fail a third inspection was not actionable), *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 672 (S.D.N.Y. 2008) (failure to warn, in a registration statement, of a "much-later materialization of a quality control problem" was not actionable), *In re Huntington Bancshares Inc. Sec. Litig.*, No. 2:07-cv-1276, 2009 WL 4666455, at *12 (S.D. Ohio Dec. 4, 2009) (failure to predict that loan loss reserves would turn out to be inadequate not actionable where defendants had no reason to know of the deterioration of a client's sub-prime mortgage portfolio "prior to. . . [the client's] own announcement

## 2.    Defendants' Misrepresentations Were Material

"At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161-62 (2d Cir. 2000). Materiality is a mixed question of law and fact that is generally inappropriate for resolution on a motion to dismiss. *See In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 292 (S.D.N.Y. 2009). Plaintiffs have satisfied this standard in the AC. Defendants simply cannot establish that the misleading representations, which they seek to characterize as "puffery," corporate optimism, or expressions of opinion (Def. Mem. at 24-28), were "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Id.*

Defendants first attempt to portray their statements about Manulife's risk management as immaterial "puffery" (Def. Mem. at 25-26), a defense whose acceptance by the courts has been "increasingly rare." *In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 749 n.70 (S.D. Ohio 2006). Statements may be deemed "puffery" only when they are so "exaggerated or general" that they "make no specific claims on which [investors] can rely." *In re Bayer AG Sec. Litig.*, No. 03 Civ. 1546 (WHP), 2004 U.S. Dist. LEXIS 19593, at *37 (S.D.N.Y. Sept. 30, 2004); *see also Abbey*, 423 F. Supp. 2d at 357 ("While mere puffery is insufficient to state a claim of securities fraud, public statements must be 'consistent with reasonably available data' and should not misrepresent existing facts.").[13] Not only did Defendants characterize Manulife's risk management as "prudent" and

_____

that it was having problems"), and *In re Downey Sec. Litig.*, No. 08-CV-3261-JFW (RZx), 2009 WL 2767670, at *5 (C.D. Cal. Aug. 21, 2009) (plaintiffs made unsupported allegations that company's loan-loss reserves were understated, based solely on later increases). Def. Mem. at 20.

[13] "To determine whether a statement is puffery, a court must examine the context in which the statement was made." *In re Viropharma, Inc. Sec. Litig.*, No. 02-1627, 2003 U.S. Dist. LEXIS 5623, at *20 (E.D. Pa. Apr. 7, 2003); *see also In re Nash Finch Co. Sec. Litig.*, 502 F. Supp. 2d 861, 879 (D. Minn. 2007) (holding that although certain statements were "not independently actionable,"

"proactive[,]" and claim that the Company was "well-diversified across risk categories" and "clear[ly] focus[ed] on managing the risk profile" of its Guaranteed Products (¶¶44, 48, 55), but they also specifically described Manulife's risk management framework as designed to protect against the very type of earnings losses and capital strain that ultimately occurred as a result of the Company's equity market exposure. *See* ¶44 (stating that Manulife only took risks that were "prudent in relation to the Company's capital strength and earnings capacity"); ¶¶50-51 (stating that Manulife's "exposure to equities" was "managed against . . . capital and earnings at risk based limits" that were "designed to keep potential losses . . . within acceptable limits"). In May 2008, when adverse market conditions were beginning to set in, Defendants cited Manulife's "prudent" and "rigorous" "risk management framework" as the ***specific reason*** for the Company's supposed ability to weather these conditions. ¶58. These statements are hardly so exaggerated or general as to undermine reliance, and are simply "too specific to be considered mere puffery." *NovaGold*, 629 F. Supp. 2d at 302.

Further, Defendants' statements about Manulife's risk management cannot be considered "puffery" because Defendants "allegedly knew that the contrary" was true. *See Novak*, 216 F.3d at 315. Defendants had decided ***not*** to actively manage Manulife's growing equity market exposure from its Guaranteed Products and instead had left that exposure largely unhedged and exposed to market price risk in order to increase short-term profitability. While Defendants argue that this was simply a business decision about how to "manage the risk" (*see* Def. Mem. at 26), a reasonable investor surely would not have understood this *laissez-faire* approach as "prudent" or "proactive," or "rigorous" risk management, and thus would have been misled by these characterizations of

_____

when "considered in context" they were "not immaterial puffery").

Manulife's risk management.  ¶¶44, 58.[14]

 Likewise, Defendants' repeated reassurances, as market conditions worsened, that Manulife's balance sheet was strong, that the Company had more-than-adequate capital reserves, and that it was "well-positioned" to withstand stock market declines, were anything but mere puffery or vague statements of corporate optimism as Defendants seek to portray them.  Def. Mem. at 24-25; *see* ¶¶68, 78, 81.  Rather, they were a ***direct response*** to investor concerns about the exposure that Manulife had to the severe market turmoil (concerns that Defendants dismissed as "grossly exaggerated") (¶¶77-78), and were intended to, and did, assuage those concerns.  *See Abbey*, 423 F. Supp. 2d at 361 (statements were material where they "were often made in response to specific inquiries about the riskiness of Abbey's portfolio").

 "Taken together, as the authors undoubtedly intended," *Billhofer v. Flamel Techs. SA.*, 663 F. Supp. 2d 288, 299 (S.D.N.Y. 2009), these statements were unquestionably significant enough to alter the total mix of information available to investors.  *See, e.g.*, *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 509 (S.D.N.Y. 2009) (Moody's statements about its "independence" were not puffery); *In re Dura Pharm., Inc. Sec. Litig.*, 548 F. Supp. 2d 1126, 1144 n.15 (S.D. Cal. 2008) (finding "defendants' representations of being 'on track' to bring the inhaler to market . . . sufficiently specific [so as] to avoid dismissal as non-actionable puffery").

 Defendants' attempt to characterize their statements downplaying the possibility that

---

[14]  Plaintiffs here are not alleging that Manulife made statements generally describing its risk management practices, which then failed to prevent a bad investment, as in *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 205-06 (2d Cir. 2009), *Rubin v. MF Global, Ltd.*, 634 F. Supp. 2d 459, 473 (S.D.N.Y. 2009) and *In re Citigroup Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004).  Def. Mem. at 22, 26; *see also id.* at 26 (citing *Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996)) (similar statements about "financial integrity" were puffery).  Rather, the AC alleges that Defendants made materially false and misleading statements about the nature of Manulife's risk management strategies and misrepresented the efforts that the Company was supposedly making to mitigate equity market risk.

Manulife would have to issue equity as immaterial statements of opinion and optimism is similarly unavailing. Def. Mem. at 27-28. "[O]ptimistic statements may be actionable upon a showing that the defendants did not genuinely or reasonably believe the positive opinions they touted . . . ***or that the opinions imply certainty***." *Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 239 (S.D.N.Y. 2006); *see also Moody's*, 599 F. Supp. 2d at 509 (statements were actionable because "even if . . . [they] were ones of intention or desire, they also 'imply certainty'"). Defendants' unequivocal assurances that "[e]xternal equity capital raising is not anticipated to be necessary to maintain our fourth quarter capital ratios . . . even with market conditions at current levels and as they persist in the future" (¶81), that they had "no plans" and "no intention to issue [common] equity capital, contrary to speculation" (¶¶74, 77), and if necessary, the Company would do "something ***else*** to re-establish [its] capital levels" – *i.e.*, something ***other*** than issuing dilutive equity (¶78) – plainly implied certainty. *Cf.* Def. Mem. at 28. And, in light of the fact that the OSFI was insisting that Manulife shore up its capital position immediately by "do[ing] a series of transactions" (Rudman Ex. A at 4) at the very same time that Defendants were issuing these guarantees, Defendants had no reasonable basis for their positive reassurances. "In this context, Defendants' 'vague statements' were actually statements that implied certainty when, in fact, Defendants' purportedly had little reason to believe them."[15] *Lapin*, 506 F. Supp. 2d at 240; *see also Billhofer*, 663 F. Supp. 2d at 299 (holding that representations that program was a "success" and that interest in the company's technologies "has never been higher" were not mere puffery where defendants had no

---

[15] The fact that Defendants did not have a reasonable basis to genuinely or sincerely believe their positive assurances distinguishes this case from each of those cited by Defendants. Def. Mem. at 24-25 (citing *Pollio v. MF Global, Ltd.*, 608 F. Supp. 2d 564, 571 (S.D.N.Y. 2009); *Steinberg v. Ericsson LM Tel. Co.*, No. 07-CV-9615-RPP, 2008 WL 5170640, at *9 (S.D.N.Y. Dec. 10, 2008); *In re DRDGold Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 568-69 (S.D.N.Y. 2007); *Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 154 (S.D.N.Y. 2004)).

reasonable basis for making those "categorical claims"); *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 182 (S.D.N.Y. 2003) (finding statements that a company was "financially solid" to be actionable where defendants did not have a reasonable basis for them).[16]

Accordingly, Defendants' positive statements touting Manulife's "prudent" risk management, praising its "strong" balance sheet and more-than-adequate capital reserves, and stating that the Company was "well-positioned" to withstand the stock market declines that were occuring and would not need to issue equity minimized Manulife's true risk exposure from its Guaranteed Products, lacked a reasonable basis, and misled investors. *See, e.g.*, ¶¶44, 58, 68, 74, 77-78, 81. In context, these statements are not so general that no reasonable investor would rely on them, and the AC cannot properly be dismissed on the ground that they are immaterial. *See Ganino*, 228 F.3d at 162.

### 3.    Defendants Cannot Establish a Truth on the Market Defense

All of Defendants' arguments that they fully disclosed Manulife's exposure to stock market declines, or that the market was already aware of that exposure, invoke, but fail to establish, a "truth on the market" defense. *See* Def. Mem. at 19-23; *Ganino*, 228 F.3d at 167. To establish a truth on the market defense, "the corrective information must be conveyed to the public 'with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by' the alleged misstatements." *Id.* Whether the relevant information was adequately disclosed is generally "a fact-intensive query that cannot be disposed of on a motion to dismiss." *Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 229 (S.D.N.Y. 2008) (citing *Ganino*, 228 F.3d at 167).

---

[16]  Defendants' criticism that these allegations "rely on mischaracterizations of the Defendants' statements" and things that they "did not say" (Def. Mem. at 19, 27) is nothing more than a transparent (and inappropriate) attempt to engage in factual disputation.

Here, for example, the broad disclaimers contained in Manulife's 2007 annual report (made prior to the onset of market turmoil) that: (i) "[m]arket price volatility . . . may lead to asset returns insufficient to support product liabilities, and may impact the value of assets in our shareholders' equity accounts"[17] and (ii) "[a] sustained decline in stock markets could reduce asset-based fee revenues and increase the cost of guarantees associated with our variable products" (Auby Ex. 1 at 24; *see* Def Mem. at 1, 6; *see also id.* at 20), hardly contained the "degree of intensity and credibility" necessary to counter-balance Defendants' numerous misstatements discussed herein downplaying the impact of the steep stock market declines that were occurring throughout the Class Period. *Hall*, 580 F. Supp. 2d at 229; *see also EVCI*, 469 F. Supp. 2d at 102 (holding that disclosure "was not 'meaningful' because [the company] did not disclose that the risk factors were not merely hypothetical (*i.e.*, they 'could' happen), but were in fact happening").

Defendants' statement that market declines would reduce "shareholder economic value" did not disclose the potential earnings impact of such declines. Auby Ex. 1 at 22; *see also* Def. Mem. at 6, 20. "[S]hareholder economic value" referred to: "the net present value of future cash flows related to current assets, recurring premiums to be received and product benefit and expenses to be paid, all discounted at market yields adjusted for tax" (Auby Ex. 1 at 24), and had nothing to do with the earnings exposure from Manulife's Guaranteed Products. Defendants' only warning about that potential impact, made in November 2008, near the end of the Class Period, was that it "may be material." Auby Ex. 9 at 4; *see* Def. Mem. at 10; *see also id.* at 20. In fact, Defendants did not begin to quantify the earnings impact that further equity market declines would have until February

---

[17]  The phrase "shareholders' equity account" may fairly be read as referring to the investment portfolios held by purchasers of Manulife's Guaranteed Products, since there is no such equity account for purchasers of its common shares. *See* Auby Ex. 1 at 24. References to "Auby Ex. ___" are to the exhibits to the Declaration of Scott N. Auby, Esq., dated February 12, 2010, submitted in support of Defendants' motion.

12, 2009, after the truth about Manulife's exposure had already begun to emerge, equating a 10% market drop with a quarterly earnings reduction of $1.6 billion. ¶102. While Defendants contend that analysts understood that the regulatory *capital reserves* that Manulife was required to hold for its Guaranteed Products would increase in a "non-linear" manner as the markets declined (Def. Mem. at 21 n.6), they give no indication that analysts, let alone ordinary investors, understood the exponential nature of the *earnings* impact that steep stock market declines could have. *See* ¶120 (the *Toronto Star* reporting, on June 20, 2009, that "investors have complained that they were not properly informed of the risk" related to Manulife's Guaranteed Products, "particularly in a steep stock market decline").[18]

The same analysis holds true for Defendants' selective statements about Manulife's hedging initiatives. Def. Mem. at 22-23. *Compare, e.g.*, ¶¶48, 51 ("hedging . . . [is] used to ensure our aggregate risk remains within our risk appetite and limits" and "[w]e mitigate . . . market price . . . risk . . . through . . . capital markets hedging"); ¶65 (hedging was "very much on the front burner" and going forward, Manulife would "probably be doing more hedging") *with* Auby Ex. 7 at 6; *see*

---

[18] Defendants' reliance on documents upon which Plaintiffs neither relied nor referenced in the AC, such as eight Canadian securities analyst reports, is inappropriate in the context of this motion. *See, e.g.*, *In re Scholastic Sec. Litig.*, No. 97 Civ. 2447 (JFK), 1998 U.S. Dist. LEXIS 13910, at *5 (S.D.N.Y. Aug. 31, 1998) (striking conference call transcript and analyst reports where complaint did not reference them and they were not integral to it); *see also In re Bausch & Lomb, Inc. Sec. Litig.*, No. 01-CV-6190 (CJS), 2003 U.S. Dist. LEXIS 24062, at *53 (W.D.N.Y. Mar. 28, 2003) (striking conference call transcript). Far from asking the Court to merely acknowledge the existence of these materials, Defendants ask the Court to assume the truth of their contents. *See* Def. Mem. at 4 n.2 (arguing that the Court need not accept as true the AC's allegations that "are contradicted by matters of which this Court may take judicial notice"); *see also Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007) (holding that "SEC filings could not properly be considered for the truth of their contents"). Defendants also improperly ask the Court to give them the benefit of every favorable factual inference arising from those materials. *See, e.g.*, Def. Mem. at 22 (relying upon analyst reports to "demonstrate" what "investors understood"); *id.* at 31 n.11 (arguing that stock chart Defendants created "undercuts any inference" that a "decline resulted from corrective disclosures, rather than the continuing market decline"). Moreover, unlike the freely-available materials upon which Plaintiffs rely, the foreign analyst reports appear to have been available by purchase only.

Def. Mem. at 9 ("we're going to do more hedging but the volatility and cost of using hedging is very very high"). Defendant Rubenovitch's statement, during the May 8, 2008 conference call, that "we do hedge a portion, but by and large we retain the risk" (Auby Ex. 3 at 10; *see* Def. Mem. at 2, 7) was undermined and contradicted by his statement *six months later*, during the November 6, 2008 conference call – after the markets had fallen dramatically, and analysts and investors were expressing increased concerns about the Company's equity exposure – that Manulife now had "a program in place . . . [that] hedge[d] a *substantial portion*" of its Guaranteed Products. ¶91. These statements were at best equivocal, and misled investors into believing that Manulife was taking material steps to mitigate its exposure to market price risk, when in fact that exposure was continuing to grow largely unchecked. *See* ¶66. Even Defendants' statements about Manulife's belated efforts to hedge some of its new guaranteed business failed to inform investors that those initiatives would do virtually nothing to reduce the Company's equity exposure, the vast majority of which stemmed from previously-issued Guaranteed Products that remained unhedged. ¶¶66, 93. In any event, hedging just $3 to $3.5 billion of Manulife's equity market exposure from its Guaranteed Products – which investors discovered at the end of the Class Period had grown to $101 billion – certainly did not constitute hedging a "substantial portion" of that exposure. ¶¶65, 91. *See Hall*, 580 F. Supp. 2d at 229 ("Disclosures such as the 'ratcheting down' of the Disney Stores remodeling efforts did not fully reveal the numerous breaches of the License Agreement that occurred during 2006-2007.").

The fact that Defendants made limited statements about the impact of equity market declines (*see* Def. Mem. at 6-11, 20) does not undermine the falsity of their statements where Defendants also downplayed the significance of that impact, by telling investors that Manulife's balance sheet and capital reserves were strong and the Company was well-positioned to absorb the exposure from its

Guaranteed Products. *See Operating Local 649*, 595 F.3d at 92 ("The veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers."). Likewise, since investors did not have an accurate picture of the impact that significant stock market declines could have on the Company's balance sheet – in light of Defendants' denials that there would be any material impact – they could not adequately asses whether Manulife's limited hedging efforts meaningfully reduced that exposure.

At bottom, whether Defendants' purported disclosures were sufficient to counter-balance their misstatements presents disputed issues of fact, which courts have routinely recognized are not inappropriate for resolution on a motion to dismiss. *See Hall*, 580 F. Supp. 2d at 229.

### C.    Plaintiffs Have Sufficiently Alleged Facts Giving Rise to a Strong Inference of Scienter

In the Second Circuit, a plaintiff may plead a strong inference of scienter, *i.e.*, a mental state embracing intent to deceive, manipulate or defraud, by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or which show that a defendant had the motive and opportunity to commit fraud. *See ECA*, 553 F.3d at 198. Even in light of this requirement, however, a "plaintiff is not required to prove his case; only to raise a reasonable and strong inference of scienter." *EVCI*, 469 F. Supp. 2d at 99. Moreover, while the inference of scienter "must be cogent and compelling," it "need not be irrefutable . . . or even the 'most plausible of competing inferences,'" but merely "*at least as likely* as any plausible opposing inference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324, & 328 (2007) (emphasis in original). "The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23 (emphasis in original).

To plead conscious misbehavior or recklessness through circumstantial evidence, a plaintiff

must allege, "conduct that 'at the least is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *South Cherry St., LLC v. Hennessee Group LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (emphasis omitted). "[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information that contradicted their public statements." *Novak*, 216 F.3d at 308. The key question is whether "defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Id.*[19]

Here, the AC contains allegations that support a strong inference that Defendants had access to information that undermined their positive assurances that Manulife's balance sheet and capital levels were strong and that the Company continued to be well-positioned to absorb the impact of the worsening market turmoil. While Defendants were making those assurances, they knew, as the *Financial Post* later reported, that the OSFI had initiated a series of "activity reviews" of Manulife's financial condition, based on the regulator's concerns about Manulife's risk exposure from its Guaranteed Products and the adequacy of its capital reserves. Rudman Ex. A at 3-4. That risk exposure was rapidly expanding over the course of the Class Period, from $2.1 billion to over $27 billion. *See* ¶53 (Table 3); ¶99. The sheer magnitude of this more than twelve-fold increase in the amount at risk from Manulife's Guaranteed Products is further evidence that Defendants recklessly ignored and disregarded the huge risks posed by the growing shortfall. *See Scholastic*, 252 F.3d at

---

[19]  Although Defendants criticize the absence of motive allegations such as insider sales in the AC (Def. Mem. at 14), the U.S. Supreme Court held in *Tellabs* held that "the absence of a motive allegation is not fatal" and that "the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint." *Tellabs*, 551 U.S. at 325.

77 (size of $24 million in special charges "undermines, at the pleading stage," defendants' argument that they were unaware of events negatively affecting financial results); *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 347 (S.D.N.Y. 2004) ("the scope of the fraud alleged may appropriately be considered in determining whether scienter has been adequately pled"); *see also Hall*, 580 F. Supp. 2d at 229 (observing that the number of alleged breaches of a licensing agreement suggested that the parties' relationship "was being mismanaged and in danger of being terminated"). In fact, the *Financial Post* reported that, as far back as April 2006, Manulife's chief risk officer explicitly warned Defendant D'Alessandro in a presentation that the Company's balance sheet "***could not absorb [this] growing equity risk***." Rudman Ex. A at 2. *See Scholastic*, 252 F.3d at 72 (pre-class period information is relevant to establish defendants' knowledge of the true facts even before the start of the class period). By the start of the Class Period, some of Manulife's board members were urging Defendant D'Alessandro to hedge Manulife's exposure and curtail the sale of its Guaranteed Products. Rudman Ex. A at 3.

In October 2008, Defendants also denied that a common share issuance was under consideration, at the very same time that the OSFI was pressuring them to "do a series of transactions" to shore up Manulife's capital reserves. Rudman Ex. A at 4. Just seven weeks later, the Company issued $2.1 billion in equity, one of the largest share issuances in Canadian history, which surely was not put together overnight. ¶94. The proximity in time between Defendants' denials and the share issuance also provides strong circumstantial evidence of conscious misbehavior and recklessness. *See Citiline Holdings*, No. 08-cv-03612-RJS, slip op. at 2-3, 8 (proximity in time between defendants' statements that their loan loss reserves were adequate on December 6, 2007, sixteen business days before the end of the quarter, and their February 28, 2008 announcement of impairment charges and increases in loan loss provisions supported a strong inference of scienter);

*see also Boston Scientific*, 523 F.3d at 91 (holding that "[t]he extremely short time period" (seven days) between statements about resolving a product's problems, and its recall, was "strong evidence" of scienter).

Further, despite Defendants' characterizations of the Company's risk management as proactive, "prudent" and "specifically designed to keep potential losses within acceptable limits[,]" as well as Defendant D'Alessandro's assurances that thanks to Manulife's "rigorous" risk management, the Company was well-positioned to "successfully weather . . . volatile equity markets" and to "compete in all market conditions[,]" during the Class Period, the OSFI was raising questions about Manulife's risk controls.  ¶¶44, 51, 58, 68; Rudman Ex. A at 4.  According to the *Financial Post*, on November 12, 2008, the OSFI issued a "supervisory letter" informing Manulife that it had increased its "intervention stage rating" on the Company, and had identified deficiencies that could lead to serious "material safety and soundness concerns."  Rudman Ex. A at 5.  Following a meeting with Manulife's senior executives in December 2008, the OSFI continued to express concerns about "board approved risk-tolerance policies[.]"  Rudman Ex. A at 6.  The OSFI's misgivings were so serious that, at the regulator's behest, Manulife retained Deloitte & Touche to conduct an independent examination of the Company's risk-management controls for its Guaranteed Products.  Rudman Ex. A at 7.  On February 3, 2009, the OSFI raised Manulife's composite risk rating, signaling that the Company's risk exposure was not sufficiently mitigated by its capital and earnings, and faulted "senior management's failure to effectively control . . . [equity market] risk."  Rudman Ex. A at 7.

Taken collectively, these allegations raise a strong inference that Defendants had access to information contradicting their public statements.  *See In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 458 (S.D.N.Y. 2005) (scienter adequately pled where company's failure to disclose that it had

extended "hundreds of millions of euros of [loan] guarantees to a financially unstable customer" "became increasingly unreasonable" as the risk of loss to the company grew along with the customer's financial difficulties); *see Moody's*, 599 F. Supp. 2d at 515 (allegations that defendant "had 'information suggesting that [his] public statements were not accurate'" were "sufficient to allege . . . scienter"); *Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 622 (S.D.N.Y. 2008) (allegations that Defendants had knowledge of facts that explicitly contradicted their public statements were, alone, enough to satisfy the pleading requirement for scienter).

In addition, the fact that the OSC, Canada's primary stock market regulator, launched an investigation into Manulife concerning the same conduct at issue in this lawsuit, and reached a preliminary conclusion that Manulife had failed to adequately disclose its exposure to market price risk arising from its Guaranteed Products prior to March 2009 (¶¶113, 116), further contributes to an inference of scienter. *See Hall*, 580 F. Supp. 2d at 233 (holding that an SEC investigation was "probative of scienter").[20]

Finally, Defendant Rubenovitch's resignation as CFO, announced on June 19, 2009, the same day that Manulife disclosed that it was under investigation by the OSC, "add[s] to the overall pleading of circumstantial evidence of fraud." *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 394 n.176 (S.D.N.Y. 2007); *see also Middlesex Ret. Sys. v. Quest Software, Inc.*, No. CV 06-6863 DOC (RNBx), 2008 U.S. Dist. LEXIS 68419, at *25 (C.D. Cal. July 10, 2008) (resignation was "highly probative of scienter"); *Nash Finch*, 502 F. Supp. 2d at 882 ("unexpected resignations").

While Defendants take issue with the AC's lack of citation to specific reports containing information contradicting their statements (Def. Mem. at 13, 15-16), the new information contained in the *Financial Post* article identifies such information, including: (i) a presentation by the chief risk

---

[20]  The non-binding nature of this preliminary conclusion is irrelevant.  Def. Mem. at 22 n. 7.

officer to Defendant D'Alessandro warning that Manulife's balance sheet could not absorb the growing equity market risk from its Guaranteed Products; (ii) two supervisory letters issued by the OSFI expressing concerns about the Company's capital levels, equity exposure and risk management; and (iii) meetings between the regulator and Manulife's senior executives regarding those issues. *See* Rudman Ex. A at 2, 6-7. In fact, "even in the absence of specific information contradicting their public statements . . . knowledge of contradictory information" may be imputed to corporate executives "if the subject-matter of the alleged misstatements is sufficiently 'significant'" to the company, as Manulife's Guaranteed Products unquestionable were here. *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 293 (S.D.N.Y. 2006) (discussing the "core operations" doctrine).

As discussed above, this is not a case about executives, accused of management indiscretions, who ***reasonably*** failed to expect the unexpected. *See* Def. Mem. at 13, 16-17 (citing, *inter alia*, *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) (allegations of misguided optimism, without more, did not support an inference of scienter)). As such, Defendants' repeated invocation of the financial crisis does not render their statements any less false or misleading. It is for this reason that the purported competing inference urged by Defendants – *i.e.*, that unsuspected market turmoil was solely to blame for the damage inflicted by Manulife's equity exposure – is disingenuous, is no more plausible than the strong inference of fraudulent intent, and is premature in advance of discovery. *See, e.g.*, *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 494 (S.D.N.Y. 2004) (plaintiffs offered more than hindsight where they alleged that the "company failed to take into account information that was available to it").

Taken collectively, these facts "support an inference that is cogent and compelling in light of other explanations" and "Defendants offer no alternate, more compelling inference to warrant dismissal." *In re Xethanol Corp. Sec. Litig.*, No. 06 Civ. 10234 (HB), 2007 U.S. Dist. LEXIS 65935,

- 30 -

at *9, *11 (S.D.N.Y. Sept. 7, 2007); *In re Sadia, S.A. Sec. Litig.*, No. 08 Civ. 9528 (SAS), 2009 U.S.

Dist. LEXIS 66998, at *34-*35 (S.D.N.Y. July 29, 2009) (finding scienter where, *inter alia*,

defendants allegedly made statements and omissions "with reckless, if not knowing, disregard for the

truth," three individual defendants resigned or were fired, and the company initiated a special audit).

### D.    The AC Adequately Alleges Loss Causation

Loss causation is "the causal link between the alleged misconduct and the economic harm

ultimately suffered by the plaintiff." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*,

343 F.3d 189, 197 (2d Cir. 2003). "The essence of loss causation is the notion that the alleged

'misstatement or omission concealed something from the market that, when disclosed, negatively

affected the value of the security.'" *In re IMAX Sec. Litig.*, 587 F. Supp. 2d 471, 485 (S.D.N.Y.

2008) (citation omitted). To establish loss causation, a plaintiff need only "'plead that the loss was

foreseeable and caused by the materialization of the risk concealed by the fraudulent statement.'" *In

re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 288 (S.D.N.Y. 2008) ("*IPO*") (quoting *ATSI

Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 107 (2d Cir. 2007)). In this regard, the alleged

facts must support an inference that the "'misstatements and omissions concealed the circumstances

that bear upon the loss,'" and that all or a portion of the loss would not have occurred absent the

fraud. *IPO*, 544 F. Supp. 2d at 289 (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d

Cir. 2005)). "Moreover, there is no 'requirement that the disclosure take a particular form or be of a

particular quality.'" *IPO*, 544 F. Supp. 2d at 289.

The AC satisfies these straightforward requirements by alleging that Defendants' fraudulent

misrepresentations artificially inflated and sustained the price of Manulife's securities (¶¶57, 84), and

that the inflation was removed in tandem with the revelation of the truth in a series of partial

disclosures, or, in the alternative, a materialization of the undisclosed risk associated with Manulife's

equity market exposure. *See* ¶¶96, 105, 107, 110 (stock price drops); *see also* ¶¶140-48 (general loss

- 31 -

causation allegations).  Specifically, Manulife's share price rose and remained artificially inflated as Defendants, *inter alia*, downplayed the risks posed by the Company's growing equity market exposure from its Guaranteed Products.  ¶¶140-42.  Defendants' assurances in October 2008 maintained that artificial inflation and caused the Company's stock to rebound.  ¶¶84, 143.

Through a series of announcements beginning on December 2, 2008, investors gradually learned the truth about Manulife's huge equity market exposure from its Guaranteed Products, as the risks which that exposure posed to the Company's balance sheet began to materialize in a foreseeable chain of events "that bore on [Plaintiffs'] ultimate loss[.]"  *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 510 (S.D.N.Y. 2005).  On that date, Defendants announced that, despite their assurances just seven weeks earlier, the Company was issuing over $2 billion in dilutive equity and expected to incur a fourth quarter loss of $1.5 billion due to increasing the capital reserves backing its Guaranteed Products.  ¶¶94-95.[21]  On February 12, 2009, Defendants: (i) revealed that the amount at risk from Manulife's Guaranteed Products – a shortfall that the Company was responsible for covering – had reached an astounding $27 billion; (ii) confirmed the capital reserve increase and an even greater-than-expected quarterly loss of $1.8 billion; and (iii) admitted that the Company had been "late in activating" it hedging programs.  ¶¶97, 99, 104.  Manulife's share price tumbled as the market reacted to these announcements, falling from an opening price of $17.50 per share on December 1, 2008, to a closing price of $14.15 per share on February 13, 2009.  ¶¶96, 105, 144-45.  After Fitch Ratings downgraded Manulife on February 27, 2009 due to its "outsized, unhedged

---

[21]  This was not merely a decision to "reverse course" due to changing business conditions, as in *In re Omnicom Group, Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 552 (S.D.N.Y. 2008).  Def. Mem. at 29 n.9.  As discussed above, Defendants' statements about issuing equity implied certainty, and Defendants did not have a reasonable basis for them.  Moreover, not only was *Omnicom* a decision on summary judgment, rendering Defendants' reliance on that opinion at this juncture misplaced, but *Omnicom* was "not a case about materialization of an undisclosed risk," as here.  *Id.* at 551; *see* Def. Mem. at 29-31, 33.

equity market exposure[,]" the Company's stock closed at $10.15 per share.  ¶¶105-06.[22]

    In a March 2, 2009 presentation, Defendant Rubenovitch: (i) placed the $27 billion amount at risk from Manulife's Guaranteed Products in context, by stating that the value of the funds associated with those products totaled $74 billion – meaning that Manulife had made payment guarantees totaling $101 billion (a sum that dwarfed expected profits); (ii) confirmed that Manulife's Guaranteed Products were the main cause of the Company's disappointing 2008 earnings, which otherwise would have been in line with the previous year; and (iii) disclosed that despite the Company's significant increases in its capital reserves, those reserves still only covered less than half of the amount at risk.  ¶108.  After the presentation, Manulife's stock closed at $7.90 per share on March 3, 2009, the last day of the Class Period.  ¶110.

    As these allegations make clear, Defendants' contention that the series of announcements beginning on December 2, 2008 did not reveal any previously undisclosed information is simply unfounded.  Def. Mem. at 28-30, 32-34; *see also id.* at 10-12.[23]  Defendants' related argument that some of the announcements reported new developments (Def. Mem. at 31-33; *see also id.* at 10-12), ignores that a plaintiff may plead loss causation by alleging that the risks which were previously concealed materialized through a series of events or announcements, foreseeably causing investor loss.  *See IPO*, 544 F. Supp. 2d at 288-89 (noting that there are "several possible methods of pleading loss causation, including . . . 'materialization of risk' and 'corrective disclosure'"); *see also*

---

[22]  The Fitch Ratings downgrade cited the possibility of heightened earnings volatility going forward, thereby enhancing the market's understanding of the magnitude of Manulife's equity exposure.  Def. Mem. at 33; *see, e.g., Steiner v. Medquist, Inc.*, No. 04-5487 (JBS), 2006 U.S. Dist. LEXIS 71952, at *70-*71 (D.N.J. Sept. 29, 2006) (de-listing announcement satisfied loss causation because it "gave investors greater insight into the magnitude of the potential scheme as well as the complexity of the internal investigation").

[23]  Defendants' arguments that Plaintiffs cannot plead loss causation because Defendants did not make any materially false or misleading statements, and because their disclosures were adequate, as discussed above, are without merit.  *See* Def. Mem. at 28-29.

*Abbey*, 423 F. Supp. 2d at 362 (loss causation adequately alleged where company "concealed the magnitude of the risk associated with its portfolio and the inadequacy of its credit provisioning, which led plaintiff to purchase [its] securities at inflated prices[,]" resulting in foreseeable share price decline when risk materialized).[24]

Defendants proffer a number of inappropriate fact-based arguments relating to damages, contenting that Manulife's stock also declined before the truth began to emerge (Def. Mem. at 31 n. 11), that it temporarily rebounded several days after the December 2, 2008 announcements (*id.* at 32), and that the declines were attributable to the general market downturn that was occurring (*id.* at 29-30, 32). None of these intensely factual contentions are determinative of – or relevant to – whether Plaintiffs have adequately ***pled*** loss causation at this stage of the litigation (which they have). *See Glidepath Holding B.V. v. Spherion Corp.*, 590 F. Supp. 2d 435, 458 (S.D.N.Y. 2007) (where loss causation is adequately alleged, "the question of whether, in fact, the loss was caused by an intervening event (including a general market loss), the Second Circuit has held, 'is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss'" (citing *Emergent Capital*, 343 F.3d at 197)); *see also Moody's*, 599 F. Supp. at 513 ("[i]n cases of an intervening event, the question of causation is reserved for trial"); *In re Vivendi Universal, S.A., Sec. Litig.*, 634 F. Supp. 2d 352, 364 (S.D.N.Y. 2009) (noting, in denying a motion for summary judgment, that "[s]orting out which declines were caused by [] extraneous factors and which were caused by a materialization of

---

[24]   *Fort Worth Employers' Ret. Fund v. Biovail Corp.*, 615 F. Supp. 2d 218 (S.D.N.Y. 2009) and *Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210 (S.D.N.Y. 2009) are both inapplicable. Def. Mem. at 33. In *Biovail*, "no corrective disclosure ever occurred" because defendants continued their "'misstatements' after the expiration of the class period" (615 F. Supp. 2d at 229), and in *SafeNet*, a single reference in a press release to two minor accounting errors did not reveal that the company "was involved in the kind of widespread revenue recognition accounting fraud" that the plaintiffs there had alleged. 645 F. Supp. 2d at 228. Neither of those situations is present here.

the concealed risk is generally the province of an expert"). This is particularly so here, because Plaintiffs' allegations specifically concern the risks posed by Manulife's *stock market exposure*; as such, the occurrence of market declines simply cannot undercut the inference that Plaintiffs' losses were a foreseeable result of the risks that materialized along with those declines.

### E.    The AC Adequately Alleges a Control Person Claim

Neither Defendant D'Alessandro (Manulife's former CEO), nor Defendant Rubenovitch (its former CFO), dispute that they are "control persons" for purposes of Section 20(a) of the Exchange Act. Instead, they contend that Plaintiffs have failed to allege either a primary violation of the securities laws or their culpable participation in the fraud. Def. Mem. at 34-35. Since, as shown above, Plaintiffs have alleged a primary violation under Section 10(b) of the Exchange Act, including (assuming, *arguendo*, they must), by sufficiently alleging that Defendants D'Alessandro and Rubenovitch acted with scienter, the Court should also sustain Plaintiffs' control person liability claims. *See, e.g.*, *In re Pfizer Inc. Sec. Litig.*, 584 F. Supp. 2d 621, 641 (S.D.N.Y. 2008) (allegations that individual defendants directly participated in the daily management of the company and made strategic decisions sufficiently pled culpable participation).

## IV.    CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss in its entirety.[25]

---

[25]  In the event that the Court finds the AC insufficient for any reason, Plaintiffs respectfully request an opportunity amend. *See Cortec Inds., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("It is the usual practice upon granting a motion to dismiss to allow leave to replead."); *see also Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 347 Fed. Appx. 617, 622 (2d Cir. 2009) (in determining whether leave to amend should be granted, "courts may consider all possible amendments").

DATED:  March 29, 2010                    COUGHLIN STOIA GELLER
                                            RUDMAN & ROBBINS LLP
                                          SAMUEL H. RUDMAN
                                          DAVID A. ROSENFELD
                                          ERIN W. BOARDMAN


                                          _____/s/ Samuel H. Rudman_____
                                               SAMUEL H. RUDMAN

                                          58 South Service Road, Suite 200
                                          Melville, NY  11747
                                          Telephone:  631/367-7100
                                          631/367-1173 (fax)

                                          *Lead Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Erin W. Boardman, hereby certify that on March 29, 2010, I caused a true and

correct copy of the attached:

Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss
the Amended Class Action Complaint; and

Declaration of Samuel H. Rudman

to be served by email and first-class mail to the following counsel:

Edwin G. Schallert, Esq.                 Scott N. Auby, Esq.
Gary W. Kubek, Esq.                      Debevoise & Plimpton, LLP
Stuart C. Naifeh, Esq.                   555 13th Street, N.W.
Debevoise & Plimpton, LLP                Washington, DC  20004
919 Third Avenue                         Telephone: 202/383-8053
New York, NY  10022                      202/383-9238 (fax)
Telephone: 212/909-6000
212/909-6836 (fax)


                            _____ /s/ Erin W. Boardman ____
                                   ERIN W. BOARDMAN