**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

—————————————————————x
In re MANULIFE FINANCIAL CORP. )  1:09-cv-06185-JFK
SECURITIES LITIGATION    )
            )  ECF Case
            )
            )
—————————————————————x


# MEMORANDUM OF LAW IN SUPPORT OF
# DEFENDANTS' MOTION TO DISMISS

DEBEVOISE & PLIMPTON LLP

Edwin G. Schallert
Gary W. Kubek
Stuart Naifeh
Julie S. Suh
919 Third Avenue
New York, NY 10022
(212) 909-6000 (phone)
(212) 909-6836 (fax)

Scott N. Auby
555 13th Street NW, Suite 1100E
Washington, DC 20004
(202) 383-8000 (phone)
(202) 383-8118 (fax)

*Attorneys for Defendants*

February 12, 2010

23129437

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...............................................................................................1

FACTUAL BACKGROUND ...................................................................................................4

I.      The Defendants. .................................................................................................................4

II.     The Products and Guarantees at Issue. .............................................................................5

III.    Manulife's Disclosures Concerning its Guaranteed Product Equity Market Risks ............6

ARGUMENT .........................................................................................................................13

I.      The Complaint Does Not Adequately Plead a Claim Against Any Defendant Under
        Section 10(b) and Rule 10b-5. .......................................................................................13

        A.      The Complaint Does Not Plead Facts Creating a Strong Inference of Any
                Defendant's Scienter. .........................................................................................13

        B.      The Complaint Does Not Adequately Allege Any Material
                Misrepresentations. ............................................................................................18

                1.      The Complaint Impermissibly Alleges Omissions Based on
                        Hindsight. ..............................................................................................19

                2.      Manulife Did Not Misrepresent Its Hedging Activities. ............................22

                3.      Plaintiffs' Other Allegations Fail to Allege Any Material
                        Misstatement. ........................................................................................23

        C.      The Complaint Fails Adequately to Allege Loss Causation. ...............................28

                1.      Defendants Disclosed the Facts that Plaintiffs Claim Were Later
                        Revealed to Investors. .............................................................................29

                2.      The Complaint Fails to Plead Facts That Attribute Plaintiffs'
                        Losses to Fraud Instead of Other Factors. ................................................30

II.     The Complaint Does Not State a Section 20(a) Claim
        Against the Individual Defendants. ..................................................................................34

CONCLUSION ......................................................................................................................35

i

## TABLE OF AUTHORITIES

CASES

*380544 Canada, Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199 (S.D.N.Y. 2009) .......................16

*Acito v. IMCERA Group, Inc.*, 47 F.3d 47 (2d Cir. 1995) ...........................................16, 17, 20, 21

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ..................................................................................31

*ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) .........................................14

*Beleson v. Schwartz*, 599 F. Supp. 2d 519 (S.D.N.Y. 2009) .........................................................22

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..................................................................28, 32

*Denny v. Barber*, 576 F.2d 465 (2d Cir. 1978) ....................................................................13, 16

*Dujardin v. Liberty Media Corp.*, 359 F. Supp. 2d 337 (S.D.N.Y. 2005) .....................................23

*Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005) ..........................................28, 30, 31

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 533 F.3d
      187 (2d Cir. 2009)....................................................................................................14, 18, 26

*First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994)..................................32

*Fort Worth Employers' Ret.  Fund v. Biovail Corp.*, 615 F. Supp. 2d 218 (S.D.N.Y. 2009) ........33

*Ganino v. Citizens Util. Co.*, 228 F.3d 154 (2d Cir. 2000) .............................................................4

*Goplen v. 51job, Inc.*, 453 F. Supp. 2d 759 (S.D.N.Y. 2006)......................................................14

*Graham v. Barringer*, No. 08-CV-9357, 2009 WL3852461 (S.D.N.Y. Nov. 17, 2009)..............17

*Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352 (2d Cir. 2002)................................................20

*In re Acterna Corp. Sec. Litig.*, 378 F. Supp. 2d 561 (D. Md. 2005) ...........................................32

*In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666 (S.D.N.Y. 2007).........................30

*In re Citigroup Sec. Litig.*, 330 F. Supp. 2d 367 (S.D.N.Y. 2004) ..........................................26, 27

*In re Downey Sec. Litig.*, No. 08-CV-3261-JFW (RZx), 2009 WL 2767670
      (C.D. Cal. Aug. 21, 2009)......................................................................................................20

*In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562 (S.D.N.Y. 2007) ...............................25, 26

*In re Duane Reade Inc. Sec. Litig.*, No. 02-CV-6478, 2003 WL 22801416
(S.D.N.Y. Nov. 25, 2003) ........................................................27

*In re Huntington Bancshares Inc. Sec. Litig.*, No. 2:07-CV-1276, 2009 WL 4666455
(S.D. Ohio Dec. 4, 2009) ........................................................20

*In re IBM Corp. Sec. Litig.*, 163 F.3d 102 (2d Cir. 1998) ............................27

*In re Loral Space & Commc'ns Ltd. Secs. Litig.*, No. 01-CV-4388, 2004 WL 376442
(S.D.N.Y. Feb. 26, 2004) ........................................................15

*In re Merck & Co. Sec. Litig.*, 432 F.3d 261 (3d Cir. 2005)...........................33

*In re Omnicom Group, Inc. Sec. Litig.*, 541 F. Supp. 2d 546 (S.D.N.Y. 2008)...........29, 30, 31, 33

*In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681 (S.D.N.Y. 2008)....................18

*In re PXRE Group, Ltd., Sec. Litig.*, 600 F. Supp. 2d 510 (S.D.N.Y. 2009) ............15, 16

*In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247 (S.D.N.Y. 2008) ............4

*In re Union Carbide Class Action Sec. Litig.*, 648 F. Supp. 1322 (S.D.N.Y. 1986) ....................19

*Joffee v. Lehman Bros., Inc.*, 410 F. Supp. 2d 187 (S.D.N.Y. 2006).....................29, 33

*Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001) ......................................14

*Kramer v. Time Warner, Inc.*, 937 F.2d 767 (2d Cir.1991) .............................4

*Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55 (2d Cir. 1996) .....................24, 26

*Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161 (2005).............................28, 31, 32

*Leykin v. AT & T Corp.*, 423 F. Supp. 2d 229 (S.D.N.Y. 2006).........................4

*Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117 (D. Conn. 2007).......................18, 19

*P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92 (2d Cir. 2004) .....................20

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662 (S.D.N.Y. 2008)...........20

*Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146 (S.D.N.Y. 2004)...........25, 28

*Police & Fire Retirement Sys. of City of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210
(S.D.N.Y. 2009)................................................................33

*Pollio v. MF Global, Ltd.*, 608 F. Supp. 2d 564 (S.D.N.Y. 2009)......................25

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004).....................................24, 25, 26

iii

*Rubin v. MF Global, Ltd.*, 634 F. Supp. 2d 459 (S.D.N.Y. 2009) ...................................................21

*S. Cherry St. LLC v. Hennessee Group LLC*, 573 F.3d 98 (2d Cir. 2009).....................................14

*Sable v. Southmark/Envicon Capital Corp.*, 819 F. Supp. 324 (S.D.N.Y. 1993) .........................23

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801 (2d Cir. 1996)................................................................................................4, 15, 19, 28

*Santa Fe Indus., Inc. v. Green*, 430 U.S. 462 (1977)....................................................................23

*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994) .............................................16, 24

*Spielman v. Gen. Host Corp.*, 402 F. Supp. 190 (S.D.N.Y. 1975) ................................................19

*Steinberg v. Ericsson LM Tel. Co.*, No. 07-CV-9615-RPP, 2008 WL 5170640 (S.D.N.Y. Dec. 10, 2008)...........................................................................................................24

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148 (2008) ...................................13

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2009).......................................................................................................................15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)..................................13, 14

## FEDERAL STATUTES

15 U.S.C. § 78u-4 ........................................................................................................13, 18, 22, 28

Securities Exchange Act of 1934 § 10, 15 U.S.C. § 78j.........................3, 4, 13, 18, 23, 25, 27, 28

Securities Exchange Act of 1934 § 20, 15 U.S.C. § 78t........................................................4, 5, 34

## FOREIGN STATUTES

Securities Act, R.S.O. 1990, ch. S.5, § 127, amended by S.O. 2009, ch. 18 (Can.)......................22

## OTHER AUTHORITIES

Fed. R. Civ. P. 8 .............................................................................................................................31

Fed. R. Civ. P. 9 ...............................................................................................................................4

SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 .......................................................13, 18, 23, 24, 25, 28

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

—————————————————————x
In re MANULIFE FINANCIAL CORP.          )          1:09-cv-06185-JFK
SECURITIES LITIGATION                    )
                                         )          ECF Case
                                         )
                                         )
—————————————————————x

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS

Defendants submit this Memorandum of Law in support of their motion to dismiss all

claims asserted in the Amended Class Action Complaint for Violation of the Securities Laws,

dated December 29, 2009 (the "Complaint" or "AC").

## PRELIMINARY STATEMENT

During 2008, equity markets in the U.S. and around the world suffered massive declines

– the worst in decades – as major financial institutions collapsed and investors feared that the

entire financial system would break down.  Before the financial markets plummeted, Defendant

Manulife Financial Corporation ("Manulife" or the "Company") disclosed in its 2007 Annual

Report that equity market declines "may lead to asset returns insufficient to support product

liabilities, and may impact the value of assets in our shareholders' equity accounts."  Ex. 1 at

24.[1]  In particular, because Manulife faced exposure for guaranteed benefits offered as part of

some variable annuities, segregated funds and other retirement products, Manulife warned that

"[a] sustained decline in stock markets could . . . increase the cost of guarantees associated with

our variable products."  *Id.*

---

[1]     All documents cited as Ex. ___ are exhibits to the Declaration of Scott N. Auby submitted in
support of the motion to dismiss.

1

As the stock market declined during the first 8½ months of 2008, Manulife disclosed the adverse effect of that decline on its quarterly earnings and its capital reserves. When the market collapsed in late September and early October after the failure of Lehman Brothers and several commercial banks, the government takeover of Fannie Mae and Freddie Mac and the rescue of AIG, Manulife issued a special press release on October 13, 2008 disclosing the increase in its Guaranteed Products reserve as of the end of the third quarter. The Company also cautioned that "[s]ince quarter-end the equity markets have deteriorated further" and "to the extent that any increase in reserve is required . . . , this would decrease the earnings for that period." Ex. 6 at 1.

The Complaint does not allege that any of those disclosures inaccurately reported the Company's financial results. Instead, Plaintiffs allege that Manulife failed to disclose that "a downturn in the markets would require the Company to bolster the capital reserves backing its guaranteed payments . . . , which would have a devastating impact on the Company's balance sheet." AC ¶ 5. But Manulife did warn investors about the possible consequences of "a downturn in the markets" (or "an equity market decline," as Plaintiffs sometimes call it). *See e.g.*, *id.* ¶¶ 45(c), (d), 49(c), (d), 66, 82, 141. Plaintiffs' real complaint, made with the benefit of 20-20 hindsight, is that Defendants did not predict and disclose the full effects of a global market collapse, which reduced equity market prices by 50% or more. The federal securities laws, however, do not impose clairvoyance as a standard.

Plaintiffs' other claims are no stronger. Their assertion that Manulife failed to disclose that it "retain[ed] substantially all of the risk associated with the [guaranteed] products," *e.g.*, *id.* ¶¶ 45(b), 49(b), is belied by Defendant Rubenovitch's clear statement during a quarterly conference call with analysts that "we do hedge a portion, but *by and large we retain the risk*." Ex. 3 at 10 (emphasis added). Similarly, Plaintiffs' claims that Defendants falsely "reassured

investors that the Company would not need to issue equity" and "would not raise capital by issuing equity," AC ¶¶ 74, 77, are disproved by the Complaint's own quotations of Defendants' actual statements that "the Company . . . *has no plans* to issue common equity" and "we *have no intention* to issue equity capital." *Id.* ¶¶ 74, 77 (emphasis added).

In addition to failing to plead any material misstatements or omissions, the Complaint is devoid of allegations that suggest – much less meet the "strong inference" standard – that any Defendant engaged in fraud or recklessly made any statement or omission. The Complaint does not even attempt to satisfy the "motive and opportunity" prong of the scienter standard by alleging a motive for Defendants to engage in fraud. Instead, Plaintiffs rely on allegations that, by virtue of the Individual Defendants' positions and Manulife's risk management processes, Defendants had "access to . . . adverse undisclosed information" and the "true facts regarding Manulife." *Id.* ¶¶ 125-26. But the caselaw is clear that such generalized assertions are insufficient to allege scienter unless they are accompanied by particularized allegations that Defendants had access to specific documents or other information that disclosed the supposed "true facts." The Complaint alleges no such particularized facts.

Plaintiffs also have failed to allege facts supporting the "loss causation" element of a section 10(b) claim. As the Supreme Court and the Second Circuit have made clear, Plaintiffs must provide a factual basis for concluding that Manulife's stock price reacted negatively to a specific disclosure of previously misrepresented facts. Instead, the Complaint relies on purported "corrective disclosures" that did not disclose any previously undisclosed facts, but rather reported new developments, such as the decision to issue equity or the financial results for the fourth quarter 2008. Plaintiffs even resort to unsupported speculation that a "leak" of the

first purported corrective disclosure caused Manulife's stock to fall 6% – on a day when the broader market plunged even more.  None of this is sufficient to allege loss causation.

In sum, the Complaint is long on rhetoric but wholly lacking in the specificity that Rule 9(b) and the Private Securities Litigation Reform Act require when accusing a company and its officers of securities fraud.  These deficiencies require dismissal of Plaintiffs' section 10(b) claims and their related claims under section 20(a) of the Securities Exchange Act of 1934.

## FACTUAL BACKGROUND[2]

### I.    The Defendants.

Manulife is a leading insurance and financial services company headquartered in Toronto, Canada, with worldwide operations.  AC ¶ 19.  Its stock is traded on the New York and Toronto stock exchanges.  *Id.*  Manulife offers a broad range of insurance and financial planning services and products to its global customer base.  *Id.* ¶ 34.  As an insurance company, Manulife is in the business of taking risk to earn a return.

Dominic D'Alessandro was President and Chief Executive Officer of Manulife until his retirement on May 7, 2009.  *Id.* ¶ 20.  Peter Rubenovitch (with Mr. D'Alessandro, the "Individual Defendants") was Senior Executive Vice President and Chief Financial Officer of Manulife until June 22, 2009.  *Id.* ¶ 21.

---

[2]    For purposes of this motion, the Complaint's factual allegations are taken as true, except to the extent those allegations are contradicted by matters of which this Court may take judicial notice.  The Court may take notice of the full content of (i) documents partially quoted in the complaint, *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808-09 (2d Cir. 1996), (ii) Manulife's public disclosures, whether or not cited or quoted in the Complaint, *see, e.g.*, *Leykin v. AT & T Corp.*, 423 F. Supp. 2d 229, 237 (S.D.N.Y. 2006) (citing *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773-74 (2d Cir. 1991)), (iii) "well-publicized stock prices," *Ganino v. Citizens Util. Co.*, 228 F.3d 154, 167 (2d Cir. 2000), and (iv) statements made by Defendants in conference calls with analysts and by analysts in their published reports.  *See In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 285 n.23 (S.D.N.Y. 2008).

## II.    The Products and Guarantees at Issue.

The Complaint's allegations focus on Manulife's guaranteed variable annuity and segregated fund investment products (collectively, the "Guaranteed Products"). AC ¶ 38. Although these products vary in structure, they all allow policyholders to make payments that are invested in one or more funds, as directed by the policyholder, for his or her account. In addition to offering policyholders potential growth in their designated investments, the Guaranteed Products guarantee policyholders certain minimum levels of benefits, such as periodic payments or withdrawal amounts, at specified dates or events in the future. *Id.* ¶¶ 38-39.

If the return on the amounts invested by policyholders is insufficient to cover the guaranteed payments, Manulife is responsible for the shortfall. Manulife's Canadian and United States regulators therefore require the Company to maintain reserves to cover potential shortfalls under a variety of possible adverse investment return scenarios. *Id.* ¶¶ 40-41. Manulife is required to adjust these reserves quarterly to reflect changes in the value of policyholders' investments, even though most of these guaranteed benefits are not payable until years or decades in the future. Thus, declines in the equity markets (among other factors) increase the levels of Guaranteed Product reserves that Manulife is required to hold. *Id.* ¶ 42.

As the equity markets declined precipitously in the latter part of 2008, the value of the policyholders' investments held in Manulife's Guaranteed Products significantly decreased. As a result, Manulife was required to increase substantially its reserves for Guaranteed Products, resulting in charges that reduced Manulife's reported earnings and capital. *Id.* In late 2008, these charges led the Company to raise additional capital by negotiating a large loan and issuing additional equity. *Id.* ¶¶ 86, 94.

23129437

### III.    Manulife's Disclosures Concerning its Guaranteed Product Equity Market Risks.

Throughout the putative class period, March 28, 2008 through March 3, 2009, Manulife disclosed the risks that equity market declines posed to shareholder value by reason of the Guaranteed Products and other factors.  The 2007 Annual Report filed with the SEC on March 28, 2008 warned investors, in a section labeled "Market Price and Interest Rate Risk," that "Market price volatility and interest rate changes . . . with our product guarantees . . . may lead to asset returns insufficient to support product liabilities, and may impact the value of assets in our shareholders' equity account."  Ex. 1 at 24.  Manulife expressly warned investors that "[a] sustained decline in stock markets could reduce asset-based fee revenues and increase the cost of guarantees associated with our variable products."  *Id.*  The Annual Report included a chart showing that "an immediate 10% decline . . . in the market value of equity funds" on Manulife's variable products and mutual funds potentially would reduce shareholder value by approximately $749 million, including $209 million attributable to "[v]ariable product guarantees."  *Id.* at 26.[3] Manulife also disclosed that, as of the end of 2007, "the excess of guaranteed values over fund values on all policies where the guaranteed value exceeds the fund value" was approximately $2.1 billion.  *Id.*

Manulife thereafter provided updated information throughout 2008 about the impact that equity market declines were having on its Guaranteed Product liabilities and the Company's earnings.  During the first three months of 2008, the S&P 500 index declined by approximately 10 percent.  Ex. 21 at 10-11.  On May 8, 2008, Manulife issued a press release announcing its results for the first quarter of 2008, disclosing in the opening paragraph that "[t]he sharp declines in global equity markets, particularly in the U.S. and Asia, reduced reported earnings in the

---

[3]    Manulife of course did not represent that equity markets could not or would not decline more than 10%.  All dollar amounts, except stock prices, are in Canadian dollars.

quarter by $265 million." Ex. 2 at 1.  The press release stated that "[w]orldwide equity markets were the most severe in 21 quarters" and pointed to "the impact of unfavourable equity markets on segregated fund guarantee reserves." *Id.* at 1, 4.

Manulife also made clear that its hedging of the exposure to equity market declines was quite limited.  In an analyst conference call later that day, Mr. Rubenovitch stated that "we do hedge a portion, *but by and large we retain the risk*."  Ex. 3 at 10 (emphasis added).  The market's prior knowledge of this fact was confirmed by an analyst's comment (omitted from the Complaint) that "philosophically, Manulife has historically not hedged, whether its [sic] equity markets or . . . currency." *Id*. at 20.  Mr. D'Alessandro warned, during the same call, that because the Company's variable annuity business was growing, "we see the day that the amounts of equity exposure that are going to accumulate are larger than we're comfortable with." *Id.* Therefore, "we will probably be doing more hedging." *Id.* at 21.  However, he noted that the Company's hedging contracts had only increased from $3 billion "to 3.3 or 3.5 [billion], modest growth," because "the volatility's so high and it costs you much more than . . . in normal markets." *Id*.[4]  Mr. Rubenovitch also stated that a "full hedging program" would have "reduced our income and reduced the volatility quite materially." *Id.* at 17.  Thus, Defendants left no doubt that the Company's equity risk on Guaranteed Products was largely unhedged.

During the second quarter of 2008, the S&P 500 declined another 3 percent.  *See* Ex. 21 at 11-13.  On August 7, 2008, Manulife issued a press release announcing the company's second quarter 2008 results.  The press release disclosed that although operating results were "excellent," earnings fell about $100 million from the prior year because "weak U.S. and Hong Kong equity markets" and several other factors had reduced earnings by about $250 million.

---

[4]    This elaborated on Mr. D'Alessandro's prior comment that "it's really a case of how rapidly you'd want to expand that activity" because "today hedging is fairly costly." *Id*. at 10.

Ex. 4 at 1.  During an investor call that same day, Mr. D'Alessandro acknowledged that the
Company's capital level was "a bit lower than it's historically been," and that "part of that is
driven by what you see in the markets with equity values being where they are and the need to
provide capital for some of our business lines, particularly the variable annuities."  Ex. 5 at 17.

After remaining relatively stable in July and August, equity markets plunged in
September as a result of nearly unprecedented turmoil in the financial services industry,
including Lehman Brothers' bankruptcy filing and the AIG bailout, leaving the S&P 500 with
about a 9% decline during the third quarter.  *See* Ex. 21 at 13-15.  The stock market collapse
accelerated in early October, as the S&P 500 fell almost 23 percent between September 30 and
October 10.  *See id.* at 15-16.  "In light of [this] unprecedented market volatility," Manulife
issued a special press release on October 13, 2008.  Ex. 6 at 1.

The Company's October 13 release disclosed that its Guaranteed Product reserve had
been increased to $1.4 billion at the end of the third quarter and expressed Manulife's belief that,
despite the deterioration in the equity markets, it "remain[ed] conservatively reserved."  *Id.*
However, contrary to Plaintiffs' allegation that Manulife "made misleading assertions about the
sufficiency of [its] capital reserves backing its [Guaranteed Products]," AC ¶ 74, the press
release cautioned (in language not quoted in the Complaint) that the reserve for Guaranteed
Products is "recalculated every quarter to reflect the passage of time and any change in the
market value of assets that may have occurred."  Ex. 6 at 1.  Manulife expressly warned that
"[s]ince quarter end the equity markets have deteriorated further which will have an
unfavourable impact on Manulife's capital ratios unless these markets recover," and that "to the
extent that any increase in reserve is required in any period, this would decrease the earnings for
that period."  *Id.*  And, contrary to the allegation that Manulife "misleadingly reassured that [it]

8

would not need to issue equity to shore up its capital levels," AC ¶ 74, the press release stated only that Manulife "*has no plans* to issue common equity." Ex. 6 at 1 (emphasis added).

On an analyst conference call the following day, Mr. D'Alessandro further discussed the Company's lack of *current* intention to issue equity capital:

> [T]he capital resources of the company, under almost any reasonable expectation of what's going to happen, are more than adequate today. *I can't predict the future . . . . [I]f markets do deteriorate we're a big, strong company and we'll go and do something else to re-establish our capital levels at an acceptable threshold.*

Ex. 7 at 13 (emphasis added). Mr. D'Alessandro added (in language not quoted in the Complaint) that "we're going to do more hedging but the volatility and cost of using hedging is very very high." He cautioned that it was not "realistic to expect that we would be able to go and hedge away all of our exposure in a very short time frame, and I don't think it's the right use of our resources." *Id.* at 5-6.

On November 6, 2008, Manulife announced its third quarter earnings, reporting that "[t]he sharp declines in global equity markets reduced reported earnings in the [third] quarter by $574 million." Ex. 8 at 1. Manulife also announced that it had entered into a $3 billion credit agreement "to provide additional regulatory capital" and "enhance [Manulife's] overall capital position." *Id.* In an analyst conference call that day, Mr. D'Alessandro explained that although Manulife's "capital position at September 30 was very satisfactory . . . , the decline in equity markets continued into October as indices fell further by about 15% in Canada and the United States and by more than 20% in Asia," and these further declines had "put enormous pressure on our capital ratios." Ex. 9 at 2. Mr. D'Alessandro stated that the $3 billion loan was "a prudent step to further solidify [Manulife's] capital base," and that "barring a sizeable collapse in markets, we expect to remain well capitalized at year end . . . ." *Id.* When an analyst asked why Manulife had not issued additional equity to raise capital, Mr. D'Alessandro replied that "[w]e

see equity as a more expensive form of capital," but "if we didn't have any options, we would

have raised the equity." *Id.* at 13.

   With respect to the future, Mr. Rubenovitch warned that "[g]oing forward . . . we'll see

considerable volatility in net income both positive and negative from equity market

performance," that "the impacts may be material," and that Manulife was "likely" to record

"variable annuity related charges to earnings . . . in the fourth quarter should markets fail to

recover from the October month end levels." *Id*. at 3 (quoted at AC ¶ 89).  In response to a

Citibank analyst's question about why Manulife had not done more hedging, Mr. D'Alessandro

responded:

> [W]e didn't expect the volatility in the markets that actually transpired.
> We didn't expect the markets to be as unsettled as they turned out.  We
> didn't expect all of these financial institutions to fail . . . .  Maybe you
> guys saw it at Citibank, but we didn't see it.  And to jump into the
> [hedging] market when volatility was at its peak would have been
> prohibitively expensive to our shareholders.

*Id.* at 7.  This was the context (omitted from the Complaint) in which Mr. Rubenovitch stated

that Manulife had "a program in place [that] hedges a substantial portion, but not 100% of the

product," and that Manulife was "now hedging all the *new business* originated in the US so that

we don't add to our existing position." *Id.* at 9, 13 (emphasis added).

   On December 2, 2008, following an additional 7% decline in the S&P 500 during

November, Ex. 21 at 16-17, Manulife announced that it would "further strengthen its financial

and capital position by issuing $2.125 billion in common equity, which would raise its regulatory

capital ratio to one of the highest levels in the Company's history."  Ex. 10 at 1.  The press

release also announced that, as the result of the further worldwide equity market declines since

September 30, "an *estimated* increase in reserves for variable annuities of approximately $2.7

billion is expected to be recorded in the fourth quarter," bringing such reserves to approximately

$5 billion at December 31, 2008, "*if equity markets remain unchanged*," and that "[p]rimarily because of this anticipated increase in reserves for variable annuities . . . an *estimated* loss for the fourth quarter of approximately $1.5 billion is anticipated." *Id.* (emphasis added). The release expressly cautioned that this information was "based on current estimates and assumptions and may change." *Id.*

On February 12, 2009, Manulife announced its final financial results for the fourth quarter and full year 2008. Those results included an increase of the reserves backing the Guaranteed Products to $5.78 billion and a fourth quarter loss of approximately $1.87 billion, reflecting a $2.4 billion increase in Guaranteed Products liabilities. Ex. 11 at 1, 5. Manulife's press release explained that the "major reason" for the increase over the loss estimated on December 2, 2008 was "[a] sharp drop in swap interest rates which are used to value segregated fund guarantee liabilities . . . ." *Id.* at 1. Despite these charges, Manulife remained profitable for the year, with net income of $517 million. *Id.*

In a conference call with investors the same day, Mr. Rubenovitch stated that "[d]ue to the sharp global equity market declines in the fourth quarter, the reported amount at risk" on Guaranteed Products, "which represents the excess of guaranteed values over fund values, has increased to CAD27 billion." Ex. 12 at 5. Mr. Rubenovitch also estimated that a further "one-time equity correction of 10%, followed by normal market growth, would reduce reported earnings by about" $1.6 billion. *Id.* at 6. In addition, Mr. Rubenovitch reiterated the prior disclosure that new Guaranteed Product business "written in the U.S. is now being hedged as written," and stated that Manulife was "planning to extend our hedging programs to our key businesses in other geographies." *Id.* at 7.

11

On that same February 12, 2009 call, Mr. D'Alessandro summarized the factors, all of which had been previously disclosed, that led to the impact of the dramatic and unanticipated equity market declines of late 2008 on Manulife's Guaranteed Product reserves and earnings:

> [W]e've known we have had this equity risk, it was almost intentional that we chose to take equity risk in the years gone by thinking that we were a logical repository given the nature of our liabilities and the obligations we were taking on. We had to invest them in a portfolio of assets, and equities [had] performed very, very well . . . . [W]e were late in activating our hedging programs. We had it ready to go. We hired all the . . . people, set up all the systems – but it took us a while – longer than we should have – to get it going, and the markets got away from us. No one expected them as I said at the last call to collapse quite as significantly as they have . . . . We have equities that are not worth what we paid for them . . . . [D]o you believe that over time markets will recover and . . . that shortfall will be made up? We do our accounts on the basis that the stock market will never recover . . . .

*Id.* at 23.

On February 27, 2009, Fitch Ratings downgraded Manulife. However, Fitch did not cite any previously undisclosed information. AC ¶ 106.

On March 2, 2009, Mr. Rubenovitch gave a presentation on variable annuities at a conference in Scottsdale, Arizona. His presentation did not disclose new material information but reiterated information from the February 12, 2009 press release and conference call, *i.e.*, that Manulife's 2008 reported earnings were $517 million, down from $4.302 billion in 2007, due in large part to the impact of equity market declines; that its Guaranteed Products' amount at risk was approximately $27 billion; and that its Guaranteed Product reserves were approximately $5.78 billion. *Id.* ¶ 108. The presentation also reiterated that all new Guaranteed Product business written in the U.S. was currently being hedged and discussed plans to extend the hedging program to all new business in Canada. *Id.* ¶ 109.

## ARGUMENT

**I.     The Complaint Does Not Adequately Plead a Claim Against Any Defendant Under Section 10(b) and Rule 10b-5.**

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must adequately allege, among other things, that the defendant acted with scienter, that the defendant made a material misrepresentation or omission, and that the material misrepresentation caused investors loss. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008); 15 U.S.C. § 78j(b).  Plaintiffs have failed sufficiently to plead any of these required elements.

**A.     The Complaint Does Not Plead Facts Creating a Strong Inference of Any Defendant's Scienter.**

Plaintiffs have not satisfied their burden of alleging particularized facts that give rise to a "strong inference" of any Defendant's scienter.  15 U.S.C. § 78u-4(b)(2).  The Complaint does not allege any motive for Defendants to commit fraud, nor does it contain a single factual allegation about any document, communication, or other information that contradicted any Defendant's public statement and was available to that Defendant when the statement was made. Instead, Plaintiffs merely assert that because managing equity market risk was important to Manulife's business, the Defendants should have predicted and disclosed, before global equity markets collapsed during 2008, the impact of such a collapse on Manulife's financial position. *See*, *e.g.*, AC ¶ 133.  Settled Second Circuit law, however, does not permit Plaintiffs to allege "fraud by hindsight" by pointing to events that took place after alleged misstatements were made.  *See Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978).  Plaintiffs' section 10(b) and Rule 10b-5 claims against all Defendants should therefore be dismissed.

To plead a defendant's scienter, a plaintiff must allege particularized facts giving rise to a "cogent and compelling" inference that the defendant acted with "an intent to deceive, manipulate or defraud."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

13

The plaintiff's factual allegations and matters of which the court may take judicial notice, considered collectively, must raise an inference of the defendant's scienter that is at least as plausible as competing, non-fraudulent inferences. *Id.* at 323. In this Circuit, the required strong inference of scienter may be established by alleging facts that show either (a) that a defendant had the "motive and opportunity" to commit fraud, or (b) strong circumstantial evidence of a defendant's "conscious misbehavior or recklessness." *See ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). The Complaint does neither.

Plaintiffs do not even attempt to allege facts about any Defendant's motive to commit fraud. For example, the Complaint does not (and cannot) allege that Mr. D'Alessandro, Mr. Rubenovich, or any other senior executive at Manulife sold stock during the putative class period, often the primary way that plaintiffs attempt to allege motive. *See, e.g.*, *S. Cherry St. LLC v. Hennessee Group LLC*, 573 F.3d 98, 108 (2d Cir. 2009); *Goplen v. 51job, Inc.*, 453 F. Supp. 2d 759, 772 (S.D.N.Y. 2006). Plaintiffs correctly do not assert that their generalized allegations that Manulife sought to "increase its short-term profitability" support motive, *see* AC ¶¶ 45(b), 56, as such allegations do not constitute the "concrete and personal benefits" required to allege scienter through motive. *See ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 533 F.3d 187, 198 (2d Cir. 2009) ("desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation do not constitute 'motive' for purposes of this inquiry").

Because the Complaint fails to allege a motive to commit fraud, Plaintiffs' burden of alleging strong circumstantial evidence of conscious misbehavior or recklessness is "correspondingly greater." *See Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001). The Complaint falls well short of meeting that burden.

14

In considering whether a complaint pleads strong circumstantial evidence of conscious

behavior or recklessness, "Second Circuit cases uniformly rely on allegations that [1] *specific*

contradictory information was available to the defendants [2] *at the same time* they made their

misleading statements." *In re PXRE Group, Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 536

(S.D.N.Y.) (emphasis in original) (citation omitted), *aff'd*, *Condra v. PXRE Group Ltd.*, 2009

WL 4893719 (2d Cir. 2009).  Although the Complaint makes conclusory assertions that

Defendants, "by virtue of their receipt of information reflecting the true facts" had "access to the

adverse undisclosed information," AC ¶¶ 125, 126, it contains no factual allegations that support

any Defendant's scienter on this basis.  "[W]here plaintiffs contend defendants had access to

contrary facts, they must specifically identify the reports or statements containing this

information." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d

190, 196 (2d Cir. 2009); *see also In re Loral Space & Commc'ns Ltd. Secs. Litig.*, No. 01-CV-

4388, 2004 WL 376442, at *10-11 (S.D.N.Y. Feb. 26, 2004) (plaintiffs must provide specific

details about the nature, content, reliability, and availability of allegedly contradictory internal

reports).  The Complaint does not identify or provide details about a single undisclosed report,

communication or other piece of information that was available to any Defendant and

contradicted that Defendant's public statements.

Vague allegations that Defendants were aware of negative information through

unspecified "internal corporate documents, conversations and connections . . . , attendance at . . .

meetings . . . and/or via reports and other information," AC ¶ 126; *see also id.* ¶¶ 125, 139,

cannot create the requisite strong inference of any Defendant's scienter.  *See San Leandro*

*Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 812 (2d Cir.

1996) ("Plaintiffs' unsupported general claim of the existence of confidential company sales

15

reports . . . is insufficient to survive a motion to dismiss."). Similarly, allegations that Manulife

had board and management committees responsible for risk management, AC ¶¶ 127-32, are

insufficient in the absence of particularized allegations of facts known to those committees that

contradicted the Company's public disclosures. "It is well established that boilerplate allegations

that defendants knew or should have known of fraudulent conduct based solely on their board

membership or executive positions are insufficient to plead scienter." *PXRE Group,* 600 F.

Supp. 2d at 545 (internal quotation omitted); *see also 380544 Canada, Inc. v. Aspen Tech., Inc.*,

544 F. Supp. 2d 199, 222 (S.D.N.Y. 2009) ("[A]llegations regarding a defendant's managerial

status are insufficient to support a strong inference of scienter.").

        Unable to point to any specific undisclosed information that contradicted any

Defendant's public statement, Plaintiffs are left with the allegation that if the disclosures "about

Manulife's risk management [process] are true," then the Defendants "possessed knowledge

during the Class Period about Manulife's risk exposure . . . and the resulting impact that equity

market declines would have on the Company's capital level and earnings." AC ¶ 133. But

Defendants *did* disclose the risk posed by an "equity market decline;" what they did not do, and

were not required to do, was foresee and disclose the impact of the worst financial crisis in recent

history, which accelerated throughout late 2008. This is a classic allegation of fraud by

hindsight, which has long been insufficient to create a strong inference of scienter. *See Denny v.

Barber*, 576 F.2d at 470 (rejecting legitimacy of "alleging fraud by hindsight").

        A failure to anticipate future events does not constitute securities fraud, and "allegations

that statements in one report should have been made in earlier reports" are insufficient to survive

a motion to dismiss. *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 51, 53 (2d Cir. 1995).

Accordingly, in *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994), the Court

of Appeals found insufficient allegations that, in light of a company's later increases to its loan

loss reserves, the defendants knew or recklessly disregarded that the reserves were inadequate

when making their statements:

> [Plaintiff] records statements by defendants and holds them up against
> the backdrop of what actually transpired . . . . This technique is sufficient
> to allege that the defendants were wrong; but misguided optimism is not
> a cause of action, and does not support an inference of fraud . . . . These
> allegations do not say . . . that the company's disclosures were
> inconsistent with current data.  The pleading strongly suggests that the
> defendants should have been more alert and more skeptical, but nothing
> alleged indicates that management was promoting a fraud.  People in
> charge of an enterprise are not required to take a gloomy, fearful or
> defeatist view of the future; subject to what current data indicates, they
> can be expected to be confident about their stewardship and the
> prospects of the business that they manage.

As detailed above (at 6-11), Manulife repeatedly disclosed that an equity market decline

would result in reduced shareholder value and explained the steps it was taking (and not taking)

to mitigate that risk.  As equity markets declined throughout 2008, Manulife updated investors

on the impact that decline was having on Manulife's financial position.  Yet despite these

ongoing actions to keep investors informed, Plaintiffs seek to hold Manulife and its senior

executives liable for fraud because they failed – as nearly everyone did – to predict the full

extent of the meltdown in equity markets and to make disclosures that would have fully reflected

such a prediction.  The Complaint's allegations do not plead a claim that Defendants committed

securities fraud.  *See Acito*, 47 F.3d at 53 ("defendants' lack of clairvoyance simply does not

constitute securities fraud"); *Graham v. Barringer*, No. 08-CV-9357, 2009 WL3852461, at *1,

*12 (S.D.N.Y. Nov. 17, 2009) (dismissing claim that defendants misrepresented risks of

subprime real estate loans because vague allegations of "too little, too late" fail to state a claim

for securities fraud).

17

**B.    The Complaint Does Not Adequately Allege Any Material Misrepresentations.**

A disclosure is actionable under Section 10(b) and Rule 10b-5 only if it misstates a material fact or omits a material fact necessary to keep the statement from being misleading. *ECA*, 553 F.3d at 197.  A securities fraud complaint alleging material misstatements or omissions must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  Where, as here, a complaint is based on "investigation of counsel," AC at 1 (preamble), its allegations are necessarily made on "information and belief," and the complaint must plead particularized facts concerning the reasons why the statements were misleading when made.  *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 688, 691 (S.D.N.Y. 2008); *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 136 n.16 (D. Conn. 2007).

Plaintiffs have failed to plead particularized facts supporting their repeated assertions that Defendants' statements were false or misleading when made.  Plaintiffs rely on the subsequent market collapse to allege that Defendants failed to disclose that Manulife's "risk management policies, practices and controls" were "inadequate and ineffective" or "not prudent," or that "an equity market decline" (the most dramatic in 70 years) "would have a devastating effect on the Company's balance sheet."  AC ¶¶ 45, 49, 52, 66, 79.  But allegations that, with hindsight, Defendants did not predict and disclose the full potential impact of drastic worldwide equity market declines on shareholder value do not suffice to allege that any statements were misleading when made.

18

In addition, Plaintiffs allege that Defendants said things that the Complaint itself, or documents cited therein, makes clear they did not say. *Compare*, *e.g.*, AC ¶ 76 (alleging that Defendants said Manulife "would be able" to manage its capital without issuing common equity) and ¶ 77 (Mr. D'Alessandro "reiterated that Manulife would not raise capital by issuing equity") *with id.* ¶ 74 (quoting actual statement that Company "has no plans" to issue equity) and ¶ 77 ("we have no intention to issue equity capital"). Similarly, Plaintiffs' conclusory allegations that Manulife misrepresented its efforts to hedge against equity market risks, *see*, *e.g.*, *id.* ¶¶ 7, 45, 49, 52, are contradicted by Manulife's repeated disclosures throughout the putative class period that its hedging efforts were limited and not yet fully implemented. *See*, *e.g.*, Ex. 3 at 10; Ex. 7 at 6; Ex. 9 at 7. Plaintiffs' remaining allegations challenge statements of corporate optimism and opinion that are not actionable as a matter of law.

### 1. The Complaint Impermissibly Alleges Omissions Based on Hindsight.

Plaintiffs claim, in light of the impact that the equity market decline of 2008 ultimately had, that statements by Defendants before the market collapsed were materially misleading because they did not fully disclose the equity market risks associated with Manulife's Guaranteed Products. *E.g.*, AC ¶¶ 45(e), 49(e), 52(f), 71, 75, 79, 82, 94-105. Plaintiffs cannot rely on 20-20 hindsight to plead a material misstatement or omission. *See In re Union Carbide Class Action Sec. Litig.*, 648 F. Supp. 1322, 1327 (S.D.N.Y. 1986) ("[t]he determination of materiality is to be made upon all the facts as of the time of the transaction and not upon a 20-20 hindsight view long after the event") (*quoting Spielman v. Gen. Host Corp.*, 402 F. Supp. 190, 194 (S.D.N.Y. 1975), *aff'd*, 538 F.2d 39 (2d Cir. 1976)).

To be actionable, a statement must be materially misleading in light of the facts that existed when the statement was made. *See San Leandro*, 75 F.3d at 812-13 (disclosure of adverse information three weeks after positive representation does not support a finding that the

prior statement was false when made).  Accordingly, courts consistently have rejected allegations, like those here, that statements were misleading because negative events transpired after the statements were made.  *See, e.g.*, *Acito*, 47 F.3d at 53 (rejecting allegation that defendants' statements were materially misleading because they did not anticipate and disclose subsequent negative results of FDA inspection); *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 672 (S.D.N.Y. 2008) ("An earlier statement is not somehow made misleading simply because it failed to foretell a . . . problem which later materialized.").[5]

The Complaint itself and other documents subject to judicial notice show that Defendants consistently disclosed the equity market risks associated with Manulife's Guaranteed Products to investors.  Manulife's 2007 Annual Report, issued at the beginning of the putative class period, explicitly warned investors that equity market declines posed significant risks to shareholder value.  *See supra* at 6; AC ¶¶ 51, 53.  Subsequent disclosures during the putative class period reported the ongoing effects of the equity market decline and the risks that further declines might pose to shareholder value.  *See supra* at 6-11; AC ¶¶ 63-64, 67, 74, 85, 88-89, 94-95.  Because Manulife's disclosures "warn[ed] of the specific contingency that [lay] at the heart of the alleged misrepresentation," *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 96 (2d Cir. 2004), none of Defendants' statements were materially misleading for failing to disclose that contingency. *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357, 359 (2d Cir. 2002) (Courts "analyze the allegedly fraudulent materials in their entirety to determine . . . whether defendants'

---

[5]    *See also In re Huntington Bancshares Inc. Sec. Litig.*, No. 2:07-cv-1276, 2009 WL 4666455, at *12 (S.D. Ohio Dec. 4, 2009) (defendant "may have incorrectly believed it had adequate reserves, but the mere fact that those reserves eventually proved to be inadequate does not mean a false statement was made"); *In re Downey Sec. Litig.*, No. 08-CV-3261-JFW (RZx), 2009 WL 2767670, at *5 (C.D. Cal. Aug. 21, 2009) (rejecting allegations that post-statement increases to reserves indicated that reserves were misstated where the plaintiff "failed to allege any facts demonstrating that anything other than changing conditions at [defendant] and in the market dictated the increases in [defendant's] reserves").

23129437

representations or omissions, considered together and in context, would affect the total mix of information," such that "a reasonable investor could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist."); *Rubin v. MF Global, Ltd.*, 634 F. Supp. 2d 459, 473 (S.D.N.Y. 2009) (alleged failure to disclose possibility that a "risk management system would fail" is not actionable where defendants "made it clear that the . . . risk management system was not infallible").[6]

In addition, analyst reports issued before the putative class period show that the market was aware of Manulife's high sensitivity to equity market volatility. For example, on March 24, 2008, Scotia Capital reported that "Manulife is the most sensitive of the large Canadian lifecos to both equity markets and currency." Ex. 14 at 7. The next day, another analyst reported that "MFC is the most exposed to the macro headwinds (i.e., weaker US$; lower equity markets, lower interest rates) and as a result it could fall short of EPS growth and return on equity (ROE) targets in 2008." Ex. 15 at 3. The market was aware that this sensitivity stemmed primarily from Manulife's guaranteed benefit products, as reflected in an analyst's statement that "MFC has the largest book of variable product with guarantees and does not hedge a material part of its exposure." Ex. 16 at 13; *see also* Ex. 19 at 1 ("The sensitivity to stock prices and lower [capital and surplus ratio] is no surprise to us given the nature of Manulife's product and investment mix."). These reports show that investors were well aware of Manulife's sensitivity to equity

---

[6]  Plaintiffs' assertion that Defendants should have viewed a larger than 10 percent equity-market decline as "plausible" and disclosed the "disproportionately greater" impact of a larger decline, AC ¶¶ 47, 54(b), 90, charges Defendants with the "lack of clairvoyance" that "simply does not constitute securities fraud." *Acito*, 47 F.3d at 53. In any event, analysts noted that larger equity market declines could require disproportionate increases in capital. *See* Ex. 20 at 3 ("Directionally the required capital for equity guarantees [in Manulife's variable products] would worsen on subsequent similar moves in equity markets as the relationship is non-linear (i.e. the second 10% decline in equity markets should hurt more than the first 10% - similar to the value of an option)."); Ex. 13 at 6 (reserve calculations due to equity market changes are not "perfectly linear").

markets.  *See Beleson v. Schwartz*, 599 F. Supp. 2d 519, 527 (S.D.N.Y. 2009) (where analyst

reports and other public information clearly revealed the concerns about which plaintiffs claim to

have been misled, allegedly misleading statements were immaterial).[7]

### 2.    Manulife Did Not Misrepresent Its Hedging Activities.

Plaintiffs repeatedly assert that Defendants' statements during the putative class period

about Manulife's efforts to hedge the equity market risk associated with its Guaranteed Products

were misleading because "Manulife did not have in place any meaningful or effective hedging

programs."  *E.g.*, AC ¶¶ 45(b), 49(b), 52(b), 66, 93.  Labeling Manulife's hedging programs

"meaningless" or "ineffective," however, does not satisfy Plaintiffs' burden to plead

particularized facts supporting the allegation that Defendants' statements were false or

misleading.  *See* 15 U.S.C. § 78u-4(b)(1).  As described above (at 7-10), Manulife repeatedly

described the limited nature of its hedging program and explained that "by and large we retain

the risk."  Ex. 3 at 10; *see also* Ex. 7 at 6 ("I don't think it's realistic to expect that we would be

able to go and hedge away all of our exposure in a very short time frame and I don't think it's the

right use of our resources.").

Moreover, analyst reports demonstrate that investors understood that Manulife's hedging

of variable product guarantees did not fully cover its risk.  For example:

- In a March 25, 2008 report, TD Newcrest stated that "MFC has *started* to
  dynamically hedge, albeit *only a portion* of its U.S. variable annuity options risk."
  Ex. 15 at 16 (emphasis added).

---

[7]    Plaintiffs' allegation that the Ontario Securities Commission ("OSC") had reached a
"preliminary conclusion that the Company had failed to adequately disclose its exposure to
market price risk," AC ¶ 13, does not satisfy Plaintiffs' burden to support their fraud claim
with particularized factual allegations.  Moreover, this is merely the "preliminary
conclusion" of the OSC Staff and thus has no legal weight.  The Commission itself, not the
Staff, has the authority to make enforcement decisions after a hearing.  *See* Securities Act,
R.S.O. 1990, ch. S.5, § 127, amended by S.O. 2009, ch. 18 (Can.), Ex. 22.

- During Manulife's May 8, 2008 investor call, in which both Mr. Rubenovitch and Mr. D'Alessandro described the limits of Manulife's hedging activities (*see supra* at 7), an analyst acknowledged that "Manulife has historically not hedged." Ex. 3 at 20.

- After the same call, a CIBC World Markets analyst wrote that "volatile equity markets and a lack of hedging caused a large swing in earnings . . . [and] if MFC continues to sell a significant amount of guaranteed variable annuities and chooses not to hedge – *such results . . . are likely to repeat . . . .*" Ex. 17 at 2 (emphasis added).

- In an analyst report dated August 7, 2008, Credit Suisse wrote that "with the absence of . . . more material hedging against its growing variable annuities operations, we should expect more volatility in Manulife's quarterly earnings resulting from severe equity market swings." Ex. 18 at 2.

In light of Manulife's disclosures and these public statements, there is no basis for Plaintiffs' claim that investors were misled about the extent of Manulife's hedging efforts. *See Dujardin v. Liberty Media Corp.*, 359 F. Supp. 2d 337, 348 (S.D.N.Y. 2005) (dismissing claims where public documents disclosed that which plaintiffs alleged was concealed); *Sable v. Southmark/Envicon Capital Corp.*, 819 F. Supp. 324, 333 (S.D.N.Y. 1993) ("The naked assertion of concealment of material facts which is contradicted by published documents which expressly set forth the very facts allegedly concealed is insufficient to constitute actionable fraud.") (citations omitted).[8]

### 3.    Plaintiffs' Other Allegations Fail to Allege Any Material Misstatement.

Plaintiffs' remaining allegations of false or misleading statements also fail as a matter of law to support a claim under section 10(b) and Rule 10b-5.

---

[8] To the extent that Plaintiffs are actually attacking the performance of Manulife's management because they believe that Manulife should have hedged more and sooner, the federal securities laws do not provide a cause of action for alleged mismanagement. *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477 (1977) (no claim under § 10(b) for alleged "instances of corporate mismanagement").

Statements of Optimism/Opinion.  Numerous misstatements alleged in the Complaint are not only unsupported by particularized facts showing their falsity, but involve mere expressions of corporate optimism and opinion that are immaterial as a matter of law.  For example, Plaintiffs challenge statements that "Manulife . . . has a high-quality balance sheet," the Company was "well-positioned to weather these difficult times" and "to do well no matter . . . how turbulent the financial markets may get," and concerns about the impact of equity market declines on Manulife's product guarantees were "grossly exaggerated."  *E.g.*, AC ¶¶ 58, 68, 74, 77. Likewise, Plaintiffs argue that Manulife misled investors by stating that "the capital resources of the company . . . are more than adequate" and that "the Company remains conservatively reserved."  *Id.* ¶¶ 74, 78.  According to Plaintiffs, these statements "concealed and downplayed the significant risk that a continuing equity market downturn would require Manulife to shore up [its] capital reserves."  *Id.* ¶¶ 75, 79.  In fact, as discussed above, Manulife disclosed the risk of equity market declines to shareholder value, and the Complaint alleges no facts indicating that these statements were not true when made.  Moreover, these statements of corporate optimism or opinion cannot have been materially misleading as a matter of law.

A securities fraud claim cannot be based on vague statements of corporate optimism.  *See Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) (a company is "not required to take a gloomy, fearful or defeatist view of the future") (*quoting Shields*, 25 F.3d at 1129-30); *Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) (statements by company that it would not "compromise its financial integrity" and that it had a "commitment to create earnings opportunities" were "precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable"); *Steinberg v. Ericsson LM Tel. Co.*, No. 07-CV-9615-RPP, 2008 WL 5170640, at *9 (S.D.N.Y. Dec. 10, 2008) (statements that company would "continue to do well

24

and gain market share and outperform the competition were, without more, simply expressions of confidence in the viability of [defendant's] future business which do not give rise to a securities violation").

Manulife's statements about its ability to do well even in the face of turbulent financial markets merely expressed "a hopeful outlook" for the Company's future performance and prospects. Such statements are classic examples of nonactionable expressions of corporate optimism. *See Rombach*, 355 F.3d at 174; *Pollio v. MF Global, Ltd.*, 608 F. Supp. 2d 564, 571 (S.D.N.Y. 2009) (statements that "business is in . . . robust health" and "a stronger company than ever before" are non-actionable puffery).

In addition, as statements of opinion, these statements are not actionable under section 10(b) and Rule 10b-5 without specific factual allegations that Defendants did not sincerely hold the views expressed. *See Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 154 (S.D.N.Y. 2004) (statements of opinion not actionable unless plaintiffs "'allege with particularity' 'provable facts' to demonstrate that the statement of opinion is both objectively and subjectively false"); *In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 568-69 (S.D.N.Y. 2007) (statements that company has a "strong balance sheet" were "more properly characterized as optimistic statements of opinion as opposed to fact" and not actionable where plaintiff failed to allege they were not sincerely held). Because the Complaint contains no such factual allegations, none of these statements of opinion can support a securities fraud claim.

Risk Management. Plaintiffs assert that Manulife's statements concerning its "prudent" risk control systems and its "long-standing philosophy of financial discipline and rigorous risk management," AC ¶¶ 48, 51, 58, were materially misleading because Manulife's risk control systems allegedly were "inadequate and ineffective" given its ultimate need to raise capital "to

25

shore up the capital reserves backing its guaranteed payments." *Id.* ¶¶ 45, 49, 52, 59. Once again, Plaintiffs' allegations are insufficiently specific and are impermissibly grounded in hindsight, based on Manulife's need to increase reserves and raise capital as the equity markets experienced an unprecedented collapse.

These broad statements regarding the quality of the Company's risk controls and approach to risk management are at worst puffery and are immaterial as a matter of law. *Rombach*, 355 F.3d at 174; *ECA*, 553 F.3d at 205-06 (holding defendant's statements about its "highly disciplined risk management" and "its standard-setting reputation for integrity" were "no more than 'puffery' which does not give rise to securities violations"). Such statements were "too general to cause a reasonable investor to rely upon them [and] did not, and could not, amount to a guarantee that its choices would prevent failures in its risk management practices." *ECA*, 553 F.3d at 206; *see also Lasker*, 85 F.3d at 59 ("broad, general" statements regarding the defendant's financial integrity could not reasonably be relied upon as a guarantee that the company's "actions would in no way impact [its] finances").

Moreover, Plaintiffs allege no facts indicating that Manulife's processes for risk control were anything other than what it disclosed. For example, although Plaintiffs allege that Manulife "was not focused on 'managing the risk profile' of its John Hancock variable annuity business," they concede in the very next sentence that Manulife "had made a deliberate decision to retain substantially all of the risk." AC ¶ 56. Making a decision to retain risk may be subject to second-guessing, but it clearly was "managing the risk profile." Thus, the disclosure was not false or misleading. *See In re Citigroup Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) (descriptions of risk management processes do not support a securities fraud claim absent allegations they are materially inaccurate).

Similarly, Plaintiffs allege no facts supporting the assertion that Manulife's statements that it sought to control risk by "remain[ing] diversified across risk categories, business and geographies," AC ¶ 44; *see also id.* ¶¶ 48, 50, 51, were misleading because Manulife's "investment portfolio backing its [Guaranteed Products] was in fact highly correlated to an equity market decline." AC ¶ 45; *see also id.* ¶¶ 49, 52. First, the quoted disclosures refer to Manulife's business as a whole, not just the Guaranteed Products. Plaintiffs allege no facts indicating that Manulife's overall business was not diversified. Indeed, the Company earned a profit in 2008 despite the massive charges for the Guaranteed Products. Second, the Guaranteed Products "investment portfolio," which included largely equity securities, did not belong to Manulife but to the purchasers of those products, who directed the investment of their payments. Manulife's "investments" backing its potential liability with respect to the Guaranteed Products were the Company's other businesses.

Intention to Raise Equity. Lastly, allegations relating to Manulife's statements that it did not intend to issue equity, AC ¶¶ 77, 81, rely on mischaracterizations of the Defendants' statements. The Complaint pleads no facts indicating that, at the time the actual statements were made, they did not accurately reflect Defendants' intentions.

For a statement to be actionable under Section 10(b), "the representation must be one of existing fact, and not merely an expression of . . . expectation or declaration of intention." *In re Duane Reade Inc. Sec. Litig.*, No. 02-CV-6478, 2003 WL 22801416, at *4 (S.D.N.Y. Nov. 25, 2003) (citations omitted); *see also In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 107-08 (2d Cir. 1998) (statement that "I have no real plan, no desire, and I see no need to cut the dividend" was a non-actionable prediction or opinion). All of the statements identified by Plaintiffs were statements of present intention or expectation, not, as Plaintiffs miscast them, "assurances" as to

what the Company would do regardless of future developments. *E.g.*, AC ¶¶ 78, 84, 86. In order for these statements to be actionable, Plaintiffs must allege facts indicating that the Company's intentions were not as stated. *Podany*, 318 F. Supp. 2d at 154. The Complaint contains no such factual allegations. To the contrary, Defendants made clear that if conditions changed, Manulife would consider other options. *See, e.g.*, AC ¶ 32 ("[I]f markets do deteriorate we're a big, strong company and we'll go and do something else to re-establish our capital levels . . . at an acceptable threshold."); *San Leandro*, 75 F.3d at 812 (no misstatement as to present intent where there was "no allegation that [defendant] made any statements or predictions foreclosing the possibility of adopting alternative . . . strategies").

### C.    The Complaint Fails Adequately to Allege Loss Causation.

In addition to failing adequately to allege any Defendant's scienter or a material misrepresentation, the Complaint does not sufficiently allege "loss causation, *i.e.*, a causal connection between the material misrepresentation and the loss" that Plaintiffs claim to have suffered. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005) (citing 15 U.S.C. § 78u-4(b)(4)) (emphasis removed). For this reason, too, the Complaint's section 10(b) and Rule 10b-5 claims should be dismissed.

To plead loss causation, Plaintiffs must allege facts showing that a misstatement or omission by Defendants "concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (stating that *Dura* requires that "something beyond the mere possibility of loss causation must be alleged"). The Complaint fails to allege facts that permit a plausible inference of a causal link between any misrepresentation and Plaintiffs' alleged losses. First, because Defendants' disclosures did not misstate or omit any material facts, the purported corrective disclosures to which the Complaint

28

points, AC ¶¶ 144-147, did not reveal any previously concealed material information.  Second,

the Complaint does not allege facts sufficient to attribute any of Plaintiffs' losses to disclosure of

the alleged misrepresentations instead of to the general equity market decline or new

developments affecting Manulife's business.

> **1.    Defendants Disclosed the Facts that Plaintiffs Claim Were Later Revealed to Investors.**

Before the supposed revelations of the "truth" alleged in the Complaint, Defendants

disclosed the facts they are accused of concealing.  In particular:

- Long before Manulife's December 2, 2008 and February 12, 2009 announcements of increases to Guaranteed Product reserves and the resulting reductions in earnings, AC ¶¶ 144-45, Defendants disclosed the risk that equity market declines would require increased Guaranteed Product reserves and would reduce earnings. *See supra* at 6-10.[9]

- Prior to Fitch's downgrade of Manulife's rating on February 27, 2009, which cited "heightened volatility" because of "outsized, unhedged equity market exposure," AC ¶¶ 106, 146, Defendants disclosed that Manulife had not historically hedged its equity market exposure and that its efforts to start doing so had been limited.  *See supra* at 7-12.

Because "the matters that Plaintiffs claim [Defendants] failed to disclose had, in fact,

been disclosed to the market," none of the supposed "corrective disclosures" to which the

Complaint points can establish loss causation.  *Joffee v. Lehman Bros., Inc.*, 410 F. Supp. 2d 187,

191 (S.D.N.Y. 2006); *see also Omnicom*, 541 F. Supp. 2d at 552 ("[W]here a disclosure does not

reveal the falsity of the alleged misstatements, it does not qualify as 'corrective.'").

Moreover, some of the alleged corrective disclosures merely repeated information in

prior announcements that the Complaint also claims were corrective:

---

[9]    Manulife's announcement on December 2, 2008, that it would raise equity capital did not prove false its prior statements that, based on then-current conditions, Manulife did not intend to raise equity.  "A decision to reverse course, particularly in a dynamic business environment, does not imply that the earlier business strategy was a subterfuge."  *In re Omnicom Group, Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 552 (S.D.N.Y. 2008).

23129437

- Plaintiffs assert that the Company's February 12, 2009 announcement of *actual* increases to Guaranteed Product reserves ($5.78 billion) and losses ($1.8 billion) for the fourth quarter disclosed greater amounts than the December 2, 2008 announcement of *estimated* increases to Guaranteed Product reserves ($5 billion) and losses ($1.5 billion). However, the December 2, 2008 announcement already placed investors on notice that they should expect Manulife's final fourth quarter results to include substantial losses and increased reserves for Guaranteed Products and losses, and expressly warned that these estimates "may change."[10]

- Mr. Rubenovitch's March 2, 2009 presentation, AC ¶¶ 108-109, 147, contained information already discussed in the December 2, 2008 and February 12, 2009 press releases – *i.e.,* that precipitous equity market declines had resulted in increased Guaranteed Product reserves and losses, and that the Company's efforts to hedge against the risks of such declines were ongoing.

Even if any of the earlier statements had been a corrective disclosure (which they were not), repetition of that information is not a new basis for establishing loss causation. *See Omnicom*, 541 F. Supp. 2d at 552 ("A recharacterization of previously disclosed facts cannot qualify as a corrective disclosure.").

### 2. The Complaint Fails to Plead Facts That Attribute Plaintiffs' Losses to Fraud Instead of Other Factors.

The Complaint points to declines in Manulife's stock price around the times of the supposed corrective disclosures. *See* AC ¶¶ 144-47. The Complaint pleads no facts, however, that make it plausible that these declines were caused by any revelation of previously undisclosed information, as opposed to the general market decline or new developments. For this reason, too, the Complaint fails to allege loss causation.

The Supreme Court noted in *Dura* that the "logical link between [an] inflated share purchase price" resulting from an alleged misrepresentation "and any later economic loss is not

---

[10]    *See In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 678-79 (S.D.N.Y. 2007) (a "mere failure to meet earnings forecasts is insufficient to establish loss causation"). The February 12, 2009 press release identified the "major reason" for the increase over the prior estimates as "a sharp drop in swap interest rates which are used to value segregated fund guarantee liabilities." AC ¶ 97. Plaintiffs allege no facts indicating that this was not true.

invariably strong" because "that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events."  544 U.S. at 342-43.  Accordingly, Plaintiffs "must allege (i) facts sufficient to support an inference that it was defendant's fraud—rather than other salient factors—that proximately caused plaintiff's loss; or (ii) facts sufficient to apportion the losses" between the misrepresentation and the other factors.  *Lentell*, 396 F.3d at 177; *see also Omnicom*, 541 F. Supp. 2d at 553 ("plaintiffs must distinguish the alleged fraud from the 'tangle of [other] factors' that affect a stock's price") (quoting *Dura*, 544 U.S. at 343).

The Complaint alleges no facts that would permit the Court to attribute any of Plaintiffs' losses to the disclosure of previously concealed information instead of other factors, including the disclosure of new information.  The allegation that "[t]he timing and magnitude of the price decline in Manulife common stock negates any inference that the loss suffered by Plaintiffs . . . was caused by changed market conditions, macroeconomic or industry factors or Company specific factors unrelated to the Defendants' fraudulent conduct," AC ¶ 148, is nothing more than Plaintiffs' conclusory assertion.  It cannot meet their burden of pleading facts that make loss causation plausible.  *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (conclusory allegations do not satisfy Fed. R. Civ. P. 8(a)).[11]

---

[11]    The Complaint alleges an "80% decline from the Class Period high of $40.11 per share, reached on April 3, 2008," to its closing price of $7.90 on March 3, 2009, AC ¶ 147, Plaintiffs clearly cannot recover for the nearly 60 percent decline in Manulife's stock price before the first supposed corrective disclosure on December 2, 2008. Ex. 21 at 3, 8; *see Lentell*, 396 F.3d at 175 n.4 (allegedly concealed information "could not have caused a decrease in the value of those companies before the concealment was made public"). Moreover, the huge decline before the first alleged corrective disclosure undercuts any inference that the subsequent decline resulted from corrective disclosures, rather than the continuing market decline.

Instead of alleging specific facts, Plaintiffs rely on speculation and ignore other factors affecting Manulife's stock price. Plaintiffs suggest, citing no facts, that the day before Manulife issued its December 2, 2008 press release, "rumors . . . appear to have leaked into the marketplace" and led to a 6.34% drop in Manulife's stock price. AC ¶ 144. In addition to being wholly speculative (and therefore insufficient to state a claim, *see Twombly*, 550 U.S. at 555), Plaintiffs' assertion ignores the fact that on December 1 the entire market fell dramatically, with the S&P 500 down more than 8%. *See* Ex. 21 at 17. Because Manulife's stock price outperformed the overall market that day, this price decline is not indicative of any negative reaction to a corrective disclosure. *Lentell*, 396 F.3d at 174 ("[W]hen the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases.") (*quoting First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994)).

Moreover, although Plaintiffs contend that Manulife's stock price declined further on December 2 through December 4, AC ¶ 144, they ignore the fact that it rebounded on December 5, closing at almost exactly the same price as on December 1, the day before the announcement. *See* Ex. 21 at 8. These price movements are not indicative of any loss caused by a corrective disclosure. *See In re Acterna Corp. Sec. Litig.*, 378 F. Supp. 2d 561, 588-89 (D. Md. 2005) (no support for loss causation where price dropped only modestly after disclosure and then rebounded).

As discussed above (at 11-12), Manulife's February 12, 2009 press release and analyst call did not reveal any previously concealed information in light of Defendants' earlier disclosures, including those on December 2, 2008. Even if anything disclosed on February 12 had constituted a corrective disclosure, Plaintiffs simply assert that the stock price fell "[a]s a

32

result of these disclosures," rather than other new information disclosed in the 12-page press release or the analyst call. *See Police & Fire Retirement Sys. of City of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 228-29 (S.D.N.Y. 2009) (allegation inadequate where complaint fails to "explain why the [alleged corrective] disclosure on page eight – as opposed to all the other information in the extended 12-page press release – caused the price to decline").

In addition, the decline in Manulife's stock price following the Fitch ratings downgrade on February 27, 2009 is readily explained by the downgrade itself, which constituted a new development. *See, e.g.*, *Fort Worth Employers' Retirement Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 229 (S.D.N.Y. 2009) ( "The all-but-inevitable decline in the price of Biovail's stock . . . following the company's announcement that the FDA had not approved the [drug] application  . . . was caused by the agency's failure to approve the drug-not by any 'corrective' disclosure of some prior untruth."). Plaintiffs' allegation that this downgrade, which came two weeks after the Company's February 12, 2009 announcements, "reflect[ed] the adverse information that the market was then absorbing about the Company," AC ¶ 145, concedes that the downgrade revealed no previously undisclosed information. Any "adverse information" announced on February 12 would have been fully absorbed by the market well before the February 27 ratings downgrade. *See In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 269 (3d Cir. 2005) ("public information is absorbed into a firm's stock price . . . in the period immediately following disclosure"). Where information already has been disclosed, stock-price reactions to any subsequent "reflections" of or on that information do not support loss causation. *See Omnicom*, 541 F. Supp. 2d. at 554 (no liability where loss caused by "negative commentary about facts already known to the market"); *Joffee*, 410 F. Supp. 2d at 191 (where allegedly concealed facts

were previously disclosed, plaintiffs "cannot contend that any subsequent disclosure of [those facts] could have caused the decline").[12]

## II.    The Complaint Does Not State a Section 20(a) Claim Against the Individual Defendants.

The Complaint alleges that Messrs. Rubenovitch and D'Alessandro are liable as "controlling persons of Manulife" under section 20(a) of the Exchange Act. AC ¶¶ 157-58. To plead a section 20(a) claim, however, Plaintiffs must allege an underlying violation by Manulife of section 10(b). *SEC v. First Jersey, Sec., Inc.*, 101 F.3d 1450, 1473 (2d Cir. 1996). Because the Complaint fails to state a section 10(b) claim, the section 20(a) claims against Messrs. Rubenovitch and D'Alessandro must be dismissed. *Rombach*, 355 F.3d at 178.

Plaintiffs' section 20(a) claims also would fail because the Complaint does not adequately allege that Mr. Rubenovitch or Mr. D'Alessandro culpably participated in any underlying securities law violation. To plead a section 20(a) claim, a complaint must plead particularized facts giving rise to a strong inference of a culpable state of mind on the part of the alleged controlling person. *See* 15 U.S.C. § 78u-4(b)(2); *Kalin v. Xanboo, Inc.*, 526 F. Supp. 2d 392, 406 (S.D.N.Y. 2007) (the "weight of Second Circuit precedent favors the view that a Plaintiff must plead 'culpable participation' . . . with particularity" to state a section 20(a) claim); *see also SafeNet*, 645 F. Supp. 2d at 227 (the "heightened pleading standards" of 15 U.S.C. § 78u-4(b)(2) "apply to Section 20(a) claims"). The Complaint's allegations do not support any inference, let alone a strong inference, that either Mr. Rubenovitch or Mr. D'Alessandro possessed a culpable state of mind. Thus, the section 20(a) claims must be dismissed. *See*

---

[12]    As discussed above (at 12, 30), Mr. Rubenovitch's March 2, 2009 presentation did not reveal any previously concealed information in light of Defendants' earlier disclosures, including those on December 2, 2008 and February 12, 2009.

*SafeNet*, 645 F. Supp. 2d at 241 (dismissing section 20(a) claim against corporate officer "[f]or the reasons already mentioned in the discussion on scienter").

## CONCLUSION

For the foregoing reasons, the Complaint's claims against the Defendants should be dismissed.

Dated:  February 12, 2010

> DEBEVOISE & PLIMPTON LLP
>
> By:
>
> /s/ Gary W. Kubek
> Edwin G. Schallert
> Gary W. Kubek
> Stuart Naifeh
> Julie S. Suh
> 919 Third Avenue
> New York, NY 10022
> (212) 909-6000 (phone)
> (212) 909-6836 (fax)
> egschall@debevoise.com
> gwkubek@debevoise.com
> snaifeh@debevoise.com
> jssuh@debevoise.com
>
> Scott N. Auby
> 555 13th Street NW, Suite 1100E
> Washington, DC 20004
> (202) 383-8000 (phone)
> (202) 383-8118 (fax)
> snauby@debevoise.com
>
> *Attorneys for Defendants*