UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

─────────────────────────────────────x
In re MANULIFE FINANCIAL CORP.           )      1:09-cv-06185-JFK
SECURITIES LITIGATION                    )
                                         )      ECF Case
                                         )
                                         )
─────────────────────────────────────x

**REPLY MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS**

DEBEVOISE & PLIMPTON LLP

Edwin G. Schallert
Gary W. Kubek
Stuart C. Naifeh
Julie S. Suh
919 Third Avenue
New York, NY  10022
(212) 909-6000 (phone)
(212) 909-6836 (fax)

Scott N. Auby
555 13th Street NW, Suite 1100E
Washington, DC 20004
(202) 383-8000 (phone)
(202) 383-8118 (fax)

*Attorneys for Defendants*

April 29, 2010

## TABLE OF CONTENTS

Page

TABLE OF CONTENTS ................................................................................................................ i

TABLE OF AUTHORITIES ......................................................................................................... ii

PRELIMINARY STATEMENT .................................................................................................... 1

ARGUMENT .................................................................................................................................. 2

    I.    The Complaint Does Not Plead Facts Creating a Strong Inference of Any Defendant's Scienter. .................................................................................................................. 2

    II.   Plaintiffs Have Failed Adequately to Allege a Material Misrepresentation. ..................... 7

        A.   Plaintiffs' Allegations are Based on Fraud By Hindsight. ............................................. 7
        B.   Plaintiffs Fail to Allege Facts Showing that Defendants' Disclosures Were False or Misleading. ................................................................................................................. 8

    III.  The Complaint Does Not Adequately Allege Loss Causation. ........................................ 12

CONCLUSION ............................................................................................................................. 16

**TABLE OF AUTHORITIES**

**CASES**

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) .................................................................................13

*ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) ...........................................2

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ..................................................................13

*Citiline Holdings, Inc. v. Istar Fin. Inc.*, No. 08 Civ. 3612 (RJS), 2010 WL 1172647 (S.D.N.Y. Mar. 26, 2010) .........................................................................................................3

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 533 F.3d 187 (2d Cir. 2009).........................................................................................................10

*Ganino v. Citizens Utils. Co.*, 228 F.3d 154 (2d Cir. 2000) ..........................................................12

*Hall v. The Children's Place Retail Stores*, 580 F. Supp. 2d 212 (S.D.N.Y. 2008)....................3, 4

*In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666 (S.D.N.Y. 2007).........................15

*In re Australia & New Zealand Banking Group Ltd. Sec. Litig.*, No. 08 Civ. 11278 (DLC), 2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009)..........................................................9, 10

*In re Bayer AG Sec. Litig.*, No. 03 Civ. 1546 (WHP), 2004 WL 2190357 (S.D.N.Y. Sep. 30, 2004) ...................................................................................................................................10

*In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430 (S.D.N.Y. 2005).......................................................5

*In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266 (S.D.N.Y. 2006) .............................................5

*In re EVCI Colls. Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88 (S.D.N.Y. 2006) ........................8

*In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319 (S.D.N.Y. 2004)...............................3

*In re Hutchinson Tech., Inc. Sec. Litig.*, 536 F.3d 952 (8th Cir. 2008) ...........................................4

*In re IBM Corp. Sec. Litig.*, 163 F.3d 102 (2d Cir. 1998) .............................................................11

*In re Nash Finch Co. Sec. Litig.*, 502 F. Supp. 2d 861 (D. Minn. 2007).......................................10

*In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d 501 (2d Cir. 2010)............................................14

*In re PXRE Group, Ltd., Sec. Litig.*, 600 F. Supp. 2d 510 (S.D.N.Y. 2009), *aff'd sub nom. Condra v. PXRE Group Ltd.*, 2009 WL 4893719, No. 09-1370 (2d Cir. Dec. 21, 2009) ................................................................................................................................2, 3, 5

*In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63 (2nd Cir. 2001) .....................................................3

*In re Sec. Capital Assurance Ltd. Sec. Litig.*, No. Civ. 11086 (DAB), 2010 WL 1372688
     (S.D.N.Y. Mar. 31, 2010) ..............................................................................2, 10, 12, 14, 15

*Joffee v. Lehman Bros., Inc.*, 410 F. Supp. 2d 187 (S.D.N.Y. 2006)..............................................14

*Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221 (S.D.N.Y 2006)................................11

*Lazaro v. Good Samaritan Hosp.*, 54 F. Supp. 2d 180 (S.D.N.Y. 1999) ..........................................5

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005)............................................12, 13, 15

*Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243 (2d Cir. 2002) .............................................16

*Miss. Pub. Employees' Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75 (1st Cir. 2008) ..............3

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of
     Commerce*, No. 08 Civ. 8143 (WHP), 2010 WL 961596 (S.D.N.Y. Mar. 17, 2010)........1, 2, 7

*Police & Fire Ret. Sys. v. Safenet, Inc.*, 645 F. Supp. 2d 210 (S.D.N.Y. 2009) ...............................4

*Sable v. Southmark/Envicon Capital Corp.*, 819 F. Supp. 324 (S.D.N.Y. 1993) ............................9

*Santa Fe Indus., Inc. v. Green*, 430 U.S. 462 (1977)........................................................................3

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190 (2d
     Cir. 2008) .....................................................................................................................................2

*Tellabs v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) .........................................................6

**PRELIMINARY STATEMENT**

Although Plaintiffs deny that their claims allege "fraud by hindsight," Opp. at 3, 13-14[1], their Opposition demonstrates that, other than ignoring or mischaracterizing the disclosures that Defendants indisputably made, Plaintiffs' case is built on the argument that Defendants did not warn investors how badly the market crash would hurt Manulife's Guaranteed Products business. But Manulife *did* warn investors, at the very beginning of the class period, that "[a] sustained decline in stock markets could . . . increase the cost of guarantees associated with our variable products," Ex. 1 at 24,[2] and it provided accurate updated information (not contested by Plaintiffs) about the effect of the market collapse on Manulife's profits and reserves throughout the putative class period. Thus, Plaintiffs' claim does allege fraud by hindsight.

Plaintiffs offer no motive for Defendants to commit fraud and fail to identify any information provided to Defendants that contradicted their public disclosures. Indeed, Plaintiffs' allegation that Defendants did not hedge the Company's exposure to a market decline is inconsistent with the contention that Defendants knew or believed that Manulife would incur the losses it did and would ultimately be required to issue $2 billion of stock to increase its capital.

Courts in this District have recently dismissed other cases alleging that defendants failed to disclose what would happen as a result of the financial crisis and the stock market collapse. *See*, *e.g.*, *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of*

---

[1] Defendants' Memorandum of Law in Support of Motion to Dismiss the Amended Class Action Complaint is cited herein as "Def. Mem.," and Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss as "Opp."

[2] Documents cited as Ex. 1-22 are exhibits to the Declaration of Scott N. Auby previously submitted in support of Defendants' motion to dismiss. Documents cited as Ex. 23-24 are exhibits to the Declaration of Gary W. Kubek submitted herewith. Defendants do not "ask the Court to assume the truth of [these documents'] contents," Opp. at 23 n. 18, but simply cite them to show the actual disclosures that were made.

*Commerce*, No. 08 Civ. 8143 (WHP), 2010 WL 961596 (S.D.N.Y. Mar. 17, 2010) ("*CIBC*"); *In re Sec. Capital Assurance Ltd. Sec. Litig.*, No. Civ. 11086 (DAB), 2010 WL 1372688 (S.D.N.Y. Mar. 31, 2010) ("*Security Capital*"). In each case, the court concluded that plaintiffs failed to allege facts sufficient to support a conclusion that defendants had committed fraud, rather than being victimized by the "once-in-a-century . . . tsunami" that devastated the markets. *CIBC*, 2010 WL 961596 at *9. The same is true here, and therefore the Complaint should be dismissed.

## ARGUMENT

I.   **The Complaint Does Not Plead Facts Creating a Strong Inference of Any Defendant's Scienter.**

Plaintiffs' Opposition demonstrates that the Complaint fails to allege facts sufficient to establish scienter through either of the two tests that apply in this Circuit. *See ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). First, Plaintiffs concede that the Complaint does not allege that Defendants had the "motive and opportunity" to commit fraud. *See* Opp. at 25-26 & n.19. Instead, Plaintiffs attempt to raise the requisite strong inference of scienter by pleading conscious misbehavior or recklessness. However, Plaintiffs also acknowledge "the AC's lack of citation to specific reports containing information contradicting [Defendants'] statements," *id.* at 29, the kind of allegations required to plead scienter based on conscious misbehavior or recklessness. *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) ("[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information.") (citations omitted); *see also* Def. Mem. at 15-16.

Unable to allege that any "*specific* contradictory information was available to the [D]efendants," the test on which "Second Circuit cases uniformly rely," *In re PXRE Group, Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009) (emphasis in original, citations omitted),

2

*aff'd sub nom. Condra v. PXRE Group Ltd.*, 2009 WL 4893719, No. 09-1370 (2d Cir. Dec. 21, 2009), Plaintiffs resort to a hodgepodge of other allegations, none of which is sufficient.

First, Plaintiffs wrongly argue that "[t]he sheer magnitude" of Manulife's risk exposure is "evidence that Defendants recklessly ignored and disregarded the huge risks posed by the growing shortfall." Opp. at 26. Even if Defendants "recklessly ignored and disregarded" the alleged risks, that would not give rise to a claim for securities fraud. *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477 (1977) (no claim under § 10(b) for alleged "instances of corporate mismanagement"). Moreover, "the size of the [alleged] fraud alone does not create an inference of scienter." *PXRE Group,* 600 F. Supp. 2d at 545.[3]

With respect to the claim that Defendants misrepresented Manulife's intention to issue additional stock, there is no merit to Plaintiffs' argument that "[t]he proximity in time between Defendants' denials and the share issuance also provides strong circumstantial evidence of conscious misbehavior and recklessness." Opp. at 27. Again, the cases cited by Plaintiffs involved misrepresentations of historical facts. *See Citiline Holdings, Inc. v. Istar Fin. Inc.*, No. 08 Civ. 3612 (RJS), 2010 WL 1172647, at *1-2, *7 (S.D.N.Y. Mar. 26, 2010) (defendants announced large losses shortly after stating that portfolio was "performing pretty much as expected"); *Miss. Pub. Employees' Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75, 82-83 (1st Cir. 2008) (defendants announced product recall one week after stating that product defect had

---

[3]  The "sheer magnitude" cases cited by Plaintiffs involved particularized misrepresentations of historical facts, not uncertain future risks. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76-77 (2nd Cir. 2001) (complaint contained "detailed allegations as to what defendants knew on a daily, weekly, and monthly basis" about increasing product returns); *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 346-47 (S.D.N.Y. 2004) (defendants allegedly inflated revenue through illegal deals and fraudulent accounting practices, in "a fraud of a magnitude only rarely seen"); *Hall v. The Children's Place Retail Stores*, 580 F. Supp. 2d 212, 229 (S.D.N.Y. 2008) (defendants allegedly knew of 120 breaches of license agreement).

3

been "identified and fixed"). These cases do not support an inference of scienter as to Defendants' statements of intention, rather than facts, concerning future stock issuance.

Plaintiffs' claims also cannot survive based on the other allegations that purportedly "add[] to the overall pleading of circumstantial evidence of fraud." Opp. at 29. Although Plaintiffs contend that the OSC's investigation of Manulife "further contributes to an inference of scienter," the only case they cite does not state, as Plaintiffs assert, that "an SEC investigation [is] 'probative of scienter.'" *Id.* Rather, the court in *Hall,* 580 F. Supp. 2d at 233, noted that "[i]n the wake of the SEC investigation . . . the Company *admitted that it had material weaknesses in its internal controls—weaknesses probative of scienter*" (emphasis added). In fact, "the mere existence of [an] investigation cannot support any inferences of wrongdoing or fraudulent scienter on the part of [a] company or its senior management." *Police & Fire Ret. Sys. v. Safenet, Inc.*, 645 F. Supp. 2d 210, 230 (S.D.N.Y. 2009) (citation omitted); *see also In re Hutchinson Tech., Inc. Sec. Litig.*, 536 F.3d 952, 962 (8th Cir. 2008) ("mere existence of an SEC investigation does not suggest that any . . . statements were actually false and it does not render . . . statements . . . material nor does it add an inference of scienter").

The conclusory allegation that Mr. Rubenovitch's June 2009 resignation is probative of scienter is also wrong. *See* Opp. at 29. Pursuant to an announcement in September 2008, Donald Guloien became CEO of Manulife in May 2009. *See* Ex. 23. Plaintiffs fail to allege facts even suggesting that Mr. Rubenovitch's resignation reflected anything other than the new CEO's appointment of his own management team, including a new chief operating officer and chief investment officer. *See* Exs. 23, 24. This court has held that "[w]ithout additional factual allegations linking [defendant's] resignation . . . to the alleged fraud, the Court finds these

4

allegations insufficient to raise a strong inference of scienter." *PXRE Group*, 600 F. Supp. 2d at 545.[4]

Plaintiffs argue that the "core operations" doctrine permits "'knowledge of contradictory information' [to] be imputed to corporate executives 'if the subject matter of the alleged misstatements is sufficiently significant' to the company." Opp. at 30 (citation omitted). But even if this doctrine is still valid,[5] it merely permits knowledge of contradictory information to be imputed to top management *if* Plaintiffs allege specific information that contradicted the company's disclosures about its "core operations." As discussed below, the Complaint does not identify any specific "contradictory information" that Defendants failed to disclose.

Lastly, Plaintiffs try to rely on new allegations based on a *Financial Post* ("*Post*") article, not cited in the Complaint, but submitted as Exhibit A with Plaintiffs' Opposition. Opp. at 10. Even if these new allegations could be considered,[6] they do not provide particularized facts that support a claim of conscious misbehavior or recklessness. For example, Plaintiffs point to the *Post's* report of an April 2006 presentation in which Manulife's risk officer allegedly said that its balance sheet "could not absorb [this] growing equity risk." Opp. at 27. However, Manulife warned investors at the beginning of the class period that a market decline could result in losses on the Guaranteed Products. *See* Ex. 1. Even if the article is accurate, a vague warning in 2006

---

[4] *See also In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 446-47 (S.D.N.Y. 2005) ("In reality, there are any number of reasons that an executive might resign, most of which are not related to fraud. . . . Accordingly, absent any alleged facts linking the two resignations and the alleged fraud, the resignations of [the defendants] do not support an inference of conscious misbehavior or recklessness.").

[5] The case relied on by Plaintiffs states that post-PSLRA jurisprudence has "cast doubt on whether scienter can be pleaded in this manner." *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 294 n.209 (S.D.N.Y. 2006).

[6] "[I]t is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss." *Lazaro v. Good Samaritan Hosp.*, 54 F. Supp. 2d 180, 184 (S.D.N.Y. 1999).

of an unquantified future risk cannot support an inference that Defendants acted with scienter in failing to predict and disclose the possible extent of losses that were not incurred until the market crashed two years later.

The *Post* article's statements about Defendants' discussions with its Canadian regulator, the Office of the Superintendent of Financial Institutions ("OSFI"), regarding Manulife's capital reserves also do not support Plaintiffs' claims that "Defendants had access to information contradicting their public statements." Opp. at 26-28. First, these purported discussions cannot support an inference of scienter before the unspecified time when OSFI allegedly "showed up at Manulife's door." *Post* at 3. Moreover, the *Post* article does not identify any concealed information that contradicts Manulife's disclosures, but simply says that OSFI "raised questions," reviewed board minutes and presentations and "sought a meeting to discuss its concerns." *Id*. at 3. Although the article asserts that OSFI later "insisted [Manulife] do a series of transactions," issuance of common stock was only one of the possible options mentioned "to flush up Manulife's capital." *Id.* at 4. The article's statement that "[D'Alessandro] refused to consider diluting Manulife's shareholders with a share offering, insisting it was a last-resort option," *id.*, is consistent with Defendants' statements in late October and November 2008 that Manulife did not intend to issue equity.

Because Plaintiffs plead neither motive and opportunity nor specific facts showing Defendants' knowledge of information contradicting their public statements, Plaintiffs' conclusory allegations cannot raise an inference of scienter, let alone one that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). A far more compelling inference is that Manulife, like so many other financial institutions and investors, simply failed to foresee the

massive stock market decline in 2008 and early 2009.  *See CIBC*, 2010 WL 961596 at *9 (dismissing complaint because it "makes no reference to internal CIBC documents or confidential sources discrediting Defendants' assertions that they were only adapting to a 'rapidly changing economic landscape' during a 'once-in-a-century credit tsunami'").

## II.     Plaintiffs Have Failed Adequately to Allege a Material Misrepresentation.

### A.     Plaintiffs' Allegations are Based on Fraud By Hindsight.

Defendants' Memorandum demonstrated that Manulife consistently warned investors about the risk of losses because of its exposure, through the Guaranteed Products and other businesses, to a stock market decline.  Def. Mem. at 1, 6-11, 19-21.  As the events of 2008 unfolded, bringing about a rapid and nearly unprecedented decline in world-wide equity markets, Manulife regularly updated investors about the impact those declines were having on its variable product guarantees, and thus on its financial condition and results, and its efforts to control and address those effects.  *See*, *e.g.*, AC ¶¶ 62, 70, 74, 88, 89, 95.[7]

Plaintiffs assert that Defendants "concealed, downplayed and misrepresented Manulife's true vulnerability to the adverse market conditions that were occurring," Opp. at 13, but they do not identify any material factual misstatements.  Instead, the basis for Plaintiffs' allegations is that when the stock market declined by more than 50%, Manulife incurred substantial losses, its "amount at risk" on Guaranteed Products "mushroom[ed]" to $27 billion, and the Company had to assume bank debt and issue stock to "increase its capital reserves."  *Id.* at 15.  These allegations, based on unpredictable events that happened after Defendants' alleged misstatements

---

[7]  Defendants are not asserting a "truth on the market" defense, as Plaintiffs contend.  Opp. at 21.  That defense is predicated on there having been a false or misleading statement, which requires the defendant to identify corrective information that was known to the market.  Here, the disclosures cited by Defendants show that Plaintiffs have failed adequately to allege any false or misleading statement requiring correction.

and omissions, are a classic example of fraud by hindsight. *See also* AC ¶ 69 (alleging that Defendants failed to disclose what *might* happen "in future quarters" "if equity market volatility continued.")

### B. Plaintiffs Fail to Allege Facts Showing that Defendants' Disclosures Were False or Misleading.

Plaintiffs' attempts to identify specific statements that were false or misleading fail because they either ignore or mischaracterize Defendants' actual disclosures.[8]

<u>Possible Future Effect on Earnings</u>. Plaintiffs' contention that Defendants failed to "quantify the earnings impact" of a decline in equity markets on Manulife's earnings or to disclose that such impact could be "non-linear," Opp. at 22-23, does not allege a material misstatement or omission. Plaintiffs cite no obligation under accounting rules or otherwise for Manulife to predict the possible impact of any particular market decline, *id.* at 23, much less a range of price movements wide enough to encompass the dramatic decline that occurred in 2008 and early 2009.[9]

---

[8] Plaintiffs' assertion that they met their burden by following each alleged misstatement with "a paragraph identifying precisely what facts defendants knew but failed to disclose when the statement was made," *In re EVCI Colls. Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 96 (S.D.N.Y. 2006), is contradicted by the Complaint. Unlike in *EVCI*, where the plaintiffs cited documents and information obtained from confidential informants identifying specific facts that contradicted the defendant's public statements, Plaintiffs here merely repeat nearly identical conclusory assertions that all or most of the statements alleged in the preceding paragraph were false or misleading. *See*, *e.g.*, AC ¶¶ 45, 49, 52, 66, 75, 79, 82, 93.

[9] Moreover, Plaintiffs ignore Manulife's March 2008 disclosure of the impact of a 10% decline in equity markets, *see* Ex. 1 at 25, when they assert that Manulife "did not begin to quantify the earnings impact that further equity market declines would have until February 12, 2009." Opp. at 22-23. Also, Plaintiffs concede that Manulife disclosed that the effect of a market decline on reserves would be "non-linear." *Id.* at 23. Because the Company disclosed the basic accounting fact that if "any increase in reserve is required . . . , this would decrease the earnings in that period," Ex. 6 at 1, it is a matter of simple logic that a non-linear increase in reserves would have a non-linear effect on earnings.

Plaintiffs' contention that "shareholder economic value," defined as "the net present value of future cash flows related to current assets, recurring premiums to be received and product

8

Risk Management. Defendants disclosed, and the market was aware, that the Company had made a business decision to retain most of the risk associated with its variable product guarantees, Ex. 3 at 10, and that it was only slowly increasing its use of hedges because hedging was very expensive in the volatile markets of 2008. *E.g.*, Ex. 9 at 7. Because these facts were disclosed, they cannot give rise to 10b-5 liability. *See Sable v. Southmark/Envicon Capital Corp.*, 819 F. Supp. 324, 333 (S.D.N.Y. 1993) ("The naked assertion of concealment of material facts which is contradicted by published documents which expressly set forth the very facts allegedly concealed is insufficient to constitute actionable fraud.") (citations omitted).[10]

Plaintiffs point to a single statement – indeed, a portion of one sentence – by Mr. Rubenovitch during the November 6, 2008 analyst call, that the Company had "a program in place [that] hedged a substantial portion" of its Guaranteed Products. Opp. at 24. However, the very same answer reiterated that there was significant unhedged exposure: "we need a strategy that includes a range of things, and I think hedging does fit in," "we are as sensitive as anybody and then some about the shortfalls of hedging," and "that's why we are only looking to use it appropriately." Ex. 9 at 13. Mr. Rubenovitch also had stated earlier that "we are now hedging all the *new* business originated in the US *so that we don't add to our existing position*." *Id.* at 9 (emphasis added). More fundamentally, not only had the Company just announced third quarter charges of over $300 million related to Guaranteed Products, but Mr. Rubenovitch also said that

---

benefit and expenses to be paid," "had nothing to do with [Manulife's] earnings," Opp. at 22, is nonsensical. The Company's future cash flows from premiums and returns on assets, less benefits and expenses paid, would affect earnings. In any event, it is the shareholder economic value that is ultimately of concern to the shareholder, who owns a proportionate stake in the company.

[10] Plaintiffs assert that "investors discovered at the end of the Class Period [that Manulife's variable product guarantees] had grown to $101 billion," implying that Manulife concealed this number. Opp. at 24. Of course, the Company could not have reported the 2008 year-end level of those guarantees before that time.

"the reserve and capital required for segregated fund guarantees is very volatile," and that "[a]s long as markets are turbulent, our income statement is going to reflect the changes in the reserves related to segregated fund guarantees . . . and it is quite sensitive." *Id.* at 10. No reasonable investor could have concluded from these statements that Manulife did not have substantial continuing equity market exposure.

Plaintiffs' effort to impose liability for Defendants' statements that the Company was "conservatively reserved" or that its risk controls were "prudent" and "rigorous," AC ¶ 58, 74, also fails because these statements "contain no representations as to specific facts," and are non-actionable puffery. *See In re Bayer AG Sec. Litig.*, No. 03 Civ. 1546 (WHP), 2004 WL 2190357, at *13 (S.D.N.Y. Sep. 30, 2004); *Security Capital*, 2010 WL 1372688, at *28 (bank's reference to "its underwriting approach as 'disciplined' and 'conservative' and its overcollateralization triggers as "robust" in the face of deterioration are classic examples of puffery").[11]

Plaintiffs wrongly contend that the statements are actionable because some were made in response to investor concerns about the Company's exposure to equity markets. The cases on which plaintiffs rely hold only that allegations of puffery are not insulated from liability if they "lend support to Plaintiff's more specific allegations of false statements and fraud on the market." *In re Nash Finch Co. Sec. Litig.*, 502 F. Supp. 2d 861, 879 (D. Minn. 2007). Here, there are no specific allegations of false statements. Plaintiffs' assertion that "Defendants continued to represent that the declining markets were not negatively impacting the Company's

---

[11] Far from being "increasingly rare," Opp. at 17, courts "have routinely held [optimistic generalizations, or "puffery"] to be nonactionable as outside the scope of federal securities laws." *In re Australia & New Zealand Banking Group Ltd. Sec. Litig.*, No. 08 Civ. 11278 (DLC), 2009 WL 4823923, at *11 (S.D.N.Y. Dec. 14, 2009). The Second Circuit recently affirmed dismissal of a claim based on language remarkably similar to that at issue here. *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 533 F.3d 187, 205-06 (2d Cir. 2009) (statements that "risk management processes . . . are highly disciplined" are "no more than 'puffery' which does not give rise to securities violations").

financial position," Opp. at 2, is simply wrong. As seen in the documents the Amended Complaint cites, the general statements about Manulife's ability to weather the downturn were accompanied by disclosures of charges to income, additions to reserves and other measures of equity market exposure, which Plaintiffs do not allege were false. In light of these disclosures, Defendants' statements of corporate optimism could not have misled a reasonable investor.

Moreover, even with the benefit of hindsight, these statements were not wrong, as Manulife earned a profit in 2008, AC ¶ 97, notwithstanding the worst equity market in 70 years and a severe recession. Manulife did "weather these difficult times" because "[t]he diversified nature of [the] company" made it "well-diversified across risk categories." Opp. at 5-6.

The Issuance of Equity. Although Plaintiffs continue to mischaracterize Defendants' statements that "equity capital raising is not *anticipated*," and they had "no plans" and "no intention" to issue equity, as "unequivocal assurances," Opp. at 20, statements of future intention are not actionable absent allegations that they were not sincerely held when made, which Plaintiffs do not allege. *See In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 108 (2d Cir. 1998). Plaintiffs contend that Defendants' statements are actionable because they "imply certainty." Opp. at 20. However, statements of opinion imply certainty only "if they are worded as guarantees or are supported by specific statements of fact." *Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 239 (S.D.N.Y 2006) (quoting *In re IBM Sec. Litig.*, 163 F.3d at 107). The quoted statements were not a guarantee, but made clear that Defendants "can't predict the future" and that changing conditions could cause a change in strategy. Ex. 7 at 13. Indeed, Mr. Rubenovitch stated that if equity markets deteriorated further from October 2008 levels, the company would take the necessary steps to restore its capital levels. AC ¶ 78.[12] Several weeks

---

[12] Plaintiffs contort Mr. Rubenovitch's statement when they contend that he guaranteed that the Company would not raise equity capital. Opp at. 20. After saying that the "capital

later, when Manulife obtained a $3 billion credit line, Defendant D'Alessandro explained that Manulife "saw equity as a more expensive form of capital," but acknowledged that "if we didn't have any options, we would have raised the equity." Ex. 9 at 13. These statements did not "imply certainty" that Manulife would not issue equity if market conditions changed.

### III. The Complaint Does Not Adequately Allege Loss Causation.

Plaintiffs fail to rebut Defendants' showing that the Complaint does not allege facts establishing the required "causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (citations omitted).

Plaintiffs make the unsupported assertion that it is "inappropriate," Opp. at 34, to consider the fact that Manulife's stock had already declined from about $37 at the start of the class period to $16 on the day before the first purported corrective disclosure. Ex. 21 at 2, 8.[13] However, "when the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases." *Lentell*, 396 F.3d at 174 (citations omitted); *see also Security Capital*, 2010 WL 1372688, at *29 (loss causation not adequately alleged where "the price of [defendant's] stock declined steadily over the course of the Class Period, *while* Plaintiffs allege that the misrepresentations were being made, and *before* the 'truth was revealed' to the public") (emphasis in original).

---

resources of the company, under almost any reasonable expectation of what's going to happen, are more than adequate *today*," he acknowledged that "if markets do deteriorate, we'll go and do something else to re-establish our capital levels." Ex. 7 at 13 (emphasis added). The only ways to do that would be to borrow money or issue debt or equity.

[13] "[T]he district court may take judicial notice of well-publicized stock prices." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 n.8 (2d Cir. 2000).

In addition, Plaintiffs have not shown how any of the four alleged "corrective" disclosures—on December 2, 2008, February 12, 2009, February 27, 2009 and March 2, 2009—corrected any previously misrepresented information, and they have failed to show that such disclosures, rather than other market factors, caused their loss.

December 2, 2009. As explained above, there was nothing "corrective" about Manulife's announcement that it would issue equity and expected a large loss in the fourth quarter. Moreover, the Complaint does not adequately allege that this disclosure resulted in any loss to investors. Although Plaintiffs do not repeat their baseless speculation that a "leak" of this information caused the stock price to drop on December 1, they continue to rely on that pre-disclosure decline to support loss causation. *See* Opp. at 32 ("share price tumbled . . . *from an opening price of $17.50 per share on December 1, 2008* . . . .") (emphasis added). This speculation cannot establish a claim of loss causation that is "plausible on its face." *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Without the pre-disclosure drop, all that remains is a *de minimis* decline on December 2 from $16.39 to $15.96, with the price recovering to $16.36 by the end of the week. *See* Ex. 21.[14]

February 12, 2009. This press release and analyst call disclosed the actual loss and increase in reserves during the fourth quarter, which were somewhat larger than the prior estimates, but the December 2 press release had cautioned that it was "based on current estimates and assumptions and may change." Ex. 10. Similarly, Mr. D'Alessandro's statement that the company was "late in activating" its hedging programs did not reveal any previously concealed information: The Company had regularly informed investors about the progress of its hedging

---

[14] Moreover, Plaintiffs make no effort to disentangle the impact of the alleged corrective disclosure of the equity issuance from the new estimated fourth quarter loss announced in the same press release. *See Lentell*, 396 F.3d at 177.

13

programs, and characterizing that progress as "slow" or "late" did not reveal new information. Because these alleged "corrective disclosures" reveal no previously undisclosed information, they cannot support loss causation. *Joffee v. Lehman Bros., Inc.*, 410 F. Supp. 2d 187, 191 (S.D.N.Y. 2006) (dismissing complaint where "the matters that Plaintiffs claim [Defendants] failed to disclose had, in fact, been disclosed to the market").

February 27, 2009. The Fitch ratings downgrade was a new development, an independent basis for a stock price decline. *See Security Capital*, 2010 WL 1372688, at *31 (loss causation not established where "Plaintiffs allege no facts suggesting that it was Defendants' alleged concealment of its investment . . . rather than Fitch's [downgrade] that caused the declines in [the company's] stock value."). The basis of the downgrade, the Company's unhedged market exposure, had been extensively disclosed. *See In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010) (loss causation not established by "a negative characterization of already-public information").

March 2, 2009. None of Mr. Rubenovitch's statements, Opp. at 33, corrected any prior misrepresentation or disclosed concealed information. First, the disclosure of the value of the funds associated with the Guaranteed Products was not corrective, because the Amended Complaint does not allege that the Company previously misrepresented that value. Second, Plaintiffs' statement that Mr. Rubenovitch "confirmed" that the Guaranteed Products were the primary cause of the Company's low earnings in 2008 acknowledges that this information was previously disclosed. *Id.* Third, Plaintiffs fail to explain the supposed significance of the disclosure that the Company's reserves "covered less than half of the amount at risk," *id.*, as they do not contend that the reserves failed to satisfy accounting or regulatory requirements.[15]

---

15  Although Plaintiffs criticize Defendants' description of "amount at risk" as "a theoretical value only," Opp. at 15 n.10, that is in fact what it is. The "amount at risk" is the difference

14

Plaintiffs fare no better with their argument that even if "some of the announcements reported new developments," they "may plead loss causation by alleging that the risks which were previously concealed materialized through a series of events or announcements." Opp. at 33. A plaintiff cannot base a claim on the materialization of a risk that was previously disclosed, such as the risk of losses due to Guaranteed Products if the stock market declined. Rather, "[i]n each of the cases in which the Second Circuit has employed a materialization of the risk analysis, it has considered a particular risk that was *allegedly concealed by the defendant's actions* and which then materialized to cause a market loss." *In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 678 (S.D.N.Y. 2007) (emphasis added); *see also Security Capital*, 2010 WL 1372688, at *29 ("[i]t must be the materialization of the concealed risk that caused the plaintiff's loss.").

Plaintiffs have not satisfied their burden to "allege (i) facts sufficient to support an inference that it was defendant's fraud—rather than other salient factors—that proximately caused plaintiff's loss; or (ii) facts sufficient to apportion the losses between any disclosed and concealed portions of the risk." *Lentell,* 396 F.3d at 177. Plaintiffs have failed to recognize, much less account for, the severe world-wide decline in equity markets and the bleak economic conditions that also affected many other financial services companies and were beyond Manulife's control or its ability to disclose before they happened. *See Security Capital*, 2010 WL 1372688, at *30 (dismissing complaint where "Plaintiffs' allegations . . . incorporate intervening events and actors, and at times present . . . wide event windows that welcome into their narrative noise and information from other events").

---

between the value of guaranteed payments not required to be made for 7-30 years and the current value of the customers' fund accounts. Ex. 1 at 26. Thus, the "astounding" $27 billion at risk, Opp. at 32, would be completely eliminated by a total return of less than 40% over the next 30 years on the $74 billion of assets in the Guaranteed Product accounts.

15

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed without leave to amend.[16]

Dated: April 29, 2010

        DEBEVOISE & PLIMPTON LLP

        /s/ Gary W. Kubek
        Edwin G. Schallert
        Gary W. Kubek
        Stuart Naifeh
        Julie Suh
        919 Third Avenue
        New York, NY 10022
        (212) 909-6000 (phone)
        (212) 909-6836 (fax)
        egschall@debevoise.com
        gwkubek@debevoise.com
        snaifeh@debevoise.com
        jssuh@debevoise.com

        Scott N. Auby
        555 13th Street NW, Suite 1100E
        Washington, DC 20004
        (202) 383-8000 (phone)
        (202) 383-8118 (fax)
        snauby@debevoise.com

        *Attorneys for Defendants*

---

[16] Leave to amend should be denied where amendment would be futile, as when the proposed amended pleading could not withstand a motion to dismiss. *See Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 258 (2d Cir. 2002); *In re Merrill Lynch & Co. Research Reports Secs. Litig.*, Nos. 02 MDL 1484, 02 Civ. 9690 (JFK), 2008 WL 2324111, at *8 (S.D.N.Y. June 4, 2008) (amendment futile where risks well-disclosed or loss causation impossible to show). Plaintiffs have already amended their complaint once. The only amendment proposed by Plaintiffs is the addition of facts asserted in the *Post* article, Opp. at 11 n. 7, which are insufficient to support a claim. *See* pp. 5-6, *supra*.