USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  May 23, 2011

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------X
IN RE:  MANULIFE FINANCIAL CORPORATION  :    09 Civ. 6185 (JFK)
SECURITIES LITIGATION                   :
----------------------------------------:    **OPINION AND ORDER**
This document relates to all actions.   :
----------------------------------------X


APPEARANCES

 For Lead Plaintiffs Locals 302 and 612 of the International
 Union of Operating Engineers-Employers Construction
 Industry Retirement Trust, Western Washington Laborers-
 Employers Pension Trust, and California Ironworkers Field
 Pension Trust:

  ROBBINS GELLER RUDMAN & DOWD LLP
  By:  Samuel H. Rudman, Esq.
    David A. Rosenfeld, Esq.
    Erin W. Boardman, Esq.

 For Defendants Manulife Financial Corporation, Dominic
 D'Alessandro, and Peter Rubenovitch:

  DEBEVOISE & PLIMPTON LLP
  By:  Edwin G. Schallert, Esq.
    Gary W. Kubek, Esq.
    Stuart C. Naifeh, Esq.
    Julie S. Suh, Esq.
    Scott N. Auby, Esq.


**JOHN F. KEENAN, United States District Judge**

**JOHN F. KEENAN, United States District Judge:**

Lead Plaintiffs Locals 302 and 612 of the International Union of Operating Engineers-Employers Construction Industry Retirement Trust, Western Washington Laborers-Employers Pension Trust, and California Ironworkers Field Pension Trust (collectively, "Lead Plaintiffs") bring this putative securities fraud class action suit against Defendants Manulife Financial Corporation ("Manulife" or the "Company"), former Manulife President and Chief Executive Officer ("CEO") Dominic D'Alessandro ("D'Alessandro"), and former Manulife Senior Executive Vice President and Chief Financial Officer ("CFO") Peter Rubenovitch ("Rubenovitch") (with D'Alessandro, the "Individual Defendants").  In their Amended Class Action Complaint ("Amended Complaint" or, in citation, "Am. Compl."), Lead Plaintiffs--on behalf of a putative class including investors who purchased or acquired Manulife common stock between March 28, 2008 and March 3, 2009, inclusive (the "Class Period")--bring claims against Manulife and the Individual Defendants under Section 10(b) of the Securities Exchange Act of 1934 (the "'34 Act"), 15 U.S.C. § 78j(b), and Securities and Exchange Commission Rule 10b-5 ("Rule 10b-5"), 17 C.F.R. § 240.10b-5.  Lead Plaintiffs also bring claims against the Individual Defendants as "controlling person[s]" derivatively liable for Manulife's alleged violations of the federal

securities laws during the Class Period pursuant to § 20(a) of the '34 Act, 15 U.S.C. § 78t.

Before the Court is Manulife and the Individual Defendants' motion to dismiss the Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  For the reasons stated below, the Amended Complaint fails to state a claim against Manulife or the Individual Defendants for violations of § 10(b) of the '34 Act or Rule 10b-5. Furthermore, because Lead Plaintiffs have failed adequately to plead that Manulife violated the federal securities laws, the Individual Defendants cannot be held liable pursuant to § 20(a) of the '34 Act.  Accordingly, Manulife and the Individual Defendants' motion to dismiss is granted.  However, the dismissal is without prejudice, and Lead Plaintiffs are granted leave to amend the first Amended Complaint.

## I.  Background

Unless otherwise stated, the following facts are taken from the Amended Complaint.  The Court accepts as true all factual allegations in the complaint and construes all reasonable inferences in favor of Lead Plaintiffs. See Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 424 (2d Cir. 2008).  In addition to the allegations in the Amended Complaint, the Court considers written instruments attached to the Amended Complaint as an exhibit and all statements or documents incorporated in it

by reference, "as well as public disclosure documents required by law to be, and that have been, filed with the SEC." Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000) (citations omitted); see also DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010).  The Court may also consider matters of which the Court may take judicial notice, Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007), including well-publicized stock prices and equity index levels, Ganino v. Citizens Util. Co., 228 F.3d 154, 167 n.8 (2d Cir 2000).[1]

The Court does not consider new allegations raised by Lead Plaintiffs in their Memorandum in Opposition to the Motion to Dismiss, because long-standing precedent in the Second Circuit prevents parties from amending the pleadings by raising new issues in their briefs. Fadem v. Ford Motor Co., 352 F. Supp. 2d 501, 516 (S.D.N.Y. 2005)).

**A.   The Parties**

Lead Plaintiffs represent a putative class consisting of all United States investors who purchased Manulife common stock during the Class Period, excluding Manulife's officers and directors, their immediate family members and fiduciaries, and

---

[1] Values expressed in Canadian dollars are labeled "C$" while values expressed in United States dollars are labeled "US$." Unless taken from Amended Complaint, equity prices and index data are taken from the Google Finance website, at http://www.-google.com/finance.

"any entity in which Defendants have or had a controlling
interest." (Am. Compl. ¶ 28).

Manulife is a publicly traded financial services company
headquartered in Toronto, Ontario, and incorporated under the
laws of Canada, with shares traded on the Toronto and New York
Stock Exchanges as well as on the Stock Exchange of Hong Kong
and the Philippine Stock Exchange. (Am. Compl. ¶¶ 2, 19, 43).
In 2004, Manulife merged with John Hancock Financial Services,
Inc., a Massachusetts corporation.  Since the merger, Manulife
has operated as John Hancock in the United States. See Manulife
Financial Corp., Annual Report for the Fiscal Year Ended
December 31, 2007 (Form 40-F) (hereinafter, "2007 Form 40-F"),
Ex. 99.2 (Mar. 28, 2008), available at http://sec.gov/Archives/-
edgar/data/1086888/000119312508067981/dex992.htm.  Through its
subsidiaries in North America and Asia, Manulife provides life
insurance, long-term care insurance, and mutual fund investment
products to its customers as well as investment management and
reinsurance services. (Am. Compl. ¶ 34).

B.  **Manulife's Operations**

Both insurance regulators and securities regulators in the
U.S. and Canada regulate parts of Manulife's operations.  The
Canadian Office of the Superintendent of Financial Institutions
(the "OSFI"), as well as provincial insurance regulators in
Canada, state insurance regulators in the United States, and

insurance regulators in other markets in which it provides insurance services, regulate insurance-related aspects of Manulife's operations. (Am. Compl. ¶ 40).  As an issuer of publicly traded securities, Manulife is subject to regulations issued by the U.S. Securities and Exchange Commission (the "SEC"), as well as Canadian provincial securities regulators such as the Ontario Securities Commission (the "OSC"), and securities regulators in other markets in which it offers publicly traded securities. (Am. Compl. ¶ 43, 116).

Lead Plaintiffs' claims in this suit concern the financial impact of Manulife's segregated fund and variable annuity products on the value of Manulife common stock.  These two investment products (the "Guaranteed Products") share common features; both segregated funds and variable annuities are "hybrids of mutual fund investments and insurance contracts." (Am. Compl. ¶ 38).  The purchaser of a Guaranteed Product pays a certain amount of money to the Company in exchange for payments in the future, and Manulife invests the money on behalf of the policyholder in assets including equity securities, giving Guaranteed Product policyholders the potential to benefit from equity market growth. (Am. Compl. ¶¶ 38-39, 45).  However, unlike typical mutual fund investments, segregated fund and variable annuity investments pay a guaranteed minimum to the policyholders. (Am. Compl. ¶ 39).  To obtain the features of

stability and opportunity for growth, "customers pay hefty fees and agree to hold the annuity for a specified period of time." (Am. Compl. ¶ 39).  Manulife profits so long as the long-term value of the funds exceeds the guaranteed payment obligations, but may incur losses when the value of the funds are insufficient to cover the guarantees. (Am. Compl. ¶ 39).

Temporary declines in the value of invested funds backing the Guaranteed Products do not necessarily prevent Manulife from satisfying its Guaranteed Product obligations, which are often long-term obligations.  However, accounting rules and regulatory capital requirements force Manulife to recognize some unrealized losses when the value of the funds backing future guaranteed payments falls below certain levels. (See Am. Compl. ¶¶ 40-42). For Manulife's Canadian operations, the OSFI measures capital adequacy by calculating a Minimum Continuing Capital and Surplus Requirements ("MCCSR") ratio, which depends on available capital and other risk metrics. (Am. Compl. ¶ 40).  Another metric, Risk Based Capital, is calculated by U.S. regulators to assess Manulife's capital adequacy. (Am. Compl. ¶ 40).  Canadian Generally Accepted Accounting Principles ("Canadian GAAP") require companies to assess capital adequacy based on Conditional Tail Expectation ("CTE") levels. (Am. Compl. ¶ 41). CTE measures the ability of a given amount of capital to cover the average cost of a range of probable adverse events; a CTE

level of 80 indicates that there is capital sufficient to cover
the average cost of the top 20% of the scenarios tested with the
highest net cost. (Am. Compl. ¶ 41). Lead Plaintiffs allege
that Manulife was required to maintain a CTE level between 60
and 80. (Am. Compl. ¶ 41). Finally, Manulife is required to
report the confidence level of its capital reserves. The
confidence level corresponds to the percentage of adverse
scenarios tested currently covered by the Company's capital; a
confidence level of 90 indicates that current reserves are
adequate to cover 90% of the adverse scenarios tested. (Am.
Compl. 41).

**C.   Class Period Allegations**

Lead Plaintiffs allege that during the Class Period,
between March 28, 2008 and March 3, 2009, Manulife and the
Individual Defendants defrauded investors when they concealed
risks to the value of Manulife stock by "touting the Company's
. . . prudent risk management and the diversified nature of its
investments, and by stating that Manulife was well positioned to
weather equity market declines." (Am. Compl. ¶ 6). Lead
Plaintiffs allege that these statements artificially inflated
the value of Manulife stock, (see Am. Compl. ¶ 25, 136), so that
when "the truth was revealed to the market," the price of
Manulife common stock dropped and the investors lost a

substantial part of the value of their investments, (see Am.
Compl. ¶¶ 141, 144-148).

**1.    The 2007 Annual Report**

On March 28, 2008, the first day of the Class Period,
Manulife released its Annual Report for the 2007 fiscal year
(the "2007 Annual Report"). (Am. Compl. ¶ 43).  The 2007 Annual
Report discussed several features of Manulife's business
intended to mitigate risk.  One of these features was Manulife's
common investment platform, which provided Manulife's customers
with "a broad spectrum of diversified domestic and international
equity funds, domestic and global fixed income funds and
specialty funds . . . managed by a distinctive selection of
leading investment companies." 2007 Form 40-F, Ex. 99.1, at 3,
10.  In the "Management's Discussion and Analysis" section of
the 2007 Annual Report, Manulife stated that its risk management
systems were focused on "long-term revenue and earnings growth,"
accomplished by "capitalizing on business opportunities that are
aligned with the Company's risk taking philosophy, risk appetite
and return expectations." 2007 Form 40-F, Ex. 99.2, at 21.

In the "Risk Management" portion of the 2007 Annual Report,
Manulife detailed its methods for identifying, measuring, and
controlling risk.  A number of officers and business divisions
played a role in Manulife's risk management operations.
Officers responsible for risk management included the CEO, CFO,

Chief Risk Officer, Internal Auditor, and Chief Actuary.  The
Executive Risk Committee, the Corporate Risk Management group,
and the Audit and Risk Management Committee of the Board of
Directors were among the groups responsible for risk management
at Manulife.  Manulife Financial Corp., 2007 Annual Report (Form
6-K) (hereinafter, "2007 Form 6-K"), Ex. 99.1, 21-22 (Mar. 28,
2008), available at http://sec.gov/Archives/edgar/-
data/1086888/000119312508067982/dex991.htm.  Manulife
represented that it performed stress tests on its "regulatory
capital adequacy over a five year projected timeframe,
incorporating both existing and projected new business
activities, under a number of significantly adverse but
'plausible' scenarios." 2007 Form 6-K, at 22.  It also
represented that it "performed various risk mitigation
activities, such as product and investment portfolio management,
hedging, reinsurance and insurance protection." Id.  These
efforts were designed to keep potential losses from the risk of
underperformance of non-fixed income investments "within
acceptable limits." Id. at 23.

The 2007 Annual Report quantified the immediate effects of
an increase or decrease of 10% on the economic value of
Manulife's common stock in a table captioned "Table 2:  Impact
on Shareholders Economic Value from Variable Products and Other
Managed Assets." 2007 Form 6-K, at 25 tbl. 2.  The table

indicated that a 10% decrease in equity prices could cause a loss of C$209,000,000.00 in shareholder value due to its Guaranteed Product obligations. Id. at 26.  Another table, captioned "Table 3:  Variable Annuity and Segregated Fund Guarantees," indicated that the expected average cost stemming from its Guaranteed Products was C$2,268 million for 2007. Id. tbl 3.  With respect to its John Hancock operation in the United States, Manulife stated that it "continued to develop its variable annuity portfolio with a clear focus on meeting the needs of customers, maintaining competitiveness within the market and managing the risk profile of the business." 2007 Form 40-F, at 13.

### 2.  Statements on May 8, 2008

On May 8, 2008, Manulife held a shareholders' meeting (the "May 2008 Shareholders' Meeting") and an analyst conference call (the "May 2008 Analyst Call"), and issued a press release (the "May 2008 Press Release").  Lead Plaintiffs allege that Manulife and the Individual Defendants are responsible for a number of misstatements made in the May 2008 Shareholders' Meeting, Analyst Call, and Press Release.

At the May 2008 Shareholders' Meeting, D'Alessandro discussed Manulife's "diversified nature" and its "prudent risk management." (Am. Compl. ¶ 58).  D'Alessandro also discussed Manulife's future prospects; in D'Alessandro's view, Manulife's

"diverse asset portfolio and very, very stable funding base and
strong liquidity position" would permit Manulife "to do well no
matter what and how turbulent the financial markets may get."
(Am. Compl. ¶ 58).

Despite these optimistic statements in the May 2008 Press
Release, the Company warned that "sharp declines in global
equity markets . . . reduced reported earnings in the [first
quarter of 2008] by C$265 million or C$0.18 cents [sic] per
share." (Am. Compl. 62).  During the May 2008 Analyst Call, one
analyst asked:  "[A]t what point would [Manulife] want to start
hedging equities?"  Rubenovitch answered that Manulife was
already hedging and that further hedging would be costly in the
current economy.  He attributed the high cost of hedging against
equity market losses to low interest rates and high volatility.
Given the high cost of hedging and the long duration of
Manulife's Guaranteed Product liabilities, Manulife "would do
more [hedging] . . . commensurate with our risk appetite." (Am.
Compl. ¶ 63).  Another analyst asked, "To what extent would a
full hedging program [have] prevented some of this volatility?"
(Am. Compl. ¶ 64).  Rubenovitch stated in response that hedging
"would have reduced our income and reduced the volatility quite
materially." (Am. Compl. ¶ 64).

Later in the May 2008 Analyst Call, D'Alessandro stated
that the growth of Manulife's variable annuity offerings

suggested that it could face heightened exposure to losses in equity markets. (Am. Compl. ¶ 65 ("[W]e see the day that the amounts of equity exposure that are going to accumulate are larger than we're comfortable with.").)  According to D'Alessandro, Manulife would continue to engage in the hedging program it had begun towards the end of 2007, but noted that due to the high cost of hedging, Manulife would "be investigating other avenues to reduce [its] volatility and exposure." (Am. Compl. ¶ 65).

### 3. Statements on August 7, 2008

Lead Plaintiffs allege that Manulife and D'Alessandro made further misrepresentations in a press release issued on August 7, 2008 (the "August 2008 Press Release"), and during an analyst conference call held on the same date (the "August 2008 Analyst Call").

In its August 2008 Press Release, Manulife announced a drop in net income of C$94 million for the second quarter of 2008 on a year-to-year basis.  This reduction in profit was due in part to a C$250 million earnings charge resulting from "weak . . . equity markets, higher strain on increased sales, the strengthening of the Canadian dollar and tax related provisions." (Am. Compl. ¶ 67).

A statement in the August 2008 Press Release attributed to Rubenovitch described Manulife's operating results as

"excellent," and statements attributed to D'Alessandro echoed Rubenovitch's position. (Am. Compl. ¶¶ 67-68).  According to D'Alessandro, Manulife's "strong balance sheet, excellent distribution capabilities and leading market shares" permitted Manulife "to compete in all market conditions." (Am. Compl. ¶ 68).  D'Alessandro was questioned by one analyst about Manulife's reduced share repurchases and lower MCCSR levels, and whether these two developments suggested that Manulife was becoming "capital constrained." (Am. Compl. ¶ 70).  D'Alessandro admitted that the MCCSR of 200 was "a bit lower than it has historically been," and that the variable annuity products were "capital intensive" under the current market conditions of depressed equity values.  However, despite the high capital costs of the Guaranteed Products, D'Alessandro asserted that Manulife had "the mechanisms to monitor [the capital level issue] and take appropriate action, come what may." (Am. Compl. ¶ 70).

### 4.  Fall 2008 Statements

The fall of 2008 was a time of global economic uncertainty, characterized by extreme volatility in U.S. equity prices.  When trading ended on August 7, 2008, the S&P 500 Index was at 1,289.19.  On September 15, 2008, Lehman Brothers Holdings, Inc., one of the largest investment banks in the world, filed a Chapter 11 bankruptcy petition. See Voluntary Petition (Chapter

11), <u>In re Lehman Brothers Holdings Inc.</u>, Chapter 11 Case No. 08-13555 (JMP) (S.D.N.Y. Bankr. Sept. 15, 2008).  On October 13, 2008, the Dow Jones Industrial Average rose 936.42 points; it fell 733.08 points just two days later.  By November 20, the S&P 500 Index was down to 752.44, representing a 41.63% decline from August 7.  On December 11, 2008, federal authorities announced the arrest of Bernard Madoff for a massive Ponzi scheme perpetrated through Bernard L. Madoff Investment Securities LLC. <u>United States v. Madoff</u>, 586 F. Supp. 2d 240, 244 (S.D.N.Y. 2009) (Ellis, Mag. J.).  By the close of trading on December 31, 2008, the S&P Index had rebounded slightly and closed at 903.25. The fall of 2008 was also characterized by political and legislative uncertainty, with the enactment (and later revision) of the Troubled Asset Relief Program and a presidential election.  Lead Plaintiffs allege that Manulife and the Individual Defendants made a number of misstatements during this period of equity market uncertainty.

On October 13, 2008 Manulife issued a press release (the "October 2008 Press Release"), which according to Lead Plaintiffs contained "misleading reassurances about the sufficiency of Manulife's capital reserves backing its variable annuity and segregated fund guaranteed" and false statements indicating "that the Company would not need to issue equity to shore up its capital levels." (Am. Compl. ¶ 74).  Lead

Plaintiffs allege that Manulife falsely represented that it was "conservatively reserved," that it had "a high quality balance sheet," and that it had "no plans to issue common equity." (Am. Compl. ¶ 74).

During an analyst conference call held on October 14, 2008 (the "October 2008 Analyst Call"), D'Alessandro again discussed the allegedly pervasive capital concerns.  He characterized the concerns as "grossly exaggerated," and stated that Manulife "remain[ed] very well capitalized and . . . [had] no intention to issue equity capital." (Am. Compl. ¶ 77).  D'Alessandro continued:

> [T]he capital resources of the company, under almost
> any reasonable expectation of what's going to happen,
> are more than adequate today.  Now, I can't predict
> the future and . . . if markets do deteriorate we're a
> big, strong company and we'll go and do something else
> to re-establish our capital levels at . . . an
> acceptable threshold.

(Am. Compl. ¶ 78).  D'Alessandro's comments on the October 2008 Analyst Call were echoed by Manulife Executive Vice President and Chief Actuary, Simon Curtis, who stated that "[e]xternal equity capital raising is not anticipated to be necessary to maintain [Manulife's] fourth quarter capital ratios," and also described Manulife's balance sheet as strong. (Am. Compl. ¶ 81).

Three weeks later, on November 6, 2008, Manulife issued a press release (the "November 2008 Press Release").  In this press release, Manulife announced that its shareholders' net

income for the quarter ending September 30, 2008, was C$510 million. (Am. Compl. ¶ 85).  These earnings reflected a C$574 million reduction due to "sharp declines in global equity markets." (Am. Compl. ¶ 85).  Manulife also announced that it obtained a loan from a coalition of six Canadian banks "to provide a 5-year term loan of C$3 billion . . . to provide additional regulatory capital for its operating subsidiaries." (Am. Compl. ¶ 86).

The November 2008 Press Release also discussed the impact of recent changes to the OFSI's MCCSR guidelines for the calculation of required capital on segregated fund products. The OFSI had increased capital required for short-term obligations and reduced capital required to support distant payment obligations. (Am. Compl. ¶ 87).  Due to the change in capital requirements and the availability of regulatory capital from the C$3 billion loan, Manulife estimated that its principal Canadian operating company, Manufacturers Life Insurance Company, had an MCCSR "estimated at a very robust 225 per cent," (Am. Compl. ¶ 87), as compared with an MCCSR of 193 prior to revisions by the OFSI, (Df.'s Decl. Supp. Mot. Dismiss, Exh. 8, at 6.)

In both the November 2008 Press Release and an analyst conference call held on Noveber 6, 2008 (the "November 2008 Analyst Call"), Manulife described the benefits of the changes

to the capital requirements made by OFSI.  D'Allesandro
discussed the "enormous pressure" equity price declines were
putting on Manulife's capital reserves. (Am. Compl. ¶ 88).
Given these enormous declines, D'Alessandro stated that the
OFSI's modification of its capital requirements provided
"welcome relief" while keeping these requirements "robust." (Am.
Compl. ¶ 88).  Given the new capital requirements, Rubenovitch
stated that Manulife could withstand a further 10% decline in
market values and still maintain an MCCSR above 200, and that
"[i]t would take a market correction of 25% from the October
31st levels to reach the lower end of our targeted MCCSR range
of 180 to 200." (Am. Compl. ¶ 89).  Therefore, "barring a very
sizeable collapse in markets," D'Alessandro stated that he
expected Manulife to remain well capitalized at year end." (Am.
Compl. ¶ 88).

     Due to the structure of the variable annuity and segregated
fund products, Rubenovitch stated that upcoming losses resulting
from a short-term failure of the equity markets to rebound would
"represent crystallized amounts" of loss; instead, according to
Rubenovitch, Manulife would "generate positive income when the
markets do eventually recover from the current low levels." (Am.
Compl. ¶ 89).  Rubenovitch also noted, in response to analyst
questions about Manulife's hedging strategy, that Manulife
"hedge[d] a substantial portion, but not 100% of the product,"

and was "hedging all the new business originated in the US." (Am. Compl. ¶ 92).

Lead Plaintiffs allege that between November 6, 2008, and March 3, 2009, the public learned that statements previously made by the Defendants during the Class Period were false or misleading.

**5.  December 2008 through March 2009**

On December 2, 2008, Manulife announced that it planned to raise C$2.125 billion in common equity to strengthen its capital reserves. (Am. Compl. ¶ 94).  Manulife also announced an anticipated loss of C$1.5 billion for the quarter ending on December 31, 2008.  Further capital reserve charges were announced on February 12, 2009, along with a C$370 million increase in the anticipated loss for the fourth quarter of 2008 that had been announced on December 2 of the previous year. (Am. Compl. ¶ 97).  Manulife's net income for 2007 was C$4.302 billion; in 2008, its net income was C$517 million. (Am. Compl. ¶ 97).  As of February 12, Manulife's Guaranteed Product obligations exceeded funds backing those obligations by C$27 billion. (Am. Compl. ¶ 99).  On February 27, 2009, citing Manulife's "outsized, unhedged equity market exposure," Fitch Ratings downgraded its rating of Manulife.

On March 2, 2009 Rubenovitch gave a presentation at a conference organized by the Association of Insurance and

Financial Analysts in Scottsdale, Arizona.  The presentation disclosed that declines in equity prices had reduced earnings for 2008 by C$3.747; the bulk of this reduction in earnings was attributable to capital expenses related to Manulife's Guaranteed Products. (Am. Compl. ¶ 108).  The presentation also discussed Manulife's hedging operations, addressing both its past hedging practices and its planned future hedging. (Am. Compl. ¶ 109).

### 6.  Manulife Stock Price Movement During the Class Period

In the Amended Complaint, Lead Plaintiffs refer to the price of Manulife common stock following certain public statements in order to support their theory of loss causation. (See Am. Compl. ¶¶ 57, 84, 96, 105, 107, 110, 142-147).  Lead Plaintiffs allege that Manulife's public statements artificially inflated the price of Manulife stock, and that as these statements were publicly revealed to have been false, "the price of Manulife common shares fell precipitously as the prior artificial inflation came out of the price of Manulife's [common] stock." (Am. Compl. ¶ 140).

On the day Manulife issued the 2007 Annual Report, the price of its common stock declined from US$37.96 to US$37.24 at the close of trading.  To support their allegation that the 2007 Annual Report artificially inflated the price of Manulife common stock, Lead Plaintiffs allege that the price "rose steadily"

-19-

between March 28 and April 3, 2008.  At the close of trading on April 3, 2008, Manulife common stock was trading at US$40.11. The movement in Manulife's stock price between the issuance of the 2007 Annual Report and the October 2008 Press Release and Analyst Call is not addressed in the Amended Complaint.

By the close of trading on Sunday, October 10, 2008, the price of Manulife common stock had fallen to US$23.34.  Lead Plaintiffs allege that statements made in the October 2008 Press Release and during the October 2008 Analyst Call artificially re-inflated the price of Manulife common stock.  Manulife common stock was priced at US$26.31 at the close of trading on October 14, 2008.

Lead Plaintiffs allege that negative rumors relating to the information that would be disclosed on December 2, 2008, caused a decline in the price Manulife common stock from US$17.50 to US$16.39 on December 1, 2008, but make no allegation about where, when, or by whom these rumors were reported. (See Am. Compl. ¶ 96).  After Manulife announced its need to raise additional capital and forecast a fourth-quarter loss of C$1.5 billion on December 2, 2008, the price of its common stock fell, closing at US$15.96 on December 2, and then at US$15.34 on December 3.

As discussed above, in February 2009 Manulife confirmed many of the negative forecasts it made in early December 2008.

After the February 2009 statements, the price of Manulife common stock fell from US$15.75 on February 11 to US$14.15 at the close of trading on February 13. (Am. Compl. ¶ 105).  The downgrade by Fitch Ratings announced on February 27, 2009, is alleged to have caused the decline in Manulife's common stock price from US$10.93, its opening price on February 27, to US$10.15, its closing price on that day.  The final decline in the price of Manulife common stock alleged in the Amended Complaint took place after the presentation given by Rubenovitch on March 2, 2009.  On March 2, Manulife common stock opened at US$9.80; on March 3, 2009, Manulife common stock closed at US$7.90.

Lead Plaintiffs allege that the decline in Manulife's share price from US$40.11 on April 3, 2008, to US$7.90 on March 3, 2009, "was a direct result of the nature and extent of Defendants' fraud finally being revealed to . . . the market." (Am. Compl. ¶ 148).

**E.   Post-Class Period Allegations**

Although Lead Plaintiffs allege that the full extent of Manulife's equity market exposure resulting from its Guaranteed Products offerings were known to the investing public by March 3, 2009, they rely on a number statements and events after the Class Period to support their claims that certain of Manulife's Class Period statements were made recklessly or with the intent to deceive the public.

On March 26, 2009, Manulife filed with the SEC its Annual Report for the fiscal year ending December 31, 2008 (the "2008 Annual Report"). (Am. Compl. ¶ 111).  The 2008 Annual Report discussed the impact of the Guaranteed Products on Manulife's earnings and balance sheet, and indicated that Manulife was adopting a more comprehensive hedging program to reduce equity market risk. (Am. Compl. ¶ 111). On May 7, 2009, Manulife announced a loss of C$1.1 billion for the quarter ending March 31, 2009 in a press release (the "May 2009 Press Release") and analyst conference call (the "May 2009 Analyst Call").  Both the May 2008 Press Release and May 2009 Analyst Call addressed Manulife's ongoing hedging efforts, and during the May 2009 Analyst Call, Rubenovitch disclosed that the C$27 billion gap between Manulife's obligations on its Guaranteed Products and the funds backing those obligations had increased by C$3 billion. (Am. Compl. ¶ 114).

In a press release issued on June 19, 2009, Manulife announced that it had received a notice from the OSC that its staff "had reached a preliminary conclusion that prior to March 2009, Manulife had failed to adequately disclose" its equity market exposure. (Am. Compl. ¶ 116).  The OSC would determine whether it would commence further proceedings after giving Manulife an opportunity to respond. (Am. Compl. ¶ 117).  On the

same day, Manulife announced that Rubenovitch would resign as
CFO, effective June 22, 2009. (Am. Compl. ¶ 118).

The final post-Class Period allegations in the Amended
Complaint are quotations from various news sources.  The June
20, 2009 article from the Financial Post quoted in the Amended
Complaint states that certain investors "began asking questions
about Manulife's" Guaranteed Product exposure to declines in
equity prices after Manulife had obtained a C$3 billion loan
from a coalition of banks in November 2008. (Am. Compl. ¶ 118).
An article that appeared in the Toronto Star on June 20, 2009
suggested that they "were not properly informed" of Manulife's
equity market exposure. (Am. Compl. ¶ 120).  Lead Plaintiffs
also note that, in an article from the Globe and Mail published
on the same day, at least one expert states his belief that
investors would have changed their investment decisions "[i]f
more information would have been available." (Am. Compl. ¶ 121).
Other articles, published in the Globe and Mail and by Reuters
News on June 23 and 25, 2009, respectively, suggest that
Manulife had not fully disclosed the impact of potential
declines in equity prices. (Am. Compl. ¶ 122-123).

In their Memorandum in Opposition to Defendants' Motion to
Dismiss, Lead Plaintiffs attempt to support their allegations
that Manulife and the Individual Defendants acted with scienter
by requesting that the Court take judicial notice of an article

-23-

entitled "Inside the fortress:  Drama behind Manulife's doors,"
which appeared in the Canadian newspaper Financial Post on
January 30, 2010.  The introduction of new factual allegations
through a legal memorandum is not permitted, see Fadem v. Ford
Motor Co., 352 F. Supp. 2d 501, 516 (S.D.N.Y. 2005), and
therefore the Court does not consider any allegations not raised
in the Amended Complaint.[2]

**F.   Procedural History**

This case was initiated on June 7, 2009, when Eugene
Burzotta filed a class action complaint against Manulife and the
Individual Defendants in this Court.  Later, on September 8,
2009, Anthony Verdi filed a class action complaint against the
same defendants.  Both complaints alleged that Manulife and the

---

[2] Though the Court does not consider the new allegations based in
the Financial Post article, the result of this motion would be
no different if the Court did consider the allegations in this
motion.  For substantially the same reasons discussed below in
Sections II.B.1 and II.B.2, neither the fact that Manulife's
Chief Risk Officer believed in April 2006 that the Company
"could not absorb the growing equity risk," nor the fact that in
October 2008, the OFSI requested that Manulife raise capital by
entering into "a series of transactions" support the Lead
Plaintiffs' allegations that Manulife's public statements were
materially false or made with scienter.  Similarly, the concerns
expressed by the OFSI in November and December 2008 and the
OFSI's request that Manulife retain "Deloitte & Touche to
conduct an independent examination of [its] risk-management
processes for its Guaranteed Products," (Lead Pls.' Decl. Opp.
Mot. Dismiss Exh. A), indicate that the OFSI was performing its
duty as an insurance regulator, but do not contradict any public
statements nor render any public statements of opinion
attributable to Manulife or the Individual Defendants actionably
false.

Individual Defendants violated the federal securities laws between March 28, 2008 and June 22, 2009.  On November 2, 2009 the Court appointed Lead Plaintiffs under section 101(a) of the Private Securities Litigation Reform Act, 15 U.S.C. § 77z-1. Lead Plaintiffs filed the Amended Complaint on December 29, 2009, and Manulife and the Individual Defendants moved to dismiss the Amended Complaint on April 29, 2010.  On October 19, 2010, the Court heard oral argument on the instant motion.

## II.  Discussion

### A.  Pleading Standard

Manulife and the Individual Defendants move pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the Amended Complaint for failure to state a claim for which relief can be granted.  In the absence of heightened or particularized pleading requirements, a complaint states a claim for relief when it contains "a short and plain statement of the grounds for the court's jurisdiction," "a short and plain statement of the claim showing that the pleader is entitled to relief," and "a demand for the relief sought." Fed. R. Civ. P. 8(a)(1)-(3).  In making a determination as to whether the factual allegations support the pleader's claim to relief, the court accepts all well-pleaded facts alleged in the complaint as true and draws "all inferences in favor of the plaintiff." In re DDAVP Direct Purchaser Antitrust Litig., 585 F.3d 677, 692 (2d

Cir. 2009) (quotations omitted).  However, even when no
heightened or particularized pleading standards apply, a court
need not accept "[t]hreadbare recitals of the elements of a
cause of action, supported by mere conclusory statements."
Ashcroft v. Iqbal, 556 U.S. ----, 129 S. Ct. 1937, 1949 (2009).
Therefore, "only a complaint that states a plausible claim for
relief survives a motion to dismiss." Id. at 1950 (emphasis
added).

Two sources of heightened pleading requirements that apply
in this case are Federal Rule of Civil Procedure 9(b) and the
PSLRA.  Each is briefly discussed below.

Rule 9(b) permits a plaintiff alleging fraud or mistake to
allege "[m]alice, intent, knowledge, and other conditions of a
person's mind . . . generally," but requires that the plaintiff
"state with particularity the circumstances constituting fraud
or mistake."  Intended to provide a defendant with fair notice
of a plaintiff's claims, Rule 9(b) requires that a plaintiff:
"(1) specify the statements that the plaintiff contends were
fraudulent, (2) identify the speaker, (3) state where and when
the statements were made, and (4) explain why the statements
were fraudulent." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493
F.3d 87, 99 (2d Cir. 2007) (citing Novak v. Kasaks, 216 F.3d
300, 306 (2d Cir. 2000)).  Though knowledge may be alleged
generally, Rule 9(b) requires a plaintiff to "plead the events

which they claim give rise to an inference of knowledge." <u>In re DDAVP Antitrust Litig.</u>, 585 F.3d at 695 (quotations omitted).

Under Section 101(b) of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b), a complaint alleging fraud under the '34 Act which is brought as a class action must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed" and "state with particularity facts giving rise to a strong inference that the defendant acted with" scienter. 15 U.S.C. § 78u-4(b)(1)-(2).  The Second Circuit has recognized that the PSLRA "establishes a more stringent rule for inferences involving scienter because [it] requires particular allegations giving rise to a <u>strong</u> inference of scienter." <u>ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.</u>, 553 F.3d 187, 196 (2d Cir. 2009) (emphasis added) (quotations omitted).

**B.  Defendants' Motion to Dismiss Lead Plaintiffs' Section 10(b) of the '34 Act and Rule 10b-5 Claims**

To state a claim under Section 10(b) of the '34 Act and Rule 10b-5 for fraudulent misrepresentation, a plaintiff must allege that a defendant "(1) made misstatements or omissions of

material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." Lentell v. Merrill Lynch & Co. Inc., 396 F.3d 161, 172 (2d Cir. 2005) (quotations omitted). Failure to plead any of these required elements with the requisite level of specificity necessitates dismissal of the claim under Rule 12(b)(6).

Additionally, in order to plead proximate causation, a plaintiff must plead both "transaction" and "loss" causation. Lentell, 396 F.3d at 172. Due to the "fraud-on-the-market" presumption of transaction causation in securities fraud cases where the securities at issue were sold on an "impersonal, efficient market," see Basic v. Levinson, 485 U.S. 224, 248 (1988), transaction causation is not in dispute in this case. However, to plead loss causation, one must sufficiently plead the existence of a "causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff," Lentell, 396 F.3d at 172 (quoting Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 197 (2d Cir. 2003)), which is satisfied only where a plaintiff demonstrates that "the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a

disappointed investor," <u>Lentell</u>, 396 F.3d at 173 (emphasis in
original).

### 1.    Material Misrepresentations

The allegations of material misrepresentations or omissions
in the Amended Complaint fall into two categories.  One category
of allegations involves Manulife's public statements about its
actions to reduce risk posed by its Guaranteed Product
obligations. (<u>See</u> Am. Compl. ¶¶ 6, 7, 43-44, 46, 48, 50-51, 53,
55, 58, 62-65, 91-92).  The other category consists of
statements relating to the adequacy of Manulife's capital
reserves backing its Guaranteed Product obligations. (<u>See</u> Am.
Compl. ¶¶ 6, 8, 53, 58, 68, 70, 74, 77-78, 81, 85-87).  The
Court discusses each category below, in turn.

### a.    Statements Regarding Manulife's Risk Management Strategies

Lead Plaintiffs claim that Manulife and the Individual
Defendants made materially false and misleading statements about
the risk management strategies employed by Manulife in the 2007
Annual Report, and the May, August, and November 2008 Press
Releases, and during the May 2008 Shareholders' Meeting, and the
May, August, and November 2008 Analyst Calls.  As discussed
above, the statements allegedly misrepresenting Manulife's risk
management strategies discussed various details of Manulife's
risk profile, including Manulife's common investment platform

and the long-term duration of Guaranteed Product obligations, as
well as its risk philosophy, corporate-governance structure,
risk reporting mechanisms, and ability of its various business
segments to generate revenue.  Lead Plaintiffs argue that
Manulife deceived investors because, despite its public
statements to the contrary, Manulife employed inadequate and
ineffective risk management policies, (see, e.g., Am. Compl.
¶¶ 45), and thus misled its investors about the risks facing
Manulife as a company.  Lead Plaintiffs accuse Manulife of
retaining "substantially all of the risk associated with" its
Guaranteed Products, (see, e.g., Am. Compl. ¶ 59), failing to
include "the highly plausible contingency of equity market
declines greater than 10%" in its stress tests, (see, e.g., Am.
Compl. ¶ 47), and making unreasonably optimistic statements,
such as that it expected "to do well no [matter] what and how
turbulent the financial markets may get," (Am. Compl. ¶¶ 61).

     The alleged misstatements here are not actionable because
they allege only "fraud-by-hindsight."  It is well-established
in the Second Circuit that a plaintiff alleging securities fraud
may not substantiate a claim by pleading "fraud by hindsight."
Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., Inc., 32
F.3d 697, 703 (2d Cir. 1994) (quotation omitted); see also In re
Citigroup Inc. Secs. Litig., 753 F. Supp. 2d 206, 246 (S.D.N.Y.
2010) (claim failed where plaintiffs relied on subsequent

writedowns to argue that prior disclosures were misleading).   In this case, Lead Plaintiffs' allegations that Manulife misled the public about the effectiveness of its risk management policies and the risk of a greater than 10% decline in equity prices fail to include any explanation about why these statements were misleading when made.   The fact that some concerns about Manulife's disclosure of its equity market exposure were raised in newspaper articles does not make up for this deficiency.

To substantiate its assertions about the inadequacy of Manulife's risk management and reported stress tests, Lead Plaintiffs rely solely on the fact that equity markets declined during the Class Period, causing Manulife to set aside additional capital to support its Guaranteed Products obligations.   However, Lead Plaintiffs point to no facts suggesting that Manulife misrepresented its risk management practices or that it was negligent in reporting only a 10% drop in equity prices in publicly available stress tests.   The allegations that Manulife misrepresented its hedging program take statements out of context by ignoring various other statements about limitations on Manulife's hedging program. With regard to the stress test statements, Lead Plaintiffs have failed to show that Manulife was under any obligation to report additional information; the fact that a greater than 10% drop

eventually materialized cannot retroactively make the Defendants' statements misleading or deceptive.

Lead Plaintiffs' allegation that Manulife deceived investors by concealing its exposure to equity markets is contradicted by documents referenced in the Amended Complaint. Section 101(b) of the PSLRA requires that plaintiffs explain "the reason or reasons why [a] statement is misleading," 15 U.S.C. § 78u-4(b)(1), and therefore a failure to explain why potential disclosures were inadequate constitutes a failure to satisfy the particularity requirements of the PSLRA. Manulife and the Individual Defendants point to a number of disclosures of equity market risk that the Amended Complaint fails to address; Manulife disclosed limitations of its hedging operations and the potential exposure resulting from its Guaranteed Product obligations during the Class Period. (See, e.g., Dfs.' Decl. Supp., Ex. 3, at 10). Lead Plaintiffs' argument that the Company made a "risky wager that markets would continue to rise in the future," (Pl.'s Mem. Opp. Mot. Dismiss, at 13), does not alter the fact that this risk was disclosed to the public. Lead Plaintiffs attempt to bolster their argument by claiming that Manulife disclosed only the risk of a "non-linear" impact on capital reserves and not the possibility of an "exponential" impact on earnings, but this argument fails because Lead Plaintiffs' claim that the investors would not have

-32-

understood the relationship between capital reserves and earnings is not substantiated by factual allegations; it is simply asserted in a conclusory fashion.  Therefore, reading the allegedly fraudulent materials as a whole, it is clear that Lead Plaintiffs have failed to explain why Manulife's disclosures of its equity market exposure were inadequate.

Lead Plaintiffs also claim that Manulife and the Individual Defendants made impermissible forward-looking statements about Manulife's ability to withstand the looming financial crisis. While a securities fraud claim cannot generally be based on vague statements of corporate optimism, see Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004) (a company is "not required to take a gloomy, fearful or defeatist view of the future"), a forward-looking statement that is made recklessly or with knowledge that it is false is actionable, In re Alliance Pharm. Corp. Secs. Litig., 279 F. Supp. 2d 171, 192 (S.D.N.Y. 2003).

Among these allegedly fraudulent forward-looking statements is D'Alessandro's discussion of Manulife's future prospects at the May 2008 Shareholders Meeting.  On that occasion, D'Alessandro stated that Manulife's "diverse asset portfolio and very, very stable funding base and strong liquidity position" would permit Manulife "to do well no matter what and how turbulent the financial markets may get."  Lead Plaintiffs assert in a conclusory fashion that this statement was false and

misleading, but fail to address the fact that when D'Alessandro made this statement, he was discussing Manulife's entire business and not merely its Guaranteed Products lines of business.  When considered as a whole, Manulife did "weather the storm," despite substantial losses resulting from capital charges related to its Guaranteed Products obligations.  It is true that Manulife sustained losses in certain quarters during the Class Period, but it is uncontroverted that despite declines in equity markets, Manulife maintained positive net shareholder income annually in 2008 and 2009. See Manulife Financial Corp., Report of Foreign Issuer (Form 6-K), Ex. 99.1 (Mar. 26, 2010), available at http://www.sec.gov/Archives/edgar/data/1086888/-000119312510068392/0001193125-10-068392-index.htm.  Lead Plaintiffs have not shown that D'Alessandro's forward-looking statements about Manulife's ability to continue to be profitable were in fact false, and have failed to show that they were made with the intent to deceive investors.  The fact that, as explained above, Manulife's equity market exposure was revealed to the public at all times during the Class Period lends further support to this conclusion.

> b.  **Statements Regarding the Adequacy of Manulife's Regulatory Capital**

Lead Plaintiffs allege that Manulife and the Individual Defendants made a number of material misstatements and omissions

about the adequacy of Manulife's capital during the Class
Period, specifically in its 2007 Annual Report, in the 2008
Press Release, the October 2008 Press Release and Analyst Call,
and the November 2008 Press Release and Analyst Call.  These
allegations again fall into two categories:  statements about
the long-term adequacy of Manulife's regulatory capital and
statements about actions Manulife might take to raise capital if
doing so became necessary.

Lead Plaintiffs allege that Manulife and the Individual
Defendants made numerous misrepresentations about the adequacy
of its capital during the Class Period.  However, Lead
Plaintiffs do not allege that any defendants falsified capital
adequacy statistics released to the public.  Rather, Lead
Plaintiffs claim that Class Period statements to the effect that
Manulife was "well capitalized" misled investors about the risk
posed by Manulife's Guaranteed Products to Manulife's overall
capital levels.  As discussed above, Manulife clearly disclosed
the risks of an equity market downturn to its investors.  Lead
Plaintiffs' fail to exclude the most reasonable interpretation
of Manulife's capital adequacy statements:  that Manulife
believed its regulatory capital to be adequate given the range
of probable equity market declines and the long duration of its
Guaranteed Product obligations.  Given that Manulife explained
its reasoning along with its opinions about capital adequacy,

Plaintiffs have failed to show that these opinion statements were false or misleading when read in context.  Therefore, Lead Plaintiffs have not shown that Manulife's statements about its capital adequacy are actionable misstatements under the federal securities laws.

Lead Plaintiffs' allegations that Manulife misrepresented its intent to raise additional capital through the dilutive issuance of common stock raise issues of whether these allegations satisfy the PSLRA.  In arguing that Manulife and the Individual Defendants made misstatements about the Company's intent to raise capital by issuing equity, Lead Plaintiffs misconstrue statements in the October 2008 Press Release and Analyst Call and in the November 2008 Press Release and Analyst Call.  The defendants' statements in October and November 2008 were not--as the Lead Plaintiffs contend--"unequivocal" assurances that Manulife would not raise capital through a dilutive equity offering.  These statements merely indicated that Manulife and the Individual Defendants did not believe that a dilutive equity offering would be the best option for raising capital at that point in time.  Subsequently, circumstances changed and Manulife raised capital through a C$3 billion loan and a C$2.125 billion equity offering, but these later developments do not suggest fraud, particularly given the extreme volatility in equity markets at the time.

Furthermore, the ongoing discussions between Manulife and the OFSI regarding changes in OFSI's regulatory capital requirement reinforce the Defendants' argument that their statements suggesting additional capital would not be required, or that it could be raised without resorting to a dilutive equity offering, were made in good faith and therefore were non-actionable forward-looking statements.

**2. Scienter**

As discussed above, a number of the alleged misstatements and omissions do not qualify as well-pleaded "misstatements" under the PSLRA.  A number of others are non-actionable forward-looking statements as pleaded because Lead Plaintiffs have failed to show that they were made with an actual intent to deceive.  For these statements, Lead Plaintiffs have failed adequately to plead that the "material misstatement" and scienter elements of a securities fraud claim have been satisfied.  However, even assuming that the Amended Complaint sufficiently alleges that the Defendants made misstatements during the Class Period, dismissal of Lead Plaintiffs' claims would still be warranted because Lead Plaintiffs have failed adequately to plead scienter.

Under the heightened pleading requirements of the PSLRA and Rule 9(b), a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with

-37-

the required state of mind." 15 U.S.C. § 78u-4(b)(3)(A).  This

may be accomplished "by alleging facts (1) showing that the

defendants had both motive and opportunity to commit the fraud

or (2) constituting strong circumstantial evidence of conscious

misbehavior or recklessness." ATSI Commc'ns, 493 F.3d at 99.

Lead Plaintiffs do not claim that Manulife or the

Individual Defendants possessed a motive to commit fraud, and

instead argue that the Amended Complaint alleges circumstances

strongly suggesting conscious misbehavior or recklessness.

Manulife and the Individual Defendants contend that the Amended

Complaint does not raise an inference of scienter that is as

plausible as competing, non-fraudulent inferences.  While a

plaintiff in a securities fraud suit need not prove his case to

survive a motion to dismiss, a plaintiff must at least "raise a

reasonable and strong inference of scienter." In re EVCI

Colleges Holding Corp. Secs. Litig., 469 F. Supp. 2d 88, 99

(S.D.N.Y. 2006).  In making this determination, the Court must

consider the allegations in the Amended Complaint as a whole.

Lead Plaintiffs argue that, the massive losses sustained by the

Guaranteed Products lines of business, the Individual

Defendants' admitted role in Manulife's risk management

apparatus, and their involvement in the production of various

press releases and analyst conference calls strongly suggest

that they were aware of risks posed by declining equity markets,

but ignored and disregarded those risks.  Lead Plaintiffs also argue that Rubenovitch's resignation and the announcement of an investigation into Manulife's Class Period disclosures by the OSC in June 2009 strengthen the inference of scienter.

Lead Plaintiffs' allegations do not give rise to a strong inference of scienter unless all competing inferences are ignored; these allegations fail to raise an inference at least as compelling as more plausible, non-fraud inferences.  Lead Plaintiffs have failed to show that either Manulife or the Individual Defendants intended to deceive the public by taking on exposure to the equity markets; it is more plausible in light of all the allegations that the Defendants believed the Guaranteed Products would be profitable over the long term and that in the short term, Manulife's other revenue streams and accumulated capital would keep the Company afloat.  The resignation of Rubenovitch in June 2009 is not alleged to have been a result of his misconduct.  Lead Plaintiffs make much of the timing of the resignation, but in the absence of a specific allegation that the resignation resulted from Rubenovitch's wrongdoing, the Court cannot say that the resignation raises any inference of scienter.  The only allegation raising an inference of scienter, the OSC investigation that was announced in June 2009, does not itself constitute a strong inference of scienter and does not sufficiently strengthen the other allegations.

Securities regulators are obligated to examine the behavior of
public corporations, and the fact that a regulator is fulfilling
this role cannot be sufficient to allege scienter.  The Court
notes that the OSC has now completed its investigation and
informed Manulife that it will take no further action. See
Manulife Financial Corp., April Press Release (Form 6-K), Ex.
99.1 (April 21, 2011), available at http://www.sec.gov/Archives-
/edgar/data/1086888/000108688811000022/exhibit99-1.htm.

      With respect to the December 2, 2008 announcement that
Manulife would issue common stock to raise capital, Lead
Plaintiffs' argue that the proximity in time between Defendants'
denials and the share issuance provides strong circumstantial
evidence of conscious misbehavior and recklessness.  However,
this argument takes no account of the massive economic and
political changes taking place during the Class Period,
particularly in the fall of 2008.  The Amended Complaint does
not raise the requisite strong inference of scienter to support
a securities fraud claim.

**3.  Loss Causation**

      Manulife and the Individual Defendants argue that the
Amended Complaint fails adequately to plead loss causation.  In
Lentell, the Second Circuit contrasted the element of loss
causation in a claim under § 10(b) of the '34 Act and Rule 10b-5
to the proximate causation element of tort law, and stated that

loss causation is established where an investment loss is within
the "zone of risk" concealed by a misstatement or material
omission. 396 F.3d at 173.  Even when the "zone of risk"
requirement is satisfied, however, a plaintiff must specifically
allege:  (1) "facts sufficient to support an inference that it
was defendant's fraud--rather than other salient factors--that
proximately caused plaintiff's loss;" or (2) "facts sufficient
to apportion the losses" between the misrepresentation and other
salient factors. Id. at 177.  Lead Plaintiffs' theory of loss
causation is that public misstatements or material omissions of
information artificially inflated the price of Manulife common
stock, so that when the deceptive scheme was revealed and the
price declined, members of the Class sustained economic injury.
(Am. Compl. ¶ 140).  Lead Plaintiffs allege that the decline in
price of Manulife common stock that took place over the Class
Period was due solely to the revelation of a fraudulent scheme
on the part of Manulife and the Individual Defendants, and do
not apportion this decline between the alleged scheme and any
other salient factors, such as changed market conditions. (Am.
Compl. ¶ 148).

The first deficiency in Lead Plaintiffs' pleading of loss
causation is their failure to explain the decline in price of
Manulife common stock from US$40.11 on April 3, 2008 to US$23.34
at the close of trading on October 10, 2008.  Though Lead

Plaintiffs allege loss causation on a theory of artificial inflation followed by corrective disclosure, no corrective disclosure is pleaded to explain the decline between April and early October, which constitutes approximately one quarter of the US$32.21 decline in the price of Manulife common stock over the Class Period.  Indeed, Lead Plaintiffs take the position that public statements made in the May 2008 Shareholders' Meeting, Press Release, and Analyst Call, as well as the August 2008 Press Release and Analyst Call "maintained the artificial inflation in Manulife's common stock price." (Am. Compl. ¶ 141). In light of Lead Plaintiffs' failure to point to any corrective disclosure prior to October 10, 2008 and their affirmative statement that Class Period statements preceding October 10, 2008 maintained the artificial inflation, Lead Plaintiffs have failed plausibly to allege that the declines in the price of Manulife common stock prior to October 10, 2008 resulted from Manulife's or the Individual Defendants' fraudulent acts.

Lead Plaintiffs next allege that statements made in the October 2008 Press Release and during the October 2008 Analyst Call artificially inflated Manulife's common stock price to US$26.31 at the close of trading on October 14, 2008.  According to the Amended Complaint, the next event that caused a decline in the price of Manulife common stock took place on December 1, when unspecified rumors about Manulife's need to raise

additional capital were allegedly leaked to the market, and the
share price declined from an opening price of US$17.50 to a
closing price of US$16.39.  However, Lead Plaintiffs make no
attempt to show that any corrective disclosures caused the drop
between the October 14 closing price and the December 1 opening
price.  Furthermore, the bare allegation that rumors were
circulating in the market is not a "well-pleaded" factual
allegation.  While a complaint that provides a defendant with
notice of the claims against the defendant is not necessarily
sufficient to withstand a motion to dismiss, Iqbal, 129 S. Ct.
at 1949, an allegation so general that it fails even to provide
fair notice to a defendant fails to satisfy even the liberal
requirements of Federal Rule of Civil Procedure 8(a), see Van
Alstyne v. Ackerley Group, Inc., 8 Fed App'x 147, 154 (2d Cir.
2001) ("The function of the pleadings is to give opposing
parties notice of the facts on which the pleader will rely
. . . .");  see also Stratte-McClure v. Stanley, No. 06 Civ. 09
Civ. 2017 (DAB), 2011 WL 1362100, *14 (S.D.N.Y. Apr. 4, 2011).
Here, the rumor claim is so general that it fails to provide the
Defendants with proper notice of what rumors Lead Plaintiffs are
referring to.  Such a general claim cannot support an allegation
of loss causation.

Lead Plaintiffs argue that Manulife's December 2, 2008
announcement that it would raise capital through an offering of

C$2.125 billion in common stock was a "corrective disclosure" that caused the price of Manulife common stock to decline from US$16.39 to US$15.96 per share on December 2, and then to decline further to US$15.34 per share by December 4.  As stated above, a loss causation allegation must support an inference that a defendant's fraud proximately caused the loss.  <u>Lentell</u>, 396 F.3d at 177.  Manulife and the Individual Defendants argue that Lead Plaintiffs' loss causation allegation is deficient because it fails to explain a December 5, 2008 rebound in the price of Manulife common stock back up to a closing price of US$16.36--just three cents lower than the closing price preceding the December 2 announcement.  While such a "rebound" in a stock price after an alleged corrective disclosure does not make the allegation implausible per se, the Lead Plaintiffs' failure to address or explain this rebound renders their loss causation allegation implausible in this case.

Lead Plaintiffs allege that additional corrective disclosures were made:  on February 12, 2009, when Manulife announced that its losses for the fourth quarter of 2008 would be C$370 million higher than forecast on December 2, 2008 and that it would need to increase capital reserves by approximately C$2.7 billion; on February 27, 2009, when Fitch Ratings downgraded Manulife's ratings; and on March 2, 2009, when Rubenovitch discussed the impact of Manulife's Guaranteed

Products on the Company's earnings for 2008.  However, in order
to qualify as a "corrective disclosure" for loss causation
purposes, an alleged disclosure must "reveal the falsity of an
alleged misstatement." In re Omnicom Group, Inc. Secs. Litig.,
541 F. Supp. 2d 546, 552 (S.D.N.Y.).  Manulife's downgrade by
Fitch Ratings does not qualify as such a corrective disclosure
because the Amended Complaint does not allege that any new
material information was revealed by the downgrade.
Additionally, the disclosures on February 27 and March 2, 2009
do not reveal any new information that relates to the alleged
fraud.  If there was any fraud about Manulife's equity market
exposure or its intention to raise capital by issuing dilutive
equity, the fact of this fraud would have been revealed on
December 2, 2008; the Lead Plaintiffs make no credible
allegation that the price of Manulife common stock was
artificially inflated beyond December 2.  There are also a
number of unexplained gaps in the price decline of Manulife
common stock between December 2, 2008 and March 3, 2009 that the
Amended Complaint does not account for.

For all of the above reasons, Lead Plaintiffs' assertion
that the "timing and magnitude of the price decline in Manulife
common stock negates any inference that the loss suffered by
Plaintiffs and the other Class members was caused by [factors]
unrelated to the Defendants' fraudulent conduct," (Am. Compl.

-45-

¶ 148), is not supported by a careful analysis of the Amended Complaint.  Because the Amended Complaint fails to allege facts sufficient to attribute the Class members' economic loss to the disclosure of an alleged fraudulent scheme, Lead Plaintiffs have failed to show loss causation, and the claims against Manulife and the Individual Defendants under § 10(b) of the '34 Act and Rule 10b-5 must be dismissed.

**C.   Defendants' Motion to Dismiss Lead Plaintiffs' Section 20(a) of the '34 Act Claims**

Lead Plaintiffs claim that the Individual Defendants are liable both as primary violators of the federal securities laws, and as control persons liable due to their positions of authority within the Company.  A prima facie "control person" claim under § 20(a) of the '34 Act has two elements:  (1) a primary violation of the '34 Act by a person controlled by the targeted defendant; and (2) culpable participation by the targeted defendant in the controlled person's alleged fraud. Ganino v. Citizens Utilities Co., 228 F.3d 154, 170 (2d Cir. 2000) (quotations omitted).  The first element of a control person claim under the '34 Act is not satisfied because, as discussed above, the Amended Complaint fails to state a valid claim against Manulife.  Therefore, Lead Plaintiffs' claims under § 20(a) of the '34 Act must be dismissed.

**D.   Leave to Amend**

Under the Federal Rules of Civil Procedure, a district court must "freely give leave [to amend a pleading] when justice so requires." Fed. R. Civ. P. 15(a)(2).  While a district court may deny leave to amend "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party," Holmes v. Grubman, 568 F.3d 329, 334 (2d Cir. 2009), Manulife and the Individual Defendants allege no good reason warranting dismissal with prejudice.

### III.  Conclusion

As discussed above, Lead Plaintiffs have failed adequately to state its claims for securities fraud under § 10(b) of the '34 Act or Rule 10b-5 and its control-person claims under § 20(a) of the '34 Act.  Therefore, Manulife and the Individual Defendants' motion to dismiss the Amended Complaint is GRANTED.

Lead Plaintiffs are granted sixty (60) days from the entry of this Opinion and Order to file a second amended complaint. Manulife and the Individual Defendants shall answer or otherwise respond to this second amended complaint, if filed, within forty-five (45) days of service.

**SO ORDERED.**

Dated:    New York, New York
          May 23, 2011

                                    JOHN F. KEENAN
                              United States District Judge

-48-